1

## INTRODUCTION

This is a complaint for damages against David Letterman, Talk Show Host of the
<u>Late Show</u>, broadcast studio located at 51 West 52nd Street, New York, New York
at CBS Broadcast, Inc., Craig Kilborne, Talk Show Host of the <u>Late Late Show</u>,
broadcast from Los Angelos, California at CBS Broadcast, Inc. and CBS Broadcast,
Inc., 51 West 52nd Street, New York, New York.

The Plaintiff seeks damages for:

1.  Invasion of Privacy;

2.  Conspiracy to Invade Privacy;

3.  Theft of Plaintiff's Intellectual Property, causing loss of real estate
    income;

4.  Violation of FCC Regulations;

5.  Alienation of Affection;

6.  Defamation of Character of Plaintiff;

7.  Failure to discontinue illegal activities against Plaintiff after having
    been notified to do so;

8.  Intentional Infliction of Emotional Harm of Plaintiff;

9.  Harrassment of Plaintiff;

10. Interference of Quiet Enjoyment of Plaintiff;

11. Intellectual Theft of Plaintiff's Book, caused by Invasion of Plaintiff's
    Privacy

12. Violation of Consumer Protection Law

## PARTIES

1.   Plaintiff, Rosemary Gilroy ("Plaintiff") is an individual residing at 107
Ponemah Road, Unit #1, Amherst, New Hampshire 03031.

2.   Defendants are:

David Letterman, Talk Show Host of the Late Show, and has a place of business at CBS Broadcast, Inc. 51 West 52nd Street, New York, New York;

Craig Kilborne, Talk Show Host of the Late Late Show, and has a place of business at CBS Broadcast, Inc., 51 West 52nd Street, New York, New York and/or Los Angelos, California and

CBS Broadcast, Inc., which has a place of business at 51 West 52nd Street, New York, New York.

## JURISDICTION

3.      U.S. District Court, 55 Pleasant Street, Concord, New Hampshire 03301-3941 has jurisdiction over this matter.

This action involves claims connected with regard to illegal actions of Defendants against Plaintiff which have been perpetrated against Plaintiff in Plaintiff's homes, car and other places visited by Plaintiff, in addition to illegal activities against Plaintiff which have been broadcasted on television by Defendants.

## STATEMENT OF FACTS

4.      The Defendant, David Letterman, is the talk show host of the Late Show with David Letterman which is broadcast on Channel 4 television, CBS television, from 11:30 p.m. to 12:30 a.m. daily, except Saturday and Sunday nights, and is telecast from New York City.

5.      The Defendant, CBS Broadcast, Inc., owns and operates Channel 4 Television, and their main headquarters are located at 51 West 52nd Street, New York City, New York.

6.      The Plaintiff had resided alone in one unit of 150-152 Washington St., Newton, Massachusetts from 1987  until 1999,  Plaintiff's children having relocated out of state during June, 1987.

7.      The Plaintiff had resided with Plaintiff's children in one unit of 150-152 Washington St., Newton, Massachusetts from 1964 until 1987.

8.      The Plaintiff had resided temporarily in a rental apartment from June, 1999 until May, 2000 in New Hampshire.

9.      The Plaintiff has resided alone at 107 Ponemah Road, Amherst, New Hampshire from May 1, 2000 to the date of this filing.

10.      The Defendants caused immeasurable Damage to the Plaintiff and to

Plaintiff's life because Defendants were directly responsible for Invasion of Plaintiff's Privacy and Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years, and ongoing to date.

11.    The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants
maliciously, willfully, and deceptively committed numerous illegal actions against Plaintiff, including but not limitted to the following: Invasion of Plaintiff's Privacy, Conspiracy to Invade Plaintiff's Privacy, Theft of Plaintiff's Intellectual Property, Conspiracy to commit Theft of Plaintiff's Intellectual Property, Violation of FCC regulations, causing Allienation of Affection, Intentional Infliction of Emotional Harm to Plaintiff, Harassment of Plaintiff, Interference of Plaintiff's Quiet Enjoyment, Intellectual Theft of Plaintiff's Book, and Violation of Consumer Protection Law.

12.    The Defendants were responsible for and had involvement with business associates who perpetrated  Surveilance against Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance of Plaintiff and all of Plaintiff's activities having continued during innumerable years, and ongoing to date.

13.    The above Invasion of Plaintiff's Privacy led to millions of dollars of losses to Plaintiff and to Plaintiff's family members because the Invasion of Plaintiff's Privacy interferred with Plaintiff's business and personal activities, and interferred with Plaintiff's ability to concentrate sufficiently on important business matters in Plaintiff's home and /or home office and/or home painting studio.

14.    The Defendants and Defendants co-conspirators committed willful, malicious and deceptive illegal activities against Plaintiff which interferred with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

15.    All of the references herein to Statements made by Media personalities place all of the individuals referred to in the position of acting as co-conspirators; namely David Letterman, Craig Kilborne, Howard Stern, Charles Laquidara, and Mark Parento, among others.

16.    The quotations of statements made by the Defendants and other Media personalities demonstrate the Defendants' Invasion of Privacy of Plaintiff, the Defendants' Interference in all of Plaintiff's Activities and Life and Defendants' Defamation of Character of Plaintiff, among all other illegal activities referred to in paragraph 1 of Count I, during innumerable years, and ongoing to date.

4

17.    Numerous Threats had been made against Plaintiff's Life and against Plaintiff's Financial Status by Defendants and / or individuals known to Defendants and/or individuals with whom Defendants had been involved.

18.    Defendants were involved with individuals and/or business associates who perpetrated Theft of Plaintiff's Intellectual Property from Plaintiff's home of innumerable valuable possessions of Plaintiff, including but not limited to, Plaintiff's typed Business Plans, Plaintiff's Profit and Loss Statements, plus all detailed financial information for numerous properties which Plaintiff attempted to purchase which led to loss of potential Real Estate Income due to Intellectual Theft of Plaintiff's plans.

19.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal or implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

20.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

21.    The intention of Defendants and business associates with whom the Defendants have been involved in a Conspiracy in illegal actions against Plaintiff had been to maliciously and willfully draw attention to the Plaintiff, to wilfully and maliciously identify the Plaintiff to the television audience, to humiliate Plaintiff, to victimize Plaintiff, to destroy Plaintiff's life, to keep Plaintiff perpetually poor in order that Plaintiff would not be well able to defend herself, and to keep Plaintiff perpetually enslaved in order to financially benefit from Plaintiff's enslavement.

22.    In regard to the above, Charles Laquidara, disc jockey of WBCN and WZLX radio had stated in regard to the Plaintiff "They have been trying for 20 years to get you and they finally did.  And I am so glad."

23.    The above statement clearly demonstrates the validity of Plaintiff's claims against the Defendants named herein.

24.    The above statement clearly identifies Defendants intentions in regard to Invasion of Plaintiff's Privacy and all of the above references to Plaintiff that had been made in various segments of the Media.

25.    All of the above illegal actions by Defendants against Plaintiff have cost innumerable millions of dollars of Financial Losses to Plaintiff and to Plaintiff's Family Members.

26.    All of the above illegal actions by Defendants cost immeasurable amounts of Personal Losses to the Plaintiff during each and every year during the past twenty

to thirty-five years, the above ongoing to this date.

27.    The Defendants Interferred with Plaintiff in Plaintiff's attempts to carry out Plaintiff's plans in regard to the following, among other plans of Plaintiff:

A.    Plaintiff's attempted purchase of commercial real estate and plans to earn a substantial profit
as a result of said purchases, thereby causing Plaintiff losses of millions of dollars of potential income.

B.    Damaging Plaintiff's professional career as a professional fine arts painter, thereby causing
Plaintiff losses of millions of dollars of potential income.

C.    Plaintiff's attempts to buy and sell stock in the Stock Market, thereby causing Plaintiff and
Plaintiff's family members millions of dollars of potential income.

28.    Plaintiff's plans, due to the Interference by Defendants, instead led to great financial losses to Plaintiff of nearly all available cash on hand, the loss of $175,000 of Plaintiff's $200,000 cash on hand.

29.    Interference by Defendants led to great financial losses to Plaintiff's son of two-thirds of his cash on hand, the loss of $2,000,000 of his $3,000,000 cash on hand plus a second event of $600,000 in losses of remaining cash on hand.

30.    The fact is that both Plaintiff's son and Plaintiff are far too intelligent for the above financial losses to have occurred, and could only have occurred because Plaintiff's Privacy had been invaded upon, and because Defendants had thereby violated several Constitutional and State Laws in their perpetration of illegal activities against Plaintiff.

31.    The following Threats have been made against Plaintiff, in addition to others not herein referred to:

A.    Charles Laquidara had stated during 1999 "Join us or you are going down."
B.    Craig Kilborne had stated during 2003 "meet grandma in the parking lot ... with a lead pipe...".
C.    Disc jockey, Carter Allen, WBCN, had stated on the radio during 1998 to 1999 "There is so
much stuff going on that you would not believe me if I told you."
D.    Mark Parento had stated during 1999 on the WBCN radio program of which he was the disc
jockey "It's a Twenty Year Tragedy.'

32.    Defendants had been able to perpetrate the illegal activities against Plaintiff because Plaintiff was a single woman and lived alone, thereupon causing Plaintiff to be a readily available Victim.

33.    Plaintiff hereby stipulates that no Private Citizen of the United States needs to live this way.

34.    The Defendants caused Plaintiff to suffer absolute and total futility and waste of one Human Life with the ensuing Horror to Plaintiff of being forced to live such a life due to the constant Invasion of Plaintiff's Privacy during innumerable years and ongoing to date.

35.    During approximately 1987 Plaintiff had sent a Telegram to Charles Laquidara and WBCN Radio, requesting that he discontinue interferring in Plaintiff's Life and advising him that if he did not cease so doing, that Plaintiff named herein would bring a lawsuit against him and WBCN Radio.

## CAUSES OF ACTION

## COUNT I

## INVASION OF PRIVACY

109.   Plaintiff realleges paragraphs  1   through          108 above and incorporates them by reference as if stated herein.

110.   Defendant, CBS Broadcast, Inc. has an obligation to  General Public to operate in compliance with all applicable laws and regulations of FCC , the United States Consitution, the State of New York Laws,  and State of New Hampshire Statutes Annotated.

111.   The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

112.   The Defendants committed willful, malicious and deceptive illegal activities which interfered with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

113.   The Defendants Interferred in Plaintiff's Constitutional Right to Privacy in that Defendants, directly or indirectly, invaded Plaintiff's Privacy, and were involved in a conspiracy to illegally commit Surveilance of Plaintiff in Plaintiff's home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance, having continued during innumerable years.

114.   The herein described Financial and Personal Losses of Plaintiff have been due to the Defendants' willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to,   Invasion the Privacy of the Plaintiff, Infringements of Plaintiff's Rights, Intentional Infliction of Emotional Harm  and Harassment of the Plaintiff, in addition to the Involvement of Defendants in a Conspiracty to Invade the Privacy of the Plaintiff.

115.   The Defendants' illegal activities  were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

116. All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

117. The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

118. The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

119. Defendants were involved with individuals and/or business associates who perpetrated Theft to Plaintiff's home of innumerable valuable possessions of Plaintiff, including but not limited to, Plaintiff's typed Business Plans, Plaintiff's Profit and Loss Statements, plus all detailed financial information for numerous properties which Plaintiff attempted to purchase.

120. The entire intention of said Media Personalities and of other Media Personalities with whom the Defendants were involved had been to draw attention to the Plaintiff, to identify the Plaintiff to the Media Audience with the Defendants' willful, malicious intention of destroying Plaintiff's life, of humiliating Plaintiff, of scandalizing Plaintiff, keeping Plaintiff perpetually poor in order that Plaintiff would not be able to defend herself, and of keeping Plaintiff perpetually enslaved in order to financially benefit from said enslavement.

121. All of the above illegal actions by Defendants cost immeasurable amounts of Financial and Personal Losses to the Plaintiff during each and every year during the past twenty to thirty years, the above ongoing to this date.

122. The Defendants Invaded Plaintiff's Privacy in regard to Plaintiff's following attempts :

   A.  Plaintiff's attempted purchase of commercial real estate.
   B.  Plaintiff's plans to earn a substantial profit as a result of said purchases.
   C.  Damaging Plaintiff's professional career as a professional fine arts painter.
   D.  Plaintiff's potential earning a substantial income in the potential sale of Plaintiff's paintings.
   E.  Plaintiff's ability to continue to paint in Plaintiff's home which was also Plaintiff's art studio.
   F.  Plaintiff's attempts to buy and sell stock in the Stock Market, thereby earning a potential
        substantial income in so doing.

123.    Defendants Invasion of Privacy of Plaintiff led to great financial losses to Plaintiff of nearly all available cash on hand, loss of $175,000 of Plaintiff's $200,000 cash on hand.

124.    Defendants Invasion of Plaintiff's Privacy led to great financial losses to Plaintiff's son of two-thirds of his cash on hand, loss of $2,000,000 of Plaintiff's son's $3,000,000 cash on hand.

125.    Defendants Invasion of Plaintiff's Privacy led to a second event of greater financial losses to Plaintiff's son of his cash on hand, additional loss of $600,000 of remaining $1,000,000, for a balance of only $400,000 of Plaintiff's son's original $3,000,000 cash on hand.

126.    All of the references herein to quotations made by Media personalities place all of the individuals referred to in the position of acting as co-conspirators. namely David Letterman, Craig Kilborne, Howard Stern, Charles Laquidara, and Mark Parento, among others.

127.    The quotations of statements made by the Defendants and other Media personalities demonstrate the Defendants' Invasion of Privacy of Plaintiff, the Defendants' Interference in all of Plaintiff's Activities and Life and Defendants' Defamation of Character of Plaintiff, among all other illegal activities referred to herein during innumerable years, and ongoing to date.

128.    Numerous threats had been made by Defendants against Plaintiff's life, Plaintiff's childrens' lives and against Plaintiff's financial status.

129.    Defendant, Host of Late Night Television, Craig Kilborne, made threats against Plaintiff's life during the year 2003 in televised broadcasts on Channel 4 television before hundreds of thousands of members of the viewing audience, the intention of said Talk Show Host being to intimidate Plaintiff from filing this lawsuit against Defendants.

130.    The following incident involving Television Talk Show Host, Howard Stern, clearly demonstrates that the talk show hosts, David Letterman and Craig Kilborne, had involvement with business associates or other Media Personalities in a Conspiracy to Invade the Plaintiff's Privacy, all without Plaintiff's consent, written or verbal.

131.    If the quotations of televised statements made by the Defendants are considered in conjunction with those of other Media Personalities, it is easily proven that the Defendants have been directly liable for all Losses sufferred by Plaintiff as a direct result of the Defendants' Invasion of Privacy of Plaintiff.

132.    During the year 1999, Plaintiff had fallen asleep while watching television,

and Plaintiff had awoken while <u>Howard Stern Show</u> was being televised, and Plaintiff had inadvertently passed gas immediately upon waking up.

133.    Immediately, Howard Stern turned to his co-host and asked  "Did you just pass gas?", the co-host having responded "No.  I do not do such uncouth things."

134.    Howard Stern said "IT MUST BE THE MONITOR.  IS THE MONITOR TURNED ON?", turning to look at the Studio Monitor or a Monitor located in the Studio, towards the front of the stage at left side.

135.    Plaintiff, shocked by the above, realized 100% for the first time that Plaintiff's home had been under Surveilance by Howard Stern, that the audio-video camera hidden in Plaintiff's home led directly to a Monitor in the television studio, located at the Howard Stern Show stage and studio.

136.    Plaintiff had immediately become shocked and aware that the incident of Plaintiff having passed gas, in addition to audio-video of Plaintiff sleeping on the sofa and of the interior of Plaintiff's home,  went directly to a Monitor which was turned on at the television station which televised the Howard Stern Show and had been being done during televised times.

137.    Plaintiff knew damages and thefts were occurring in her home, had been unable to stop said occurrences, yet could not conceive how References had been being made to her Life by various Media personalities, presuming these were occurring from outside of her home, somehow.

138.    There is a vast difference between Breaking and Enterring and between a Citizen of the United States being under 24 hour Surveilance in her home, without Plaintiff's permission or consent, and without that Citizen's exact, explicit knowledge.

139.    Plaintiff, thereafter, became unable to feel secure in her own home in which she had resided during some 35 years, in regard to Invasion of Plaintiff's Privacy, in addition to repetitious burgularies in Plaintiff's home.

140.    The knowledge of Invasion of Plaintiff's Privacy was extremely damaging to Plaintiff emotionally and psychologically, Plaintiff, thereafter, unable to concentrate on Plaintiff's work and management of Plaintiff's real estate ventures sufficiently.

141.    Unable to live in Plaintiff's home of some 35 years due to the Invasion of Plaintiff's Privacy, Plaintiff had been forced to sell Plaintiff's home and to move to New Hampshire, at great loss of income to Plaintiff, since the property had doubled in value within a few years time, and to have cost Plaintiff loss of Plaintiff's personal relationships, including Plaintiff's mother.

142.   The monitor incident had become so detrimental to Plaintiff that the only solution Plaintiff could find in order to continue to reside in Plaintiff's home was to apply all of Plaintiff's concentration to pretending that there had no surveilance ongoing.

143.   If Plaintiff had not done the above, every day of Plaintiff's life would have been wasted, unable to work on anything at all otherwise.

144.   Thereupon, Plaintiff discovered that Plaintiff's memory was becoming damaged.

145.   Thereupon, Plaintiff discovered that Plaintiff still could not perform well under those conditions, working at perhaps one-half of Plaintiff's ability.

146.   Upon Plaintiff having been forced to sell Plaintiff's home, and upon having moved to New Hampshire, Plaintiff found within a few weeks that Plaintiff's Privacy continued to be Invaded.

147.   In regard to the above Invasion of Plaintiff's Privacy, among other illegal activities perpetrated against Plaintiff, Charles Laquidara had stated "They have been trying for 20 years to get you and they finally did.  And I am so glad" during the late 1990's.

148.   The above statement clearly demonstrates the validity of Plaintiff's claims against the Defendants and the  Defendants intentions in regard to Invasion of Plaintiff's Privacy, in addition to all other illegal activities of Defendants, all of which had caused and continues to cause immeasurable harm,  suffering, and irreversible damage to Plaintiff.

149.   To substantiate the above referred to Monitor / Howard Stern incident, during 1999, Charles Laquidara had said "Is the drip on?", undeniably also referring to Surveilance of Plaintiff's home.

150.   To substantiate the above referred to Monitor / Howard Stern incident, during 2003, David Letterman had stated during the David Letterman Show "You don't know it, but you are on CNN."

151.   Immediately after the Howard Stern / Monitor incident, Plaintiff immediately contacted an attorney to represent Plaintiff who, among all other attornies whom Plaintiff had contacted,  refused to do so.

152.   Typically, immediately after Plaintiff had met with and consulted the above referred to attorney, the <u>Howard Stern Show</u> had been suddenly removed from that particular television station and program for no reason that Plaintiff could comprehend other than the fact that Plaintiff had sought out an attorney to

represent Plaintiff against the Media.

153.   In a similar situation years earlier, when Plaintiff had been hospitalized due to Chest Pains and Emergency Room Doctor believing Plaintiff had sufferred a heart attack (Saturday), Charles Laquedeiros had removed from WBCN radio (Monday).

154.   After meeting with the attorney, Plaintiff attempted to "hide" the computer discs and documentation which Plaintiff had received back from the above attorney under a carpet.

155.   The next day, after the Plaintiff had gone out of and returned to her home, Plaintiff found that everything which she had attempted to hide under the dining room carpet had been Stolen from Plaintiff Home.

156.   David Letterman made the following statements on television on the Late Show on the dates listed below which refer to Plaintiff , which include but are not limited to all  such Statements.

157.   The Statements made by David Letterman clearly demonstrate the Defendants' Invasion of Plaintiff's Privacy and Involvement in a Conspiracy to Invade the Privacy of Plaintiff, in addition to Harassment of Plaintiff, and Interference of Plaintiff's Quiet Enjoyment, among all other illegal activities perpetrated against Plaintiff by Defendants.

158.   During January, 2001, David Letterman had stated during the David Letterman Show  "How would you like to spend the Weekend watching 'Ma.'" Therefore, if this remark is taken into consideration with all the other activities described herein that have been perpetuated against Plaintiff, the conclusion that Defendants are and were "watching" Plaintiff in her home, that is, having had Plaintiff under Surveilance in her home, is easily arrived at.

159.   On January 2, 2003  the David Letterman Show re-ran an earlier showing that was aired during Thanksgiving week of the year 2003, statements about "eating turkey" also having been made.

160.    Early in the program David Letterman  stated "lunatic, idiot, imbecile", totally out of context to other remarks during the program, and having been undoubtedly directed against Plaintiff.

161.   Plaintiff had been on a cruise with family members during the Thanksgiving week, the above statements "lunatic, idiot, imbecile" and "how could you do anything so stupid?" having undoubtedly referred to incidents that had occurred during the cruise.

162.   During early March, 2004 during the televised <u>David Letterman Show</u>, David Letterman repeatedly stated to his bandleader "Don't bother me," the repeated statement having been totally out of character for David Letterman, and occasionally added "I am running behind."

163.   During early March, 2004 Plaintiff had been very upset because the rehabilitation project that Plaintiff had been attempting to complete had been running far behind, and Plaintiff would repeatedly state to herself in the "Privacy" of Plaintiff's home "Don't bother me," in pretense to have been speaking to the handimen.

164.   Plaintiff herein accuses David Letterman of repeatedly stating "Don't bother me" during early March, 2004 because David Letterman was bringing to Plaintiff's attention the fact that Plaintiff was still under Surveilance and that Plaintiff's Privacy continued to be Invaded upon.

165.   Because Plaintiff had again begun in earnest to prepare herein referred to Lawsuit, David Letterman's referencing statements in regard to Plaintiff had become far more guarded and subtle.

166.   On the Sunday before February 23, 2002 Plaintiff's lower front tooth had fallen out for no apparent reason.

167.   On February 23, 2002 David Letterman repeatedly made jokes for a solid 10-15 minutes at the opening of the "<u>David Letterman Show</u>" about Dentures and performed a skit on February 23, 2002 in which David Letterman, in imitation of a dentist, acted as if he were pulling out teeth of his bandleader, Paul Schaefer, although David Letterman had not performed such skits about Dentists in the past numerous years.

168.   On February 23, 2002 David Letterman  said the following:  "They say that she is easily manipulated and will do anything you tell her to do."

169.   On February 23, 2002 David Letterman made the statement  "Why can't I find a woman like that."

170.   On February 23, 2002 David Letterman made several Jokes about "Fireplaces", totally out of context with the remainder of the program, and, at the same time, the Home of the Plaintiff contains had 8 Fireplaces because it is a 200 year old Antique Home.

171.   "Fireplaces" is only one miniscule example in the some tens of thousands of insults and incidents of Invasion of Privacy, of Interference with Quiet Enjoyment, and of all other Counts of this Lawsuit to which Plaintiff had been constantly and continuously subjected to by the Defendant and by associates of Defendants.

172.    On March 2, 2001 Plaintiff had typed a letter to Plaintiff's son about unusual, disturbing Dreams that Plaintiff had had and which were very personal in nature, something Plaintiff had never done before.

173.    On March 2, 2001 at 11:30 p.m. David Letterman repeatedly said the word "Dreams" on television and "Dreams" is not a word that Plaintiff had ever heard David Letterman remark on television.

174.    Any reasonable person would conclude that when David Letterman had repeatedly stated the word "Dreams", doing so for no apparent reason, doing so at the beginning of the program, and out of context to the remainder of the program that David Letterman had witnessed Plaintiff typing the above letter to Plaintiff's son which referred to Plaintiff's "Dreams."

175.    On March 2, 2003 David Letterman stated "all the friends that you think that you have are all in your mind'", said statement totally out of context with any other occurences during the televised Late Show of David Letterman.

176.    On March 2, 2003 David Letterman continued and remarked that someone who "came to his office was a Mafia Guy" and that "this 'Mafia Guy'" was "shaking him down", Plaintiff interprets above statement about "Mafia Guy" was an indirect threat against Plaintiff.

177.    During the summer of the year 2002 Plaintiff and an employee had been digging out weeds in the yard of Plaintiff's Home, exhausting work in 95 degree weather.

178.    On the evening after the above occasion, David Letterman's band leader had mocked the Plaintiff unmercifuly as he sang a song, a hit during former years, with excessively emotional lyrics and exagerated gestures "I love you" and "I lo-ov-ov- ove You."

179.    The above had later additionally occurred on several subsequent and similar occasions throughout the summer and fall of the year 2002 whenever Plaintiff had performed labor to Plaintiff's lawn or landscaping, and has been repeated during 2004.

180.    Photographs, which Plaintiff had taken of "Details" of her paintings for future reference as a learning tool, had been stolen from Plaintiff's Home.

181.    Plaintiff soon after saw that the above photographs of "Details" of Plaintiff's paintings had been affixed to Wine Bottles, said Wine having been advertised in television commercials, presumably for the purpose of selling the Wine to the general public on the David Letterman Show, David Letterman displaying the wine

bottles on his desk.

182.    Plaintiff accessed the David Letterman web site which contained one area which was entitled "Stupid Mamma" Jokes, above web site refers to Plaintiff and causes Defamation of Plaintiff's Character.

183.    During the year 2002 David Letterman stated "She's very intelligent" out of context to the televised program.

183.    During the year 2001 David Letterman stated "She lives like a Hermit."

184.    During January, 2001 David Letterman stated "How would you like to spend the Weekend watching 'Ma'" which was said in sarcasm.

185.    Plaintiff hereby states that Defendants had made innumerable Statements in which Plaintiff had been referred to as "Ma" during recent years.

186.    David Letterman making the above statement about "watching Ma", any reasonable person would conclude that David Letterman had admitted he had been "watching" Plaintiff, and in so doing, had Invaded Plaintiff's Privacy and committed Surveilance of Plaintiff.

187.    David Letterman had stated on the David Letterman Show during the years 2002 and 2003 and former years "The Kids are allright".

188.    The above remark of "The Kids are allright" David Letterman stated that he approved of the illegal activities of other individuals in their perpetration of causing damage against the Plaintiff, whether in the form of illegal entry into Plaintiff's home, theft of Contents of Plaintiff's home, theft of Plaintiff's Painting typewritten instructions, damage to Plaintiff's painting materials, damage done to Plaintiff's residential and commercial premises, Invasion of Plaintiff's Privacy, and any and all illegal activities perpetuated against Plaintiff.

189.    During 2003 David Letterman had stated "You don't know it, but you are on CNN."

190.    Craig Kilborne stated on October 25, 2003 at about 1:00 a.m. on the Craig Kilborne Show and towards the beginning of the nightly program on television Channel 4  "...(we) will call Grandma on the telephone and ask her to meet us at the parking lot for a "Settlement. ..."  "... Instead,..." (we)"... will bring a (lead) Pipe..."

191.    For the fact that while Craig Kilborne stated the above, Craig Kilborne thrust his arms outward and about in slashing motions, such as if a person were attacking another person with a weapon in hand,  Craig Kilborne having stated

16

further "I am in a really good mood."

192.    During the daytime of October 24, 2003, Plaintiff had begun to work on this lawsuit at Plaintiff's Computer, had printed contents of her Computer Disc, with the obvious intention of Plaintiff completing and filing the Lawsuit soon thereafter.

193.    Any reasonable person would conclude that the above statements made by Craig Kilborne constitute a threat against the life of the Plaintiff and said statements had been made to intimidate Plaintiff from filing the Lawsuit, in addition to other similar situations made against Plaintiff.

194.    On December 2, 1998 on television Channel 4, while Plaintiff resided in Massachusetts, Craig Kilbourne had stated "Give it Away for Free" while Plaintiff had been typing the "Book" in Plaintiff son's room, Plaintiff had presumed that Plaintiff could work in areas of Plaintiff's home free from Invasion of Privacy.

195.    On May 9, 2002 at 2:00 a.m. Craig Kilborne had made the televised statement "Get up off your asses."

196.    On May 9, 2002 Plaintiff had met with a Senior Partner in a large law firm in Nashua, New Hampshire in order to request that he represent Plaintiff in a case against Charles Laquidara and herein named Defendants, and as Plaintiff had expected, the attorney refused to represent Plaintiff in the lawsuit.

197.    Any reasonable person would conclude that the above remark made by Craig Kilborne had been intended to provide instruction to associates with whom Defendants had been involved, undoubtedly advising them to remove any evidence of surveillance equipment.

198.    During May, 2003 Plaintiff had purchased a calendar in a show that sold shrubbery that was heinously insulting to Plaintiff, demonstrating "Jackasses" on every monthly photograph; the cancelled Checks confirm the date.

199.    On Thursday or Friday before the Memorial Day holiday weekend, 2003, Plaintiff searched the Internet for information about the a heinously insulting Calendar and for information about the company that created and distributed the Calendar, named "Surrounded by Asses" and "Ass Good Ass it Gets," after the movie "As Good as it Gets." Photographs appeared in the Calendar of a home which looked identical to that owned by the Plaintiff, among numerous other similarities, too many to be coincidental. Plaintiff wrote to the company that "...I will sue ...".

200.    On July 24, 1996 Plaintiff's computer Discs which discs were the partial contents of Plaintiff's "Book", had been Stolen from Plaintiff's home.

201.    In addition to Defendants named herein admission of being guilty of, of being responsible for Surveilance of Plaintiff, and  Defendants' involvement in a Conspiracy with Business Associates who Invaded of Plaintiff's Privacy and commit Surveilance of Plaintiff, and were encouraged and undoubtedly paid, directly or indirectly, by Defendants to do so, Plaintiff herein refers to Statements made by other Media Personalities and / or Talk Show Hosts to substantiate Plaintiff's claims against the Defendants.

202.    To demonstrate other media personalities added surveilance of Plaintiff in Plaintiff's home, on December 2, 1998 Plaintiff's left eye had been tired due to doing a lot of typing of "Book" and that, due to the eye fatigue,  Plaintiff eye developed a temporary nervous twitch in Plaintiff's left eye.

203.    On that very evening a singer appeared on television who  exaggeratedly imitated Plaintiff by repeatedly winking  his left eye.

204.    Plaintiff had sent a telegram to Charles Laquidara while he had been employed at WBCN radio as a disc jockey during the 1987, in order to be asured that he would receive the Plaintiff's message to him.

205.    Plaintiff had advised Charles Laquidara in the telegram to discontinue interferring in Plaintiff's life and that, if he failed to discontinue interferring in Plaintiff's life, Plaintiff intended to bring a lawsuit against him and against WBCN.

206.    Charles Laquidara refused to honor Plaintiff's request that he stop interferring in Plaintiff's life, having  responded to his receipt of the above telegram (1987) by making the statement on WBCN radio the the day after receipt of the telegram "Sue me?  I'll sue you."

207.    Charles Laquidara responded to his receipt of the above telegram during 1987 by making the statement on WBCN radio  "What about all of the other (Radio) stations?"

208.    Within a few months of the Plaintiff having sent the above referred to telegram to Charles Laquidara, and having received the above response, Plaintiff had been pushed into a Nervous Breakdown, for which Defendants and Charles Laquidara, disc jockey of WBCN radio at the time, are responsible, either directly or indirectly.

209.    Charles Laquidara made thousands upon thousands of statements on the air which pointed directly to the Plaintiff and which demonstrated that he had personal knowledge of all occurences in Plaintiff's life.

210.    Plaintiff had notified Defendants on several occasions to discontinue Invading Plaintiff's Privacy, discontinue Interferring in Plaintiff's life, discontinue

Surveilance of Plaintiff, in addition to discontinue all other illegal activities stated herein.

211.   During February, 2003 Plaintiff had mailed a letter to David Letterman to advise him to discontinue Invading Plaintiff's Privacy, Interferring in Plaintiff's life, in addition to all other illegal activities stated herein.

212.   On February 10, 2003 Plaintiff had begun to prepare this lawsuit.

213.   On February 10, 2003 David Letterman had stated on the David Letterman Show "Our lawyers are tough lawyers, undeniably as a threat against Plaintiff to discontinue Plaintiff's attempted lawsuit.

214.   "Ten Things you should know" was a repeated daily theme of the Charles Laquidara radio programs during all of the 1990's and early 2000, undeniably the quotations of which had been pointing to Plaintiff.

215.   At the same time "Ten Things" was a repeated daily theme of the David Letterman Show programs during all of the 1990's and throughout 2000, 2001, 2002, and 2003, undeniably the quotations of which had been pointing to Plaintiff just as had those statements made by  Charles Laquidara.

216.   Plaintiff had spent some five hundred dollars in changing all locks to her home to supposed-burgular proof new locks, Plaintiff had installed a burgular detecting device in Plaintiff's home, Plaintiff had nailed every window, some 20 windows, in her home shut, a very dangerous condition for Plaintiff to be living under, in order to be asured that break-ins to Plaintiff's home would be discontinued.

217.   In spite of Plaintiff's efforts, the break-ins and thefts to Plaintiff's home and Invasion of Plaintiff's Privacy did not discontinue.

218.   Plaintiff had contacted the Federal Bureau of Investigation (F.B.I.) in Washington, D.C. to request assistance in regard to Invasion of Plaintiff's Privacy in Plaintiff's home, but had been advised that the F.B.I. did not have the resources to assist private individuals in regard to Invasion of Privacy in their homes.

219.   Plaintiff sought every other means available to Plaintiff in Plaintiff's attempts to guard Plaintiff's Privacy from being Invaded upon.

220.   Only individuals of substantial means would have been able to have unlawfully enterred the Plaintiff's premises after all of the great lengths to which Plaintiff had gone to in order to preserve Plaintiff's Privacy from being Invaded.

221..   Carter Allen, Disc Jockey, WBCN Radio had  stated during 1998 to 1999 on

the WBCN radio program on which he was the disc jockey "There is so much stuff going on that you would not believe me if I told you."

222.    On July 17, 2002 a San Francisco based source of Talk Show Host's Television made the statement the "Golden Goose", a statement and description undoubtedly of Plaintiff.

223.    Any reasonable person can easily conclude that "Duck" is very closely related to "Goose" and that the talk show host had been referring to Plaintiff in his reference to "Golden Goose".

224.    Any reasonable person can easily conclude that the above reference to "Golden Goose" was due to all Commercial Buildings above which Plaintiff had attempted to purchase and which were instead purchased by other Individuals.

225.    Any reasonable person can easily conclude that the above reference to "Golden Goose" was due to all other articles of Value, all business papers, all Profit and Loss Statements, all Plaintiff's typewritten Fine Arts notes that had been stolen from Plaintiff's home.

226.    During the year 2002, as Plaintiff watched CNN Television and Stock Market Analysts' program, the Panel Discussion Group's Leader stated "It's the Formula, Stupid."

227.    This statement, considered in conjunction with all of Plaintiff's quotations of Defendants named herein, among other Media Personalities, causes it to be obvious to the Court that the Defendants named herein are guilty of Invasion of Privacy of Plaintiff and thereby, also responsible for all Losses suffered by Plaintiff as a direct result of such damages caused to Plaintiff.

228.    For the fact that Bill Gates home is Invasion Proof and that his commercial success is due in part to his Privacy which is jealously guarded.

229.    Plaintiff never had the financial means to cause her home to become Invasion Proof.

230.    For the fact that no private Citizen of the United States should be required to spend innumerable thousands of dollars in their attempts to guard their homes from Invasion of Privacy.

231.    Plaintiff is a private Citizen, and not a giant Corporation, thereby causing Plaintiff to be and to have been unable to have protected Plaintiff's home, among other areas, from Invasion of Privacy of Plaintiff by Defendants.

232.    Plaintiff hereby stipulates that if the Defendants, David Letterman, Craig

Kilborne and Channel Four Television, had not Invaded Plaintiff's Privacy and had not committed all violations and illegal activities against Plaintiff as herein stated, and had not committed the breaches against Plaintiff during numerous years, attacks against Plaintiff by the Third parties or individuals would never had occurred.

233.    Although the Third Parties had performed illegal activities against Plaintiff, said attackers had been influenced by Defendants' Invasion of Plaintiff's Privacy, Harassment of Plaintiff, Defamation of Character of Plaintiff and all other Counts herein stated, and that said Third Parties who attacked Plaintiff had also been in the employ of Defendants, either directly or indirectly, undeniably received benefits from Defendants to perpetrate such activities against Plaintiff in one form or another.

234.    All of the third parties' illegal activities and attacks that had been perpetrated against Plaintiff were directly caused by the Defendants' Invasion of Plaintiff's Privacy, Harassment of Plaintiff, Interference of Plaintiff's Quiet Enjoyment, Defamation of Character of Plaintiff, Intentional Infliction of Emotional Harm, and all other illegal activities as herein stated.

235.    Plaintiff hereby states that Plaintiff had completed the Summons and Complaint, filed on disc, stored disc in Plaintiff's floor safe on April 11, 2004, to spend Easter with Plaintiff's family members, to have returned to have found that the computer disk had been stolen from Plaintiff's floor safe, thereby causing Plaintiff once again, to not be able to file Summons and Complaint, Plaintiff needing to again re-write Summons and Complaint.

236.    Plaintiff hereby states that the above Theft of Plaintiff's Summons and Complaint have been repeated on numerous occasions during the past two years, causing Plaintiff to not be able to file the Summons and Complaint against Defendants, and causing Plaintiff's case to be jeopardized due to Statute of Limitations.

237.    Plaintiff hereby states that any relevant Statute of Limitations must be extended in regard to Plaintiff's Summons and Complaint against Defendants because of the above severe extenuating circumstances.

238.    Plaintiff hereby states that the above Theft constitutes Obstruction of Justice of Defendants against Plaintiff, in addition to all other illegal activities which have been perpetrated against Plaintiff.

239.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, Consumer Protection Law, as applicable.

## COUNT II

### DEFENDANTS INVOLVEMENT IN
### CONSPIRACY TO INVADE PLAINTIFF'S PRIVACY

240.   Plaintiff realleges paragraphs 1   through 239 above and incorporates them by reference as if stated herein.

241.   Defendants have obligation to operate in compliance with all applicable laws and regulations of FCC , the United States Consitution, State of New York Laws, and State of New Hampshire Statutes Annotated, among all other State Laws.

242.   The Defendants  willfully, maliciously and deceptively have been involved in a Conspiracy to Invade the Privacy of Plaintiff, thereby interferring with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff's Unalienable Rights as a United States Citizen, said illegal activities ongoing to date.

243.   The Defendants caused immeasurable Financial Losses and Personal Damage to the Plaintiff in the form of immeasurable harm, suffering and irreversible damage to Plaintiff's life and to Plaintiff's family because Defendants have been involved with business associates in a Conspiracy to Invade Plaintiff's Privacy and to conduct Surveillance of Plaintiff, said illegal activities having continued during innumerable years, and ongoing to date.

244.   The Defendants' Involvement in a Conspiracy to Invade Plaintiff's Privacy in order to vicimize Plaintiff have caused and continues to cause immeasurable harm, suffering, and irreversible damage to Plaintiff.

245.   All of the references herein to quotations made by Media personalities place all of the individuals referred to in the position of being involved in a Conspiracy to Invade Plaintiff's Privacy. namely David Letterman, Craig Kilborne, Howard Stern, Charles Laquidara, and Mark Parento, among others.

246.   All herein described Losses of Plaintiff have been due to the willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to,  Invasion the Privacy of the Plaintiff, Involvement in a Conspiracy to Invade Plaintiff's Privacy,  Infringements of Plaintiff's Rights, Intentional Infliction of Emotional Harm and Harassment of the Plaintiff among other illegal activities.

247.   The Defendants have been involved in a Conspiracy to perpetrate Surveilance of Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance having continued during innumerable years and ongoing to date.

248.    The Defendants' involvement in a Conspiracy to Invade Plaintiff's Privacy
and to conduct Surveillance of Plaintiff had been perpetrated against Plaintiff in
order to bring Financial Benefits to Defendants.

249.    The Defendants' involvement in a Conspiracy to Invade Plaintiff's Privacy
and to conduct Surveillance of Plaintiff were committed against the Plaintiff during
numerous years without Plaintiff's consent or permission, neither written, verbal
nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge
for numerous years.

250.    Defendants' involvement in a Conspiracy to Invade Plaintiff's Privacy and to
conduct Surveillance of Plaintiff is illegal because Plaintiff is and was a private
Individual and not a Public figure.

251.    The Defendants' Defendants' involvement in a Conspiracy to Invade
Plaintiff's Privacy and to conduct Surveilance of Plaintiff have cost innumeralbe
millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and
to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable Personal
Losses to the Plaintiff, and were particularly costly during the years 1998, 1999,
2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

252.    Defendants' involvement in a Conspiracy to Invade Plaintiff's Privacy and to
conduct Surveillance of Plaintiff
included Theft of Intellectual Property from Plaintiff's home of innumerable
valuable possessions of Plaintiff, including but not limited to, Plaintiff's typed
Business Plans, Profit and Loss Statements, addresses of valuable commercial
properties that Plaintiff intended to buy and were "For Sale", plus all detailed
financial information for numerous properties which Plaintiff had attempted to
purchase.

253.    The malicious, willful, deceptive intention of said Media Personalities and of
other Media Personalities with whom the Defendants had been involved in a
Conspiracy to Invade Plaintiff's Privacy and to conduct Surveillance of Plaintiff had
been to draw attention to the Plaintiff, to identify the Plaintiff to the Media
Audience, to humiliate Plaintiff, to ridicule Plaintiff, and to cause Plaintiff to be
viewed with Contempt by viewing and listening audiences of radio and television.

254.    Defendants have been involved in a Conspiracy to Invade Plaintiff's Privacy
with the express intention of  victimizing Plaintiff and of destroying Plaintiff's life in
order to keep Plaintiff perpetually poor, thereby Plaintiff would have not been able
to defend herself against the Defendants.

255.    Defendants have been involved in a Conspiracy to Invade Plaintiff's Privacy
with the express intention of  victimizing Plaintiff and of destroying Plaintiff's life in

order to keeping  Plaintiff perpetually enslaved in order for Defendants to
financially benefit from said enslavement.

256.    In regard to the above, Charles Laquidara had stated "They have been
trying for 20 years to get you and they finally did.  And I am so glad."

257.    The above statement clearly demonstrates the validity of Plaintiff's claims
against the Defendants and identifies Defendants' intentions in regard to Defendants
having been involved in a Conspiracy to Invade Plaintiff's Privacy.

258.    Defendants have had Involvement in a Conspiracy to Invade Plaintiff's
Privacy and to commit Surveilance of Plaintiff in Plaintiff's home, in addition to all
enviroments which Plaintiff visited, all without Plaintiff's permission

260.    Defendants have had Involvement in a Conspiracy to Invade Plaintiff's
Privacy and to commit Surveilance of Plaintiff in Plaintiff's home, in addition to all
enviroments which Plaintiff visited, all without Plaintiff's permission, thereby
having caused Interference to Plaintiff in Plaintiff's attempts to carry out Plaintiff's
plans in regard to the following:

  A.    Plaintiff's attempted purchase of commercial real estate.
  B.    Plaintiff's plans to earn a substantial profit as a result of said purchases.
damaging
  C.    Plaintiff's professional career as a professional fine arts painter.
  D.    Plaintiff's potential earning a substantial income in the potential sale of
Plaintiff's paintings.
  E.    Plaintiff's ability to continue to paint in Plaintiff's home which was also
Plaintiff's art studio.
  F.    Plaintiff's attempts to buy and sell stock in the Stock Market, thereby
earning a potential
        substantial income in so doing,  instead of leading Plaintiff to suffer the
financial loss of
        nearly all available cash on hand (loss of $175,000 of $200,000 cash on
hand).

261.    Invasion of Plaintiff's Privacy, among all other illegal activities, by Third
Parties led to great financial losses to Plaintiff's son of two-thirds of his cash on
hand (loss of $2,000,000 of his $3,000,000 cash on hand).

262.    Invasion of Plaintiff's Privacy, among all other illegal activities, by Third
Parties  led to a second event of greater financial losses to Plaintiff's son of his cash
on hand (loss of $600,000 of remaining $1,000,000, for a balance of only $400,000 of
Plaintiff's son's original $3,000,000 cash on hand).

263.    On one occasion during 1998-1999 Plaintiff had paid a Down Payment of

24

Twenty-Thousand ($20,000) Dollars towards the potential purchase of a Medical Building in Norwood, Massachusetts.

264.    When Plaintiff needed to notify the real estate broker in writing, the neighbor of Plaintiff began to harass Plaintiff by covering neighbor's front lawn with items that referred to media's illegal involvement in Plaintiff's life, the items having mocked the Plaintiff and having cast dispersions on the Plaintiff.

265.    Plaintiff became very upset to see the display next to Plaintiff's home, failed to notify the real estate broker in time of Plaintiff's refusal to purchase said commercial property, thereby causing Plaintiff to lose Plaintiff's Down Payment of Twenty Thousand ($20,000) Dollars.

266.    The above is typical of the sick individuals that have harassed Plaintiff during innumerable years, Defendants and Defendants' co-conspirators being directly responsible for such damage to Plaintiff, the neighbor certainly would not have interferred in Plaintiff's life if media personalities had not been also encouraged the neighbor and not been interferring in Plaintiff's life.

267.    The quotations of statements made by the Defendants and other Media personalities demonstrate the Defendants' Invasion of Privacy of Plaintiff, the Defendants' Interference in all of Plaintiff's Activities and Life and Defendants' Defamation of Character of Plaintiff, among all other illegal activities referred to in paragraph 1 of Count I, during innumerable years, and ongoing to date.

268.    For the fact that numerous Threats had been made by Defendants against Plaintiff's Life and against Plaintiff's Financial Status.

269.    If the quotations of televised statements made by the Defendants are considered in conjunction with those of other Media Personalities, it is easily demonstrated that the Defendants have been directly liable for all Losses sufferred by Plaintiff as a direct result of the Defendants' Invasion of Privacy of Plaintiff.

270.    The following incident involving Television Talk Show Host, Howard Stern, clearly demonstrates that the Defendants had involvement with business associates and other Media Personalities in a Conspiracy to Invade the Plaintiff's Privacy, all without Plaintiff's consent, written or verbal.

271.    During the year 1999, Plaintiff had fallen asleep while watching television, and Plaintiff had awoken while <u>Howard Stern Show</u> was being televised, and Plaintiff had inadvertently passed gas immediately upon waking up.

273.    Immediately, Howard Stern turned to his co-host and asked "Did you just pass gas?", the co-host having responded "No. I do not do such uncouth things."

274.    Howard Stern said "IT MUST BE THE MONITOR.  IS THE MONITOR TURNED ON?", turning to look at the Studio Monitor or a Monitor located in the Studio, towards the front of the stage at left side.

275.    Plaintiff, shocked by the above, realized 100% for the first time that Plaintiff's home had been under Surveilance by Howard Stern, that the audio-video camera hidden in Plaintiff's home led directly to a Monitor in the television studio, located at the Howard Stern Show stage and studio.

276.    Plaintiff had immediately become shocked and aware that the incident of Plaintiff having passed gas, in addition to audio-video of Plaintiff sleeping on the sofa and of the interior of Plaintiff's home,  went directly to a Monitor which was turned on at the television station which televised the Howard Stern Show and had been being done during televised times.

277.    Plaintiff knew damages and thefts were occurring in her home, had been unable to stop said occurrences, yet could not conceive how References had been being made to her Life by various Media personalities, presuming these were occurring from outside of her home, somehow.

278.    There is a vast difference between Breaking and Enterring and between a Citizen of the United States being under 24 hour Surveilance in her home, without Plaintiff's permission or consent, and without that Citizen's exact, explicit knowledge.

279.    Plaintiff, thereafter, became unable to feel secure in her own home in which she had resided during some 35 years, in regard to Invasion of Plaintiff's Privacy, in addition to repetitious burgularies in Plaintiff's home.

280.    The knowledge of Invasion of Plaintiff's Privacy was extremely damaging to Plaintiff emotionally and psychologically, Plaintiff, thereafter, unable to concentrate on Plaintiff's work and management of Plaintiff's real estate ventures sufficiently and was extremely damaging to Plaintiff's Health, Plaintiff, thereafter, sufferring severe chest pains on numerous occasions among other health related symptoms.

281.    Upon learning of the above Surveilance of Plaintiff in Plaintiff's home, Plaintiff was forced to discontinue all attempts at Painting in Plaintiff's Painting Studio in Plaintiff's home, thereby unable to utilize the valuable method that Plaintiff had developed during the past several years, thereby causing Plaintiff to lose all the benefits of her research.

282.    The monitor incident had become so detrimental to Plaintiff that the only solution Plaintiff could find in order to continue to reside in Plaintiff's home was to apply all of Plaintiff's concentration to pretending that there had no surveilance ongoing.

283.    If Plaintiff had not done the above, every day of Plaintiff's life would have been wasted, unable to work on anything at all otherwise.

284.    Thereupon, Plaintiff discovered that Plaintiff's memory was becoming damaged.

285.    Thereupon, Plaintiff discovered that Plaintiff still could not perform well under those conditions, working at perhaps one-half of Plaintiff's ability.

286.    Unable to live in Plaintiff's home of some 35 years due to the Invasion of Plaintiff's Privacy, Plaintiff had been forced to sell Plaintiff's home and to move to New Hampshire, at great loss of income to Plaintiff, since the property had doubled in value within a few years time, and to have cost Plaintiff loss of Plaintiff's personal relationships, including Plaintiff's mother.

287.    Upon Plaintiff having been forced to sell Plaintiff's home, and upon having moved to New Hampshire, Plaintiff found within a few weeks that Plaintiff's Privacy continued to be Invaded.

288.    In regard to the above Invasion of Plaintiff's Privacy, among other illegal activities perpetrated against Plaintiff, Charles Laquidara had stated "They have been trying for 20 years to get you and they finally did. And I am so glad" during the late 1990's.

289.    The above statement clearly demonstrates the validity of Plaintiff's claims against the Defendants and the Defendants intentions in regard to Invasion of Plaintiff's Privacy, in addition to all other illegal activities of Defendants, all of which had caused and continues to cause immeasurable harm, suffering, and irreversible damage to Plaintiff.

290.    During 1999, Charles Laquidara had said "Is the drip on?", undeniably also referring to Surveilance of Plaintiff's home.

291.    During December, 2003, David Letterman had stated during the David Letterman Show "You don't know it, but you are on CNN."

292.    Undeniably, Plaintiff had been under Surveilance by several Media Personalities during innumerable years.

293.    Plaintiff immediately contacted an attorney to represent Plaintiff who, among all other attorneys whom Plaintiff had contacted, refused to do so.

294.    Typically, immediately after Plaintiff had met with and consulted the above referred to attorney, the <u>Howard Stern Show</u> had been suddenly removed from that

particular television station and program for no reason that Plaintiff could comprehend other than the fact that Plaintiff had sought out an attorney to represent Plaintiff against the Media.

295.    In a similar situation years earlier, when Plaintiff had been hospitalized due to Chest Pains and Emergency Room Doctor believing Plaintiff had sufferred a heart attack (Saturday), Charles Laquedeiros had removed from WBCN radio (Monday).

296.    Defendants have been Involved in Conspiracy to Invade Plaintiff's Privacy, Third Parties who attacked Plaintiff having been in the employ of Defendants, either directly or indirectly, or undeniably had received benefits from Defendants to perpetrate such activities against Plaintiff in one form or another, or had been influenced by Defendants to commit illegal activities against Plaintiff.

297.    Because Defendants have been  Involved in a Conspiracy to Invade Plaintiff's Privacy, all of the innumerable parties who attacked Plaintiff or incidents perpetrated against Plaintiff were directly caused by the Defendants' Invasion of Plaintiff's Privacy, Harassment of Plaintiff, Interferring with Plaintiff's Quiet Enjoyment,  Defamation of Character of Plaintiff, and all other Counts as herein stated.

298.    The following is a partial list of third parties who had been Involved with Defendants in a Conspiracy to Invade Plaintiff's Privacy, or perpetrate illegal activities against Plaintiff, and a partial list of some incidents that caused damage to Plaintiff,

   A.    All Comedians and Talk Show Hosts who appeared on Comedy Central Television, local
      cable Channel 107, who ridiculed Plaintiff or made any reference what-so-ever to Plaintiff
      and to Plaintiff's life or Plaintiff's work.
   B.    "Blue Man Group" Theatrical Production
   C.    Interference of Plaintiff's Business Activities in New Hampshire
   D.    Theft to Plaintiff's Homes in two States
   E.    Theft of Contents of Restaurant by former Tenant of Restaurant owned by Plaintiff in the
      amount of $221,000 worth of Contents
   F.    Thefts from Plaintiff's Home
   G.    Damage to Amherst, N.H. premises owned by Plaintiff
   H.    Damage to Boston, MA premises owned by Plaintiff: that is, Hyde Park, MA
   I.    Theft of Plaintiff's Instructions including Detailed Methods of Plaintiff's original, inventive
      approach to applying Acrylic Paint to canvas
   J.    Theft of Information in Plaintiff's Home which described in detail Plaintiff

plans to obtain

    Income from Purchase of a Commercial Property and for Several Commercial Properties

    for which Plaintiff had been negotiating for the purchase of.

  K.   Theft of the above Property Purchases before Plaintiff could purchase any

  L.   Interference with Plaintiff's potential Purchase of several Commercial Properties which

    would provide substantial Income to Plaintiff

  M.  Theft of Photographs from Plaintiff's Home of above referred to Commercial Property

  N.   Breaking and Enterring into Plaintiff's Home

  O.   Breaking and Enterring into Plaintiff's Commercial Properties

  P.   Driving Plaintiff into Nervous Breakdown during 1987 for which Plaintiff had been

    hospitalized

  Q.   Nearly again driving Plaintiff into Nervous Breakdown during Summer and Fall of 1994

    upon Plaintiff's viewing of Comedy Central on Television

  R.   Loss suffered by Plaintiff upon not being able to Paint in her Home in MA of Time,

    Income, Career, and Plaintiff's Personal Satisfaction and Enjoyment

  S.   Loss suffered by Plaintiff upon not being able to Paint in her Home in Amherst, New

    Hampshire of Time, Income, Career, and Plaintiff's Personal Satisfaction and Enjoyment


299.    Plaintiff had sent a telegram to Charles Laquidara while he had been employed at WBCN radio as a disc jockey during the 1987 at which time Plaintiff had advised Charles Laquidara to discontinue interferring in Plaintiff's life or that Plaintiff would bring a lawsuit against him.


300.    Charles Laquedeiros responded to his receipt of the above telegram (1987) by making the statement on WBCN radio the the day after receipt of the telegram "Sue me? I'll sue you."


301.    Charles Laquidara responded to his receipt of the above telegram during 1987 by making the statement on WBCN radio  "What about all of the other (Radio) stations?"


302.    Charles Laquidara stated repeatedly during 1999 and 2000 on WZLX radio, in addition to thousands upon thousands of statements made prior to 1999,   the following remarks which had obviously been pointed at the Plaintiff, and in addition to innumerable thousands of remarks during his some 20 years while employed at WBCN:

    A. "Let them prove it.", adding laughter after the statement, which demonstrated his contempt

        for the law.

    B. "We're not going to give you the money" during 1999.

    C. "Did you ever see anything so big" during 1999, when Plaintiff had bent over to pick up

        an object on the floor in Plaintiff's home.

    D. "Wakefield" Charles Laquidara had stated repeatedly, while Plaintiff had been viewing

        commercial property located in Wakefield, Massachusetts "For Sale" on Plaintiff's computer.

303.   Any and all herein quoted remarks by any Media Personality had been totally out of context with any other statements made during any radio or television broadcast.

304.   During Plaintiff's visit to MOMA, Plaintiff viewed a Video exhibit which contained the Video of ugly gnomish man painting who draged his paintings around his studio, which showed a distinguished appearing man sniffing the gnome's anal area, which showed the gnomish man urinating and defecating into a large, flowery, ceramic planter which looked exactly as that owned by the Plaintiff's daughter.

305.   While Plaintiff had been viewing the above video, a man watched her viewing the video, apparently saw the anger in Plaintiff's face due to her recognition of the intention of the video, and laughed non-stop while watching Plaintiff.

306.   The intent of the video and the video's relation to Plaintiff's life was to mock, ridicule and humiliate Plaintiff among Plaintiff's peers in the fine art world, among other parties known to Plaintiff.

307.   During three Months time of 1995, Plaintiff wrote the dates and times of day next to each and every statement Plaintiff heard on WZLX radio and /or other programs on Index Cards, thereby having accummulated several hundreds Index Cards.

308.   Immediately thereafter, all Index Cards had been stolen from Plaintiff's home.

309.   On one occasion during the same time frame as when Plaintiff wrote on the index cards referred to above, Plaintiff had found a footprint of a shoe on Plaintiff's countertop, the size of about a female shoe size 5, while Plaintiff lived alone and wore a much larger shoe size.

310.   Plaintiff immediately removed all contents of Plaintiff's kitchen cabinets,

examined the inside of cabinets and articles of cabinet to find if any surveillance devices had been hidden there.

311.    Charles Laquidara had stated repeatedly during 1999, 2000, 2001 and 2002 on the <u>WZLX</u> radio program of which he was the disc jockey and upon Plaintiff typing "Book" " Can't you take a Joke?" and "She can't take a Joke".

312.    "Ashley", in obvious reference to both the Plaintiff and to the movie "Gone with the Wind" during 1994 through 1999, and during subsequent years, on both <u>WBCN</u> and  <u>WZLX</u>  radio program of which he was the disc jockey.

313.    "Ten Things you should know" was a repeated daily theme of the Charles Laquidara radio programs during all of the 1990's and early 2000, undeniably the quotations of which had been pointing to Plaintiff.

314.    Upon Plaintiff's return to Boston, Massachusetts, on Monday morning Charles Laquidara stated on the radio "They've been trying to catch you for twenty years and they finally did. And I am so glad that they did," the above statement followed with his laughter of "Ha, Ha, Ha."

315.    Charles Laquidara stated repeatedly during 1999 and 2000 on <u>WZLX</u> radio, in addition to thousands upon thousands of statements made prior to 1999,   the following remarks which had obviously been pointed at the Plaintiff, and in addition to innumerable thousands of remarks during his some 20 years while employed at WBCN:

    A.    "It's Discrimination" repeatedly on the Radio and in particular during 1999.
    B.    "It's insidious" during 1999.
    C.    "You are going Down" during 1997 on <u>WBCN</u> radio program of which he was the disc
        jockey.
    D.    "It's Blackmail" during 1999, 2000 and 2001 on the <u>WZLX</u>  radio.
    E.    "We're trying to help you take out the Garbage" during 1999 on the <u>WZLX</u> radio.
    F.    "A garbage pail has two handles (names, ie)" during 1999 on <u>WZLX</u> Radio.
    G.    "They are either going to Make You or Break You", during 1999, 2000 and 2001.
    H.    "The first thing you need to do is to get rid of the Intruder" stated repeatedly during 1999
        on <u>WZLX</u> radio.
    I.    "It's not your sister that you should kill..."  during 1999 and 2001.
    J.    "Why are you doing that for if it makes you feel bad?"after Plaintiff had been typing
        Plaintiff's "Book" daily for two weeks time. immediately thereafter the computer disc, which

included some three hundred typewritten pages, had been Stolen from Plaintiff's Home.

**K.**    "Its an Italian thing" during 1999, 2000 and 2001.

**L.**    "Woody  repeatedly during 1994 through 1999, and during subsequent years, on both

<u>WBCN</u> and  <u>WZLX</u>  radio programs.

**M.**    "She is being the Detective" while Plaintiff had been driving in Cambridge, Massachusetts

repeatedly during 1994 through 1999 on both <u>WBCN</u> and  <u>WZLX</u>  radio program of which

he was the disc jockey.

**N.**    "She's going to die poor" during the first week in April, 2000 and immediately after Plaintiff

had lost Plaintiff's entire Savings in the Stock Market Crash, due to Defendants' Invasion

of Plaintiff's Privacy.

**O.**    Plaintiff had stated out loud in what Plaintiff had believed to have been the "privacy" of

Plaintiff's  Home  "I need help all right - from both the FBI and the CIA."

**P.**    Charles Laquidara had immediately stated "If you do, you will pay dearly" in obvious

reference to the Plaintiff on December 18, 1998 at 5:00 p.m. on the <u>WZLX</u> radio program

of which he was the disc jockey.

**Q.**    "It's a Conspiracy" during 1994 through 2001, repeatedly.

**R.**    "You are too conservative" during 1999.

**S.**    "We are trying to keep them apart" during 1999.

**T.**    "It's a Communist Conspiracy" during 1987.

**U.**    "You have a following" during May, 1997 on innumerable occasions.

**V.**    "The most hated woman in Rock 'n Roll" during 1999, in obvious reference to the Plaintiff.

**W.**    "Make them pay for it (ie, pay for what they have done against Plaintiff)," followed by his

laughing loudly, during 1998.

**X.**    "Pull the Plug" in obvious reference to the Plaintiff during June, 1987 on the <u>WBCN</u> radio

program of which he was the disc jockey, and during the 'Carlos Show' and immediately

before Plaintiff had been pushed into a Nervous Breakdown.

**Y.**    "I will Fire you if you wreck "her" painting materials" during 1994 throughout 1999, when

Plaintiff discovered that turpentine had been mixed into numerous pre-mixed quarts of

Plaintiff's Acrylic painting materials.

**Z.**    "I will Fire you if you wreck "her" painting materials" during 1994

throughout 1999, the
      implication was that "every other illegal activity is allowed" by Charles
Laquidara and by the
      radio station at which he had then been employed.
  AA.  numerous statements which referred to "Interns" of the radio station and to
"Students"
      during 1994 throughout 1999.
  BB.  "It's an Inside Joke" repeatedly and on innumerable occasions  during the
late 1990's and
      1999, 2000 and 2001 on <u>WZLX</u>  radio program.
  CC.  "Rob-a-Bank" during the late 1990's, 1999, 2000 and 2001 on the <u>WZLX</u>
radio program of
      which he was the disc jockey.
  DD.  "Join us or you will go down during 1998 through 1999 on the <u>WZLX</u>  radio
program.
  EE.  "We offerred to buy her house for $500,000, and to turn it into a Museum,
but she refused"
      during 1996-1997 on the WBCN radio program of which he was the disc
jockey, a false,
      libelous statement about Plaintiff.

316.   Charles Laquidara had  stated  in obvious reference to the Plaintiff during
1998 on the <u>WBCN</u>  radio program of which he was the disc jockey "It's insideous"
during 1998, 1999 and repeatedly during 2000, 2001, and 2002.

317.   Charles Laquidara had  referred to Plaintiff as  "The Snob Puppet", on
September 29, 2000 on <u>WZLX</u>  radio program of which he was the disc jockey, the
day after Plaintiff had attended an Auction of Antique furniture in New Hampshire.

318.   Plaintiff had been advised  by an attorney that Charles Laquadeiras had
"retired" after Stock Market Crash, and after all Financial Losses above to Plaintiff
and Plaintiff's family, and had been advised that he had moved to "Hawaii".

319.   The statement made by Charles Laquidara in which he stated  "We offerred
to buy her house for $500,000, and to turn it into a Museum, but she refused"
obviously demonstrated Defamation of Character of the Plaintiff.

320.   The above statement was a false statement, that no said offer had ever been
made to Plaintiff, but that Plaintiff certainly would have refused and would have
been heinously insulted if any such offer had been made to Plaintiff.

321.  Charles Laquidara had stated "You don't want to do that" and "Don't do
that if it makes you feel bad" during 1998 through 1999 on the <u>WZLX</u>  radio
program of which he was the disc jockey  while Plaintiff had been attempting to
type onto computer discs the innumerable hundreds of quotations which Plaintiff

had heard on various radio programs, and which Plaintiff had handwritten on
Index Cards.

322.    Plaintiff had been typing the above onto computer discs in order to bring
Lawsuit against Defendants, including various disc jockeys.

323.    Immediately, thereafter, all of Plaintiff's computer discs, onto which Plaintiff
had typed all extracted  notes from Index  Cards,  had been Stolen from Plaintiff's
Home.

324.    Plaintiff had had enormous amount of Equity in Plaintiff's two
Massachusetts properties due to some 35 years accummulated Equity, minimum
equity of at least One Million Dollars ($1,000,000) during 1994-1999 and again
during 1986-1987.

325.    Every attempt by Plaintiff to purchase commercial real estate properties had
been interferred with by Defendants and Third Parties who had been involved in
a Conspiracy to Invade Plaintiff's Privacy and to commit Intellectual Theft of
Plaintiff's Property, said commercial premises having  instead been sold to other
Buyers, regardless of the strength of Plaintiff's Financial Status, particularly during
the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003, although not limitted to
those years.

326.    Plaintiff more thoroughly describes Defendants illegal activities in regard to
Theft of Plaintiff's Intellectual Property in regard to Plaintiff's attempts to purchase
commercial property in Count III.

327.    All accusations by Plaintiff that are stated in "Count III, Theft of Plaintiff's
Intellectual Property" are referred to herein and are equally applicable to Count II:
Defendants Involvement in a Conspiracy to Invade Plaintiff's Privacy, and are
herein included and referred to.

328.    Charles Laquidara had  stated "Rehab sucks"  in obvious reference to the
Plaintiff during 1999 on the WZLX radio program of which he was the disc jockey,
the statement had been made immediately after  Plaintiff had found and visited a
valuable property in Dover, New Hampshire of 150,000 square feet, completely
rehabilitated in the amount of $1,000,000 in rehabilitation, two buildings having
been "For Sale" for only $675,000 each.

329.    Immediately after Plaintiff had visited the above Property in Dover, New
Hampshire, Charles Laquidara was not on the air for a few days, that statements
had been made by members of the radio staff that "Charles Laquidara had gone to
Maine on Vacation," that Charles Laquederas had been exceptionally happy and
laughing during the time frame while Plaintiff had been investigating the Dover
Property

330.   Charles Laquidara had stated in obvious reference to the Plaintiff "She's crazy" in regard to Plaintiff and the Dover, N.H. property, on WZLX, had personally conduct an Auction of his personal residence in the approximate amount of some $700,000, undeniably in order to obtain quick cash, undeniably his intentions had been to purchase the Dover, N.H. property, thereby causing Theft of Plaintiff's Intellectual Property, additionally caused by his Invasion of Plaintiff's Privacy.

331.   Plaintiff herein acuses Defendants of being involved in a Conspiracy with Charles Laquidara, among other media personalities, in order to willfully and maliciously destroy Plaintiff's life for the benefit of herein named Defendants and/or for Third Parties' financial benefit.

332.   Plaintiff herein acuses all herein named Defendants of willfully and maliciously destroying Plaintiff's life in order to provide assistance and benefits directly to Third Parties personally and/or professionally known to them.

333.   Carter Allen, Disc Jockey, WBCN Radio had stated during 1998 to 1999 on the WBCN radio program on which he was the disc jockey "There is so much stuff going on that you would not believe me if I told you."

334.   Mark Parento, Disc Jockey, WBCN Radio of the Mark Parento Show, had stated the following in obvious reference to the Plaintiff during the WBCN Radio program of which he had been the disc jockey.

335.   Plaintiff arranged to exhibit Plaintiff's Paintings in a gallery in New York City during 1999, and that, thereupon, Mark Parento stated on WBCN radio: "Sucker," adding "They ..." (ie, the Paintings) "... are worth Twenty-Thousand ($20,000) Dollars each for their collectors' value alone."

336.   Plaintiff did not seek to become "Infamous", having desired to exhibit and to sell Plaintiff's Paintings based upon their Fine Arts value alone and not for any "Infamy" value attached.

337.   Mark Parento had also stated during the same radio program "It's too late" and "They are popping up everywhere."

338.   Mark Parento had stated during 1998 on the WBCN radio program on which he was the disc jockey "Frustrated" while Plaintiff had used the word "frustrated" the previous day in a discussion with Plaintiff's daughter in Plaintiff's daughter's home.

339.   Mark Parento had stated during 1999 on the WBCN radio program of which he was the disc jockey "It's a Twenty Year Tragedy."

340.   Mark Parento had stated during the 1990's on the WBCN radio program on which he was the disc jockey "Our Girl Stupid", no conception of what was meant by that statement.

341.   On November 18, 1996 Plaintiff telephoned WBCN Radio to complain about Plaintiff's belief that Plaintiff had been being viewed on a Monitor and that said Monitoring had to have been done with Surveillance Equipment in Plaintiff's Home and without Plaintiff's permission or direct knowledge.

342.   November 18, 1996 Plaintiff had been surprised to have been allowed to have spoken to Mark Parento, particularly during air time, and that Mark Parento had stated to Plaintiff "You need to take Prosac", an anti-psychotic medication, in obvious insult and false statement to Plaintiff, while Plaintiff had complained about illegal Surveilance of Plaintiff in Plaintiff's home.

343.   Mark Parento stated in obvious reference to the Plaintiff on November 18, 1996 during the WBCN Radio program of which he had been the disc jockey said "Imagine hearing your loved ones in a state of panic" immediately after Plaintiff had hung up the telephone.

344.   Mark Parento stated in obvious reference to the Plaintiff on November 18, 1996 during the WBCN Radio program of which he had been the disc jockey "Mark Gilroy."

345.   Mark Parento stated in obvious reference to the Plaintiff during 1999 during the WBCN Radio program of which he had been the disc jockey "She thinks she is too good for our guy."

346.   Mark Parento stated in obvious reference to the Plaintiff during November 18, 1996 "all women in his whole life, one he loved most and in a different way " during the WBCN Radio program of which he had been the disc jockey.

347.   Mark Parento stated "Wake Up" in obvious reference to the Plaintiff during November 18, 1996 during the WBCN Radio program of which he had been the disc jockey immediately after Plaintiff had telephoned the radio station.

348.   Mark Parento stated "Dead Man" in obvious reference to the Plaintiff during November 18, 1996 during the WBCN Radio program of which he had been the disc jockey immediately after Plaintiff had telephoned the radio station and spoken to Mark Parento.

349.   Defendants finacially profitted by directly or indirectly becoming the Financial Backers or Financially Producing the theatrical production, Blue Man Group, a theatrical production whose sole purpose and intent was the mockery of

the Plaintiff.

350.    **Blue Man Group** had been heavily advertised to bring about the Financial Success of the production, regardless of the humiliation, pain and sufferring caused to Plaintiff or Plaintiff's family members.

351.    Reference had been made in Blue Man Group to the Plaintiff, in regard to Plaintiff's Painting, in regard to occurences in Plaintiff's life and to Defendants' involvement in Plaintiff's life, as a "total mind fuck."

352.    Immediately upon Plaintiff telephoning the Colonial Theatre in Boston at which the the initial production of Blue Man Group had been appearing in order to make plans to attend, Mark Parento stated upon the Radio "Don't Go" and such things as "It is very Insulting."

353.    The above statements made by Mark Parento tied in together Radio personalities, disc jockeys and the Defendants named herein with the theatrical production of **Blue Man Group.**

354.    Plaintiff contends that the Theatrical Production of "Blue Man Group" used subject matter directly related to Plaintiff's life, regardless of the humiliation, pain and sufferring caused to Plaintiff, Plaintiff's direct family members, and other relatives of Plaintiff.

355.    Undeniably the above production of **Blue Man Group** earns several millions of dollars annually in profits for each and every Financial Backer and/or Producer, and / or for the Defendants named herein, regardless of the humiliation, pain and sufferring caused to Plaintiff.

356.    Members of the cast of **Blue Man Group** have appeared in television commercials for the production, as well as for other products.

357.    When the Plaintiff attended the production of **Blue Man Group** during 1999 Plaintiff had been singled out in the audience and Plaintiff could see that a video photograph of her face appeared on the on-stage screen during the performance, the photograph having being taken while she sat in attendance, immediately obviously causing Plaintiff great humiliation during Plaintiff's attendance of the performance.

358.    Plaintiff had again been singled out in the audience in that one of the three main Cast members left the stage, walked and climbed across the tops of the backs of the audiences' seats from the stage to where Plaintiff had been seated, and perched above the empty seat adjoining Plaintiff with the obvious further intention of directing the Audience's attention to the Plaintiff.

359.    When a Private individual cannot attend a simple Theatrical Production

without finding out that Plaintiff is being mercilessly insulted, that her Professional Reputation is being Defamed in Public, and that she is being made a Public Spectacle, Plaintiff contends that the Private individual's Civil Liberties are being infringed upon.

360.    The display props inside of the theatre where "Blue Man Group" had been being performed displayed Props of Radios and of numerous Electrical Wires, were displayed throughout the front entry behind large glass windows within the lobby.

361.    Plaintiff's approach to Painting had been severly insulted in the production of Blue Man Group, costing Plaintiff great humiliation.

362.    Plaintiff contends that her photograph continued to have been shown on Stage during each and every subsequent Performance without Plaintiff's permission.

363.    Plaintiff hereby stipulates that if Defendants had not willfully, maliciously and deceptively Invaded Plaintiff's Privacy, in addition to committing all other illegal activities by Defendants described herein which were perpetrated against the Plaintiff during the past several years, that is, during the years 1997, 1998, 1999, 2000, 2001 and 2002, the Theatrical Production of Blue Man Group would never have occurred and Plaintiff's life would not, thereby, have been destroyed.

364.    Plaintiff hereby stipulates that Defendants illegal activities against Plaintiff recklessly endangered and destroyed Plaintiff's life, Plaintiff's finances, Plaintiff's professional career, Plaintiff's professional reputation, and those of Plaintiff's family members, thereby causing Defendants named herein to be responsible for all of Plaintiff's Losses, financial and otherwise, and for all Losses to Plaintiff's family members.

365.    On July 17, 2002 a San Francisco based source of Talk Show Host's Television made the statement the "Golden Goose", a statement and description undoubtedly of Plaintiff, and in further reference to the word "Duck" which had been used in the insulting Art Forum magazine article of November, 1987.

366.    Any reasonable person can easily conclude that the above reference to "Golden Goose" was due to all Commercial Buildings above which Plaintiff had attempted to purchase and which were instead purchased by other Individuals due to the Defendants illegal activities against Plaintiff.

367.    "Golden Goose" also refers to all articles of value, all business papers, all Profit and Loss Statements, and all Plaintiff's typewritten Fine Arts notes that had been stolen from Plaintiff's home.

368.    During the year 2002, as Plaintiff watched CNN Television and Stock Market Analysts' program, the Panel Discussion Group's Leader stated "It's the Formula,

Stupid" in obvious reference to Plaintiff and to Plaintiff's typewritten information that had been stolen from Plaintiff's home, the statement having not been made for any other apparent reason and not in response to any statement by any Panel member.

369.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

39

## COUNT III

### THEFT OF INTELECTUAL PROPERTY
### due to
### CONSPIRACY TO INVADE PRIVACY

### CAUSING LOSS OF REAL ESTATE BUSINESS INCOME

370.    Plaintiff realleges paragraphs 1    through  369  above and incorporates them by reference as if stated herein.

371.    The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

372.    The Defendants willfully, maliciously and deceptivly Interferred in Plaintiff's Constitutional Right to Privacy in that Defendants, directly or indirectly, invaded Plaintiff's Privacy, and were involved in a conspiracy to conduct Surveilance of Plaintiff and of Plaintiff's home,  thereby Defendants interferred with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, and denied Plaintiff's Unalienable Rights as a United States Citizen, having done so for numerous years, and continue to do so to date.

373.    The Defendants are and have been responsible for all Financial Losses suffered by Plaintiff in regard to Theft of Plaintiff's Intellectual  Property, in the form of Plaintiff's attempts to purchase valuable commercial real estate, and including all documentation of Plaintiff in the areas of business papers, Profit and Loss Spreadsheets of potential earnings of Plaintiff after purchase of each individual commercial property, addresses and photographs of commercial properties of each and every commercial property which Plaintiff attempted to purchase but that, due to Theft of Plainitiff's Intellectual Property, Plaintiff's plans had been interferred with by Defendants and Defendants co-Conspirators.

374.    The Financial Loss to Plaintiff was in the form of Loss of potential Annual Income of each and every commercial property referred to above.

375.    Plaintiff's Financial losses in this regard  had been due to the willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to,   Invasion the Privacy of the Plaintiff, Intentional Infliction of Emotional Harm  and Harassment of the Plaintiff, in addition to the Involvement of Defendants in a Conspiracy to Invade the Privacy of the Plaintiff,  among all other illegal activities described herein which were perpetrated against the Plaintiff.

376.   The Defendants' illegal activities and actions as herein described were committed against the Plaintiff without her consent or permission, neither written, verbal nor implied consent or permission.

377.   The Defendants illegal activities which Defendants perpetrated against Plaintiff caused immeasurable Damage to the Plaintiff because the Defendants were involved with individuals and/or business associates who perpetrated Theft to Plaintiff's home of innumerable valuable possessions of Plaintiff, including but not limited to, Plaintiff's typed Business Plans and Plaintiff's potential Profit and Loss Statements of Real Estate Investments , plus all detailed financial information for numerous valuable Commercial Real Estate  "Sleepers"   for far below Market Value which Plaintiff had attempted to purchase.

378.   The Defendants were responsible for Surveilance perpetrated against Plaintiff in Plaintiff's Home,  car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, and had involvement  with individuals and / or business associates who perpetrated Surveilance of Plaintiff in Plaintiff's Home, said Surveilance having continued during innumerable years, and ongoing to date.

379.   The Defendants involvement in Theft of Plaintiff's Intellectual Property as described above have cost innumeralbe millions of dollars of Financial Losses to Plaintiff in the form of potential Income and Profits that Plaintiff could never thereafter earn, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

380.   The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

381.   The Defendants were responsible for the Theft of Plaintiff's Intellectual Property from Plaintiff's Home in the form of Business Files, Financial Files which documented potential NET potential proceeds, Real Estate property Descriptions, addresses of said properties, photographs of said properties, Plaintiff's information of the Real Estate Brokers to contact, Plaintiff's information of the Owners of said Premises, and numerous other papers.

382.   All of the Thefts of Plaintiff's Intellectual Property interfered with the Plaintiff's attempts to purchase various valuable Real Estate Investments, any one of which would have provided a NET Annual Income to Plaintiff of approximately Nine Hundred Thousand ($900,000) Dollars to Plaintiff.