383.    The Defendants involvement in Theft of Plaintiff's Intellectual Property directly caused Financial Losses to Plaintiff because Defendants' had repeated Defendants' illegal activities while Plaintiff had been attempting to purchase several Properties during the years 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to date, thereby causing Plaintiff the lost earning capacity of the above described of NET Annual Income.

384.    The Defendants involvement in Theft of Plaintiff's Intellectual Property caused the Plaintiff the loss of the earning capacity in the amount of Nine Hundred Thousand ($900,000) Dollars NET Annual Income, during each and every year of 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004 and for the remainder of Plaintiff's Life, for lifetimes of Plaintiff's direct Heirs and for the lifetimes of their Subsequent Heirs due to Defendants' willful, deceptive and malicious illegal actions which Defendants perpetrated against Plaintiff.

385.    Charles Laquidara had stated on the radio during 1998 "They have been trying to get you for 20 years and finally did, and I am so glad the did".

386.    The above quotation of the statement made by Charles Laquidara demonstates the fact that the Defendants were directly responsible and liable for any and all Financial Losses suffered by Plaintiff, by Plaintiff's Family Members, and Plaintiff's subsequent Heirs.

387.    Charles Laquidara had stated on the radio "Rehab sucks" in obvious reference to the Plaintiff during 1999 on the WMJX radio program of which he was the disc jockey because the statement had been made immediately after Plaintiff had found and visited a valuable property in Dover, New Hampshire, located at the Southern Maine / Dover, New Hampshire border.

388.    The Sellers of the above referred to commercial real estate claimed to have spent $1,000,000 in rehabilitation of each of two buildings of the premises, yet had offerred the premises "For Sale" for only $675,000 for each of two Buildings.

389.    Plaintiff could easily have purchased either one or both of the above referred to Commercial Property in Dover, N.H. because Plaintiff had excellent credit, could easily have obtained financing to do so, Plaintiff had substantial cash on hand to be able to do so, because the Seller intended to provide a Rental Income to Plaintiff to satisfy any Lending Institutions' requirements that Income be sufficient to pay the Mortgage.

390.    Because of Defendants involvement in a Conspiracy to commit Theft of Plaintiff's Intellectual Property, the Defendants' interference in Plaintiff's plans caused Plaintiff to have lost the opportunity to purchase the Dover, New Hampshire property, thereby Plaintiff having lost the opportunity to earn an income in the amount of Nine Hundred Thousand ($900,000) Dollars per year.

Dockets.Justia.com

391.    The Defendants' willful, malicious, and deceptive involvement in a Conspiracty to commit Theft of Plaintiff's Intellectual Property caused enormous and similar damage to Plaintiff repeatedly in regard to numerous premises which Plaintiff had attempted to purchase before and after 1999.

392.    Plaintiff had spoken to the real estate Broker in regard to the Dover, New Hampshire property on a Friday, during June, 1999, viewed the property on Saturday, and was prepared to purchase shortly thereafter, to have found that the same property had already been put under agreement by another party, undoubtedly a party who had been involved with the Defendants.

393.    Charles Laquederas had been exceptionally happy and laughing during the time frame while the above had been occurring while he had been on radio air time, very unusual for Charles Laquidara.

394.    Charles Laquidara had stated in obvious reference to the Plaintiff during June, 1999 when Plaintiff had discovered the Dover, New Hampshire on the WMJX radio program of which he was the disc jockey "SHE'S CRAZY," continuing the exceptionally happy mood.

395.    All Plaintiff enormous efforts spent in studying newspaper and researching any commercial properties that had been "For Sale" in order for Plaintiff to purchase said Commercial real estate had led to Theft of Plaintiff's Intellectual Property because Charles Laquidara had been referring ON THE AIR to each and every said valuable Building which Plaintiff had discovered and worked out positive numbers for, in addition to any of Plaintiff's financial information having been spread upon the Radio Airwaves to some 300,000 listeners each day, illegally.

396.    Because of Defendants' Invasion of Plaintiff's Privacy, and Defendants' involvement with Co-Conspirators in the Invasion of Plaintiff's Privacy, any one of the Defendants, Defendants' associates, or 300,000 daily radio listeners or millions of television listeners could have thereupon financially benefitted from the Theft of Plaintiff's Intellectual Property, all of which Plaintiff had laborred diligently to locate in order for Plaintiff to purchase same.

397.    Plaintiff herein acuses Charles Laquidara and all Defendants named herein of willfully and maliciously destroying Plaintiff's life for the financial benefits to be derived via the Theft of Plaintiff's Intellectual Property by the herein named Defendants and/or for Charles Laquidara and/or other Media Personalities with whom Defendants had been involved in this regard.

398.    Because Charles Laquidara, other Media Personalities, other disc jockeys and all Defendants named herein , earn enormously high annual salaries, each certainly had it within their personal financial means to employ Financial persons

and companies to perform any needed Research for them rather than to have been involved in the Theft of Plaintiff's Intellectual Property.

399.   Plaintiff herein accuses Defendants named herein of purposefully and willfully destroying Plaintiff's life for the herein named Defendants' personal Financial Benefit in one realm or another - that is, even if one realm was to have increased the Defendants' audience while being involved in a Conspiracy to commit Theft of Plaintiff's Intellectual Property, thereby increasing Defendants' personal income.

400.   Charles Laquidara held an Auction on the Radio and held an Open House of his Home in Dover, Massachusetts on one Sunday soon after Plaintiff had discovered the Dover, N.H. property above.

401.   Plaintiff questions why it was necessary for Charles Laquidara to personally conduct an Auction of his personal residence in the probable amount of some $700,000, and to sell below market value, unless Charles Laquidara was in a HURRY to obtain some quick Cash, possibly in order to purchase the Dover, New Hampshire property, representing Theft of Plaintiff's Intellectual Property.

402.   Plaintiff hereby states that commercial premises which Plaintiff had research and attempted to purchase had, instead, been purchased either by Defendants, by Business Associates of Defendants, or by Individuals known to Defendants, thereby Defendants' illegal activities causing Plaintiff great financial losses.

403.   Plaintiff herein acuses all Defendants of willfully and maliciously destroying Plaintiff's life, and that of Plaintiff's subsequent Heirs, in order financially profit directly and/or to provide assistance and benefits directly to individuals personally and/or professionally known to them or involved with them.

404.   Plaintiff Intellectual Property included typewritten  20-30 page reports of Plaintiff's Business Plans of each and every property which Plaintiff had intended to Purchase, said Business Plans demonstrating enormous potential income to be earned by Plaintiff, Plaintiff having typed same in Plaintiff's home on Plaintiff's computer and stored said Intellectual Property  on computer discs.

405.   Plaintiff's above referred Intellectual Property of the 20-30 page reports of Plaintiff's Business Plans had been repeatedly Stolen from Plaintiff's home, representing Theft of Plaintiff's Intellectual Property,  regardless of Plaintiff's enormous attempts to protect Plaintiff's home from being illegally enterred when Plaintiff had been away from Plaintiff's home.

406.   The list is endless: ad infinum.

407.   On several prior occasions Charles Laquederias had stated on WBCN radio

44

during 1997, when Plaintiff sold her Hyde Park property in July, "You are going to go Down."

408.    Plaintiff herein states that the above statement during 1997 made by Charles Laquidara "You are going to go down" had been stated as a Threat to the Plaintiff.

409.    Defendants have been willfully, deceptively, and maliciously involved with Charles Laquidara in a Conspiracy to cause Plaintiff to lose enormous amounts of potential income and involved in a Conspiracy to cause Theft of Plaintiff's Intellectual Property, having caused Plaintiff to suffer the following Financial Losses:

410.    The Defendants caused Plaintiff to lose One Hundred and Seventy-Five Thousand ($175,000) Dollars of her entire Savings of Two Hundred Thousand ($200,000) Dollars on April 9, 2000, leaving Plaintiff nearly penniless thereafter, with the exception of the remaining some Twenty-Five Thousand ($25,000) Dollars in Savings.

411.    The Defendants caused the Plaintiff again to lose approximately Sixty-Five Thousand ($65,000) Dollars in the Stock Market during the Fall of 2000, the Sixty-Five Thousand ($65,000) Dollars having been obtained by Plaintiff when Plaintiff refinanced Plaintiff's New Hampshire property in August, 2000.

412.    Plaintiff, thereafter, being left entirely penniless after the above referred to Loss, the entire proceeds remaining from some One Million ($1,000,000) Dollars or more in previous Equity in Real Estate Holdings which the Plaintiff had previously owned.

413.    Plaintiff's above referred to Savings of Two Hundred Thousand ($200,000) Dollars represented part of Plaintiff's Equity which proceeds received when Plaintiff sold her Home in Massachusetts, said property to have accummulated equity during Plaintiff's thirty-five years of ownership and improvements.

414.    Plaintiff had accummulated more than One Million ($1,000,000) Dollars in Equity in her various real estate holdings during approximately 1999, duplicating Plaintiff's equity of 1986-1987.

415.    Plaintiff was, due to the above financial losses to Plaintiff, unable to improve and repair her two commercial properties, thereby causing Plaintiff to become unable to lease or to sell either of said premises in order to produce an income to Plaintiff.

416.    The willful, deceptive and malicious illegal activies which Defendants which had been perpetrated against Plaintiff caused Plaintiff to be forced to declare Bankruptsy during June, 2001.

417.    The above Cash Losses to Plaintiff interferred with Plaintiff's need and attempts to rehabilitate Plaintiff's two commercial properties, leading to great further financial losses to Plaintiff and losses of years' time in performing any rehabilitation to either property.

418.    The above forced Plaintiff to sell one commercial property in Middleborough, Massachusetts for approximately $200,000 less than it's market value would have been if Plaintiff had been financially able to expend some $20,000 to $40,000 in rehabilitation that was severely required.

419.    The above Financial Losses forced Plaintiff to be unable to obtain adequate funding to perform rehabilitation to Plaintiff's commercial property in New Hampshire, and finally Plaintiff being forced to obtain said funding at prohibitive interest costs of 27% Interest and other excessively expensive penalties and refinance costs.

420.    Plaintiff was thereafter forced to request funding from her son's income in order to sustain Plaintiff's life and to sustain Plaintiff's carrying costs and expenses of her two commercial real estate holdings.

421.    The above Financial Losses of Plaintiff caused great stress and grief to Plaintiff's son and greatly interferred with Plaintiff's son's ability to earn an income as a practicing physician.

422.    Plaintiff spent the major portion of some three years time and innumerable thousands of hours during which time Plaintiff researched all available Commercial Real Estate listed "For Sale" in Massachusetts and, subsequently, in New Hampshire, which were warehouses of 20,000 square feet and larger, that is, as large as 200,000 square feet.

423.    Plaintiff spent the major portion of some three years time and innumerable thousands of hours during which time Plaintiff performed researchto find said commercial real estate properties,  located said Real Estate Properties which fulfilled financial Plaintiff's plans, visited and viewed said commercial properties,  met Owners and real estate Brokers for same Real Estate Properties, photographed said Real Estate Properties inside and out, and attempted to work out purchase and sales agreements for same Real Estate Properties, and worked out innumerable Business Plans for said commercial properties.

424.    Plaintiff had worked out on 20-30 typewritten pages to the most infinitestimal detail potential Profit and Losses for each and every commercial property which Plaintiff had intended to purchase.

425.    Said innumerable copies of above potential Profit and Loss sheets had been

stolen from Plaintiff's home.

426.    All of herein referred to Real Estate Commercial Properties had previously
lay vacant for several or even numerous years with no interest from any potential
Buyers, had been listed "For Sale" during several prior years with little to no
interest from any potential Buyers, all of which would, in fact, be described as
"Sleepers" in Real Estate Jargon.

427.    Due to the Willful and Malicious Involvement of Defendants in a Conspiracy
to Invade the Privacy of the Plaintiff, for Defendants Infringements of Plaintiff's
Rights  and for Defendants Harassment of the Plaintiff, that each and every
potentially profitable Real Estate Property which Plaintiff had located and
attempted to purchase  was thereupon purchased by other Individuals immediately
upon Plaintiff having located and attempted to purchase same Properties.

428.    The Theft of Plaintiff's Intellectual Property, as referred to above had
occurred to the following properties which Plaintiff had attempted to purchase:

A.    35,000 square foot building, newly renovated, in Hanson, Massachusetts;
B.    two adjoining buildings with total square footage of 55,000 square feet in
downtown
C.    Framingham, Massachusetts;
D.    200,000 square foot building, newly renovated, in Amesbury, Massachusetts;
E.    35,000 square foot building, a former pharmacy, in downtown Billerica,
Massachusetts;
F.    two adjoining buildings with combined square footage of 150,000 square feet,
in Dover,
        New Hampshire, near downtown, which buildings the Owner had spent
more than
G.    $1,000,000 in renovations, but was willing to sell both for $650,000 each to
Plaintiff;
H.    150,000 square feet, located in downtown Nashua, New Hampshire, which
building Owner
        had agreed verbally to sell to Plaintiff for $650,000 during July, 1999, but
then refused to
        put agreement in writing as late as December, 1999, thereupon  selling to
another Buyer
        for only $550,000.

429.    The Owner of above Nashua, New Hampshire had sold the same building to
another Buyer for $100,000 less than Plaintiff had offerred to pay.

430.    The above had occurred with a 150,000 square feet, a single story structure,
in Milford, Massachusetts, owner having agreed to sell to Plaintiff for $650,000,
Plaintiff having spent months in researching the Milford property, negotiating the

price, getting a written agreement and in meeting with contractors, and having typed all profit and loss information on computer discs, said computer discs having been stolen from Plaintiff's home.

431.    As soon as Plaintiff had signed a purchase and sales agreement for Milford, Massachusetts property, vandals had set fire to the building, entire front having been destroyed, and for which illegal action Plaintiff holds Defendants responsible.

432.    The Owner thereupon agreed to sell the same property to Plaintiff after the fire for $400,000, including six acres of Land.

433.    As with all other properties which Plaintiff had attempted to purchase, the broker allowed another Buyer to buy the property instead of the Plaintiff; that is, stole the property from the Plaintiff, said Buyer was named Manomet Development Corporation.

434.    Plaintiff had found a fax had been sent from Plaintiff's fax machine to Manomet Development Corporation during the same time as the above was occurring, yet Plaintiff had not sent the fax to Manomet Development Corp. and had had no former knowledge of the recipient.

435.    Within a few months, Manomet Development Corp. had sold the Milford, Massachusetts property to a neighboring business for Eight Hundred Thousand ($800,000) Dollars, the same property that Plaintiff had negotiated and attempted to buy, and had been sold to Manomet Development Corp. for Four Hundred Thousand ($400,000) Dollars, thereby earning a net profit of Four Hundred Thousand ($400,000) Dollars for having committed Theft of Plaintiff's Intellectual Property.

436.    The sale of the Milford, Massachusetts commercial property to Manomet Development Corp. had been Theft of Plaintiff's Intellectual Property.

437.    The Defendants are responsible for Theft of Plaintiff's Intellectual Property for each and every commercial property referred to above, the enormous financial loss to the Plaintiff due only to Invasion of Plaintiff's Privacy by Defendants and Defendants' co-comspirators.

438.    Subsequently, all Massachusetts property has doubled and tripled in market value from the market value of commercial and residential properties in the years of approximately 1998 or 1999.

439.    If Plaintiff had been allowed to purchase the above property alone in Milford, Massachusetts without Interference from Defendants, whether in the form of Conspiracty to commit Theft of Plaintiff's Intellectual Property or in the form of Invasion of Plaintiff's Privacy, the current market value of the property would

undoubtedly be in the vicinity of $2,400,000, with no rehabilitation even having been completed to said premises.

440.    For the damage to Plaintiff's Life and damage to Plaintiff's Financial potential Earning Capacity, Plaintiff hereby accuses Defendants of being directly liable and responsible.

441.    Manomet Development Corp has become defunct, with no records available with the State of Massachusetts, clearly demonstrating the illegal activities of Defendants and Defendants' business associates.

442.    Plaintiff had agreements to purchase each and every property referred to above for the purchase price of $5 per square foot, only slightly more than leasing costs at the time of $3 per square foot, while the going selling price of similar warehouses was a minimum of $20 per square foot at that time.

443.    Plaintiff had proven in Plaintiff's potential Profit and Loss statements that Plaintiff could obtain an income of $900,000 NET Annual Income from above Nashua, New Hampshire property.

444.    If Defendants had not been involved in a Conspiracy to commit Theft of Plaintiff's Intellectual Property, Plaintiff could and would have earned NET income of $9,000,000 in ten years time from Plaintiff's purchase above Nashua, New Hampshire property.

445.    The Plaintiff, the Children of the Plaintiff, the Grandchildren of the Plaintiff and all subsequent Heirs of the Plaintiff's Estate will suffer the above referred to Losses, compounded, because the Plaintiff lost the annual earning capacity of the above described NET Annual Income of Nine Hundred Thousand ($900,000) Dollars NET Annual Income, for each and every Commercial Property which Plaintiff had located and had offerred to Purchase.

446.    In regard to the above 35,000 square foot building in downtown Billerica, Massachusetts several suspicious incidents occurred.

447.    Plaintiff had met the real estate broker to visit a 35,000 square foot building in downtown Billerica, Massachusetts on a Sunday morning.

448.    A young woman and an older man driving a truck with a trailer attached also were at the premises viewing the premises, suspiciously attempting to hide when the woman saw the Plaintiff, drove to an adjoining property in their attempt to hide from Plaintiff.

449.    Billerica property had been vacant and listed "For Sale" during the previous two years, the Owner and Real Estate Broker having received no Offers to Purchase

from any potential Buyers.

450.    As soon as Plaintiff became interested in the property, another buyer purchased the property instead immediately, before Plaintiff had time to do so, demonstrating obvious Theft of Plaintiff's Intellectual Property, and for which Plaintiff acuses Defendants of being responsible.

451.    No reasonable person could arrive at the conclusion that any, let alone all, of the above incidents were coincidental in which Commercial Property which had lay vacant and on the market "For Sale" with no potential Buyers for years, yet were thereupon purchased by other Buyers immediately upon Plaintiff discovering said premises, unless all incidents were the result of Defendants being involved in a Conspiracty of Theft of Plaintiff's Intellectual Property.

452.    If this Court applies a Multiplier of 100 years to the above Plaintiff's subsequent Loss of Income in the amount of the above described Nine Hundred Thousand ($900,000) Dollars NET Annual Income, this Court will arrive at a Loss to the Plaintiff and subsequent Plaintiff's Heirs of Ninety Million ($90,000,000) Dollars.

453.    All Financial Losses of Plaintiff were directly caused by the Defendants involvement in a Conspiracy to commit Intellectual Theft of Plaintiff's Property and, additionally, due to Defendants' Invasion of Plaintiff's Privacy, among all other illegal activities described herein which were perpetrated against the Plaintiff during the past several years, that is, during the years 1997, 1998, 1999, 2000, 2001 and 2002.

454.    On July 17, 2002 a San Francisco based source of Talk Show Host's Television made the statement the "Golden Goose", a statement and description undoubtedly of Plaintiff.

455.    "Golden Goose" is obviously closely related to "Duck", as Plaintiff had been referred to in Art Forum magazine during 1987, with Plaintiff's photograph attached and, going one step further, "Golden Goose" was the provider of Gold to Jack in the Beanstalk.

456.    Any reasonable person would conclude that the reference to "Golden Goose" was due to Theft of Plaintiff's Intellectual Property, including but not limited to Plaintiff's business papers, address locations of commercial properties, and Profit and Loss Statements, and including Plaintiff's typewritten Fine Arts notes - all of which had been stolen from Plaintiff's home and all due to Defendants' Invasion of Plaintiff's Privacy.

457.    During the year 2002, as Plaintiff watched CNN Television and Stock Market Analysts' program, the Panel Discussion Group's Leader stated "...IT'S THE

FORMULA, STUPID ..."

458.   Plaintiff used the word "Formula" to refer to information contained in Plaintiff's Art Painting notes.

459.   Undeniably, the statement "...It's the FORMULA, STUPID..." referred to Theft of Plaintiff's Intellectual Property from Plaintiff's home.

460.   Additionally, the above reflects some 35 years of Plaintiff's life in her cummulative knowledge of the real estate market, let alone the endless research which Plaintiff had completed in order to arrive at Plaintiff's conclusions about the above referred to commercial properties.

461.   No private Citizen of the United States should be required to spend innumerable thousands of dollars in their attempts to guard their homes from Invasion of Privacy.

462.   Plaintiff is a private Citizen, and not a giant Corporation.

463.   The Defendants are directly responsible for Plaintiff's Heirs above Financial Loss of potential Income of Ninety Million ($90,000,000) Dollars due to Defendants illegal activities perpetrated against Plaintiff.

464.   Plaintiff's Children and Grandchildren and all subsequent Heirs will never be able to realize any of the potential Income of Plaintiff in the amount of Ninety Million ($90,000,000) Dollars for which Plaintiff labored for numerous years in order to bring to fruition.

465.   If the Court were to apply an additional Loss of potential Interest Income in the amount of Twelve Percent (12%) to the above Plaintiff's Loss of potential Earning Capacity of Nine Hundred Thousand ($900,000) Dollars NET Annual Income, the Court will arrive at an additional Loss of potential Annual NET Income to the Plaintiff in the amount of One Hundred and Eight Thousand ($108,000) Dollars.

466.   The additional Loss of Interest Income in the amount of One Hundred and Eight Thousand ($108,000) Dollars per Year which had been suffered by the Plaintiff and which will continue to be sufferred by Plaintiff and Plaintiff's Heirs because of the Defendants willful, deceptive illegal activities against Plaintiff.

467.   In 1986 and 1987 the Plaintiff owned two Real Estate Properties in Massachusetts, free and clear of any incumbrances, liens or mortgages, with the approximate Market Value of more than One Million and Two Hundred Thousand ($1,200,000) Dollars at that time, having owned said properties since approximately 1963, Plaintiff having had a miniscule mortgage on each of the above two properties

at the time.

468.    Therefore, if Defendants had not interferred in Plaintiff's life during 1986 and 1987, Plaintiff could have sold said properties and would have obtained a NET Cash amount of approximately One Million and Two Hundred Thousand ($1,200,000) Dollars during 1987, as Plaintiff had intended, and to have reinvested the proceeds into more profitable ventures.

469.    Plaintiff realized full well in 1986 and 1987 that Plaintiff could realize a potential NET Annual Income of Nine Hundred Thousand ($900,000) Dollars.

470.    Because of the Defendants Invasion of Plaintiff's Privacy and involvement in a Conspiracy to Invade Plaintiff's Privacy during 1987, and because Defendants were thereupon liable for having driven Plaintiff into a nervous breakdown during 1987, Plaintiff had not been able to complete Plaintiff's business plans during 1987.

471.    The above actions of Defendants against Plaintiff occurred during 1987 immediately after Plaintiff's three children had moved out of Plaintiff's Home during June, 1987 to relocate thousands of miles away from Plaintiff.

472.    Since Plaintiff lived alone after June, 1987  Plaintiff thereupon became an easy target for the willful, deceptive malicious illegal activities which had been perpetrated against Plaintiff,  Defendants being directly responsible for the illegal activities against Plaintiff.

473.    The above referred to Financial Loss to Plaintiff in the amount of  Nine Hundred Thousand ($900,000) Dollars NET Annual Income from 1987 to date of 2004, some NINETEEN YEARS Income of Nine Hundred Thousand ($900,000) Dollars NET Annual Income comes to a total Financial Loss of potential Income to the Plaintiff of:

Seventeen Million One Hundred Thousand ($17,100,000) Dollars to date, year 2004.

474.    Losses of Potential Income to Plaintiff's Heirs in 20 Future YEARS alone , from 2005 to 2025 in the Form of Earned Interest only, at 10% per Year of above Loss to Plaintiff in the amount of Seventeen Million One Hundred Thousand ($17,100,000) Dollars to date, year 2004:

$1,710,000    10 % Interest per year, Loss to Plaintiff's Heirs
$17,100,000    Loss of the Principal of above referred to Total Amount to Plaintiff, to have been received by Heirs
$ 11,000,000   Loss of Earned Interest Income alone to Plaintiff during 19 years: 1986 to 2004,
                            approximately

$34,200,000   Loss of Earned Interest Income alone to Plaintiff's Heirs in 20 Years time: 2004 to 2025

$62,300,000   LOSS OF INCOME to PLAINTIFF'S HEIRS in 20 Years Time, from 2005 to 2025

Sixty-Two Million Three Hundred Thousand ($62,300,000) Dollars:

Loss of Income to Plaintiff's Heirs in 20 Years time to the year 2025, as demonstrated above.

475.   The above referred to Financial Loss to Plaintiff in the amount of Nine Hundred Thousand ($900,000) Dollars NET Annual Income from 1986 to date of 2004 comes to a total Financial Loss of potential Income to the Plaintiff of Seventeen Million One Hundred Thousand ($17,100,000) Dollars to date, to arrive at the total amount of Financial Loss to Plaintiff's Subsequent Heirs in 100 years time would come to a total Financial Loss of Income to Plaintiff's Heirs if one only uses the standard multiplier of 10% profit per year of invested Income:

Three Hundred and Eleven Million Five Hundred Thousand ($311,500,000) Dollars.

476.   Plaintiff herein accuses Defendants herein named as being fully aware of Plaintiff's intentions during 1986 and 1987, being fully aware of the ongoing attacks against the Plaintiff during 1986 and 1987 and subsequent years, of being directly involved in the attacks against Plaintiff during the years 1986 and 1987 and subsequent years, and of being fully aware of Plaintiff's financial status during 1986 and 1987.

477.   Because Market Values had changed enormously after the year 1987, with an enormous decline in Real Estate Values after 1987, Plaintiff was thereupon not able later to be able to sell the above described two Pieces of Residential Real Estate which Plaintiff had owned until 1997 and 1999. Thereupon, Plaintiff sufferred the further Loss of some Twelve years of potential NET Annual Income and NET Annual Earning Capacity in the amount of Nine Hundred Thousand ($900,000) Dollars from 1986 or so (ie, 1986, 1987) to 1999.

478.   Plaintiff, therefore, herein accuses Defendants of being directly and indirectly responsible for Plaintiff's Loss of the above described NET Annual Income potential in the amount of Nine Hundred Thousand ($900,000) Dollars per year during a period of Fourteen years (14 years), for a Total Loss of NET Income to Plaintiff in the amount of Twelve Million Six Hundred Thousand ($12,600,000) Dollars for the years 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998 and 1999 alone.

479.   Therefore, if this Court apply Interest in the amount of 12%, compounded annually, to the above, the Court will arrive at an additional Loss of Interest Income sufferred by the Plaintiff and Plaintiff's Heirs during the above fourteen years of

1986 through the year 1999, in the amount One Hundred and Eight Thousand ($108,000) Dollars per Year.

480.    Therefore, if this Court, in so applying the above referred to Interest Income in the amount of 12%, compounded annually, to the above Losses suffered by the Plaintiff, the Court will arrive at an additional Total Loss of Earned Interest Income which was suffered by the Plaintiff and Plaintiff's Heirs during the fourteen year period of the years of 1986 through the year 1999 in the amount of One Million Five Hundred and Twelve Thousand ($1,512,000) Dollars.

481.    Therefore, if this Court apply the above Loss of Annual NET Income to the five (5) subsequent years of 2000, 2001, 2002, 2003, and 2004 the Court will arrive at a Total Loss of NET Income for the five (5) subsequent years in the amount of Four Million Five Hundred Thousand ($4,500,000) Dollars in Total NET Income Loss to Plaintiff during those five years.

482.    Therefore, if this Court adds each of the following Items referred to above in the amount of:

$12,600,000    Earned Total Net Income Loss to Plaintiff during years
1986 through 1999: 14 years @ $900,000 Loss of

Potential Income
($1,512,000)    Earned Interest Income potential Loss per Year to
Plaintiff during years
1986 through 1999: 14 years @ 12% Interest

(Coumpounded
Annually): Per Year
$21,168,000    Earned Interest Income potential: Total Amount of
Loss Interest
Income potential to Plaintiff during 14 years: Total

Interest Loss
$4,500,000    Earned Total NET Income Loss to Plaintiff during
years
2000, 2001, 2002, 2003 and 2004, and continuing to this

Date:
$900,000 Per Year at 5 Years to Filing Date
($540,000)    Earned Interest Income potential Loss per Year to
Plaintiff
during years 2000, 2001, 2002, 2003 & 2004,and

continuing to Date:
5 years to Date of Filing
$2,700,000    Earned Interest Income potential: Total Amount of
Loss Interest
Income potential to Plaintiff during 5 years: 2000, 2001,

2002, 2003,

**Plaintiff**
**$40,968,000**
of Filing

& 2004, and continuing to date: Total Interest Loss to

TOTAL: Loss of Income suffered by Plaintiff to Date

in Regard to Real Estate Potential Earned Income

this Court will arrive at a Total Loss of Earned Income Potential of Plaintiff and to Plaintiff's Children and Heirs TO DATE in the amount of :

      **Forty Million Nine Hundred and Sixty-Eight Thousand ($40,968,000)**
**Dollars.**

483.   The above Earned Interest Loss to Plaintiff during 14 years time requires more detailed and complicated mathematical calculations because the herein calculated interest is only based upon the original $900,000 per year Earned Income Loss to Plaintiff.

484.   A mathematician needs to take $900,000 LOSS the first year, add 12% Loss of Interst, add the two amounts of $900,000 plus $108,000 to arrive at 1,008,000 LOSS to Plaintiff at the end of the the second year. take 1,008,000 Loss to Plaintiff at the end of the second year , plus 12% Interest of $120,960 , and to add $1,008,00 to $120,960 to arrive at a Loss to Plaintiff in the amount of $1,128,960 for the Loss to Plaintiff for the Third Year alone at the end of the Third Year:

| ie, | $900,000 | 1st Year Loss to Plaintiff: 1986: Income + 12% |
| | $1,008,000 | 2nd Year Loss to Plaintiff: 1987: Income + 12% |
| | | $900,000 Income Loss plus $108,000 Interest |
| | $1,128,960 | 3rd Year Loss to Plaintiff: 1988: Income + 12% |
| | | $1,008,000 Income Loss plus $120,960 Interest |
| | $1,264,435 | 4th Year Loss to Plaintiff: 1989:Income + 12% |
| | | $1,128,960 plus $12% Interest of $135,475 |

to continue forward for Nineteen Years to 2004, and to add all individual Years' LOSSES of INCOME to PLAINTIFF during the previous Fourteen years.

485.   Due to expediency at this time, Plaintiff has approximated by using only the original $900,000 LOSS of INCOME to PLAINTIFF, adding $900,000 LOSS per year for Nineteen years, to arrive at a total Loss of Income alone in the amount of Seventeen Million One Hundred Thousand ($17,100,000) Dollars which is far LESS than the above method would arrive at for a Total Amount of LOSS of INCOME to PLAINTIFF.

486.   Plaintiff herein demands that Court award Plaintiff the amount of Forty Million Nine Hundred and Sixty-Eight Thousand ($40,968,000) Dollars in damages and to order Defendants herein named to pay above amount to Plaintiff.

487.   Because the Defendants acted Willfully, Deceptively, Maliciously, Interferred with the Plaintiff's Inalienable Rights, Invaded the Plaintiff's Privacy, were involved in a Conspiracy to Invade Plaintiff's Privacy, unmercifully Harassed Plaintiff during innumerable years, and ongoing to this date, Plaintiff herein named demands that this Honorable Court order Defendants herein named to pay Plaintiff Treble Damages, but in no event less than Double Damages,  in the Total Amount of

<u>One Hundred and Eighty Six Million and Nine Hundred Thousand ($186,900,000) Dollars,</u>
plus reasonable Attorney Fees and Court Costs.

488.   12% Interest of  Total Principal Amount of Fifty Three Million Seven Hundred and Eighty-Four Thousand ($53,784,000) Dollars is a Total Amount of Interest of Six Million Four Hundred and Fifty Four Thousand and Eight ($6,454,080) Dollars per year.

489.   Therefore, the total Amount of Treble Damages plus 12% Interest, Compounded Annually, comes to a Total Amount of Damages that Plaintiff seeks of Sixty Million Two Hundred and Thirty Eight Thousand and Eighty ($60,238,080) Dollars plus reasonable Attorney Fees and Court Costs.

490.   The above referred to Loss of potential Income to Plaintiff and Plaintiff's Heirs only represents the Loss suffered by Plaintiff in the area of Loss of Real Estate Income along, and Loss in one Property alone.

491.   Plaintiff demands that Court order Defendants to pay to Plaintiff the Total Amount of Sixty Million Two Hundred and Thirty Eight Thousand and Eighty ($60,238,080) Dollars plus reasonable Attorney Fees and Court Costs  for Losses suffered by Plaintiff in regard to potential Real Estate Income and Investments alone.

492.   Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

56

## COUNT IV

## VIOLATION OF FCC REGULATIONS
## (FEDERAL COMMUNICATIONS COMMISSION)

493.    Plaintiff realleges paragraphs 1 to 492 and incorporates them for reference as if stated herein.

494.    All herein described Losses of Plaintiff have been due to the willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to, Invasion the Privacy of the Plaintiff, Infringements of Plaintiff's Rights, Intentional Infliction of Emotional Harm and Harassment of the Plaintiff, in addition to the Involvement of Defendants in a Conspiracty to Invade the Privacy of the Plaintiff, among all other illegal activities described herein which were perpetrated against the Plaintiff.

495.    Defendants perpetrated illegal activities against Defendant during the years 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004, in addition to innumerable former years.

496.    The Defendants illegally committed and were responsible for Surveilance perpetrated against Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance of Plaintiff and all of Plaintiff's activities, having continued during innumerable years.

497.    The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff, during each and every year during the past twenty to thirty years, the above ongoing to this date.

498.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

499.    The Defendants' illegal activities and actions were committed against the Plaintiff, namely direct or indirect responsibility for the Surveilance of the Plaintiff without her consent or permission, either Written, Verbal or implied consent or permission.

500.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither

written, verbal or implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

501.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

502.    The entire intention of said Media Personalities and of other Media Personalities with whom the Defendants were involved had been to draw attention to the Plaintiff, to identify the Plaintiff to the Media Audience.

503.    The Defendants vicimized Plaintiff with the express willful intention of destroying Plaintiff's life and of keeping Plaintiff perpetually poor in order that Plaintiff would not be able to defend herself.

504.    Defendants vicimized Plaintiff with the express willful intention of keeping Plaintiff perpetually enslaved in order to financially benefit from said enslavement.

505.    Defendants profited greatly financially at Plaintiff's expense in the area of untold Millions of Dollars in Income, resulting from the Defendants commission of the illegal activities described herein, in one realm or another.

506.    Plaintiff contends that Defendants were involved in a scheme to use Plaintiff as a "Guinea Pig", experimenting with Plaintiff without Plaintiff's knowledge or without Plaintiff's Consent because of Defendants' later involvement in what is now known as "Reality Television", often making statements throughout the years, such as "This is only a Test", a favorite expression of Charles Laquederias, and that Defendants are now earning tens of millions of dollars in annual income after having applied persecution upon Plaintiff for innumerable years.

507.    Only individuals of substantial means would have been able to have unlawfully enterred the Plaintiff's premises after all of the great lengths to which Plaintiff had gone to in order to preserve Plaintiff's Privacy from being Invaded.

508.    Mark Parento had  stated during 1999 on the WBCN radio program on which he was the disc jockey "It's a TWENTY YEAR TRAGEDY," said statement demonstrates the degree to which Defendants have persecuted Plaintiff.

509.    Mark Parento had  stated during the 1999 on the WBCN radio program on which he was the disc jockey "Our Girl Stupid," which statemen demonstrates that Plaintiff had been unaware that during some 20 or more years, Plaintiff's home had been under surveilance, and that Plaintiff's life had been being destroyed, in one realm or another.

510.    The Defendants committed willful, malicious and deceptive illegal activities which interferred with the Plaintiff's Constitutional Rights of Life, Liberty and the

Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

511.   In regard to the above, Charles Laquidara had stated "They have been trying for 20 years to get you and they finally did.  And I am so glad."

512.   The above statement clearly demonstrates the validity of Plaintiff's claims against the Defendants named herein.

513.   The above statement clearly identifies Defendants intentions in regard to Invasion of Plaintiff's Privacy and all of the above references to Plaintiff that had been made in various segments of the Media.

514.   The Defendants committed direct attacks against Plaintiff and were  involved with other Media Personalities in the above referred conspiracy to vicimize Plaintiff which had caused and continues to cause immeasurable harm,  suffering, and irreversible damage to Plaintiff.

515.   The Defendants caused Interference to Plaintiff in Plaintiff's attempts to carry out Plaintiff's plans in regard to the following:

   A.  Plaintiff's attempted purchase of commercial real estate.
   B.  Plaintiff's plans to earn a substantial profit as a result of said purchases.
   C.  Damaging Plaintiff's professional career as a professional fine arts painter.
   D.  Plaintiff's potential earning a substantial income in the potential sale of Plaintiff's paintings.
   E.  Plaintiff's ability to continue to paint in Plaintiff's home which was also Plaintiff's art studio.
   F.  Plaintiff's attempts to buy and sell stock in the Stock Market, thereby earning a potential
        substantial income in so doing.
   G.  Plaintiff's plans, due to the Interference by Defendants, instead led to great financial losses
        to Plaintiff of nearly all available cash on hand, the loss of $175,000 of Plaintiff's previous
        $200,000 cash on hand.
   H.  Interference by Defendants led to great financial losses to Plaintiff's son of two-thirds of
        his cash on hand, the loss of $2,000,000 of his previous $3,000,000 cash on hand.
   I.   Interference by Defendants led to a second event of great financial losses to Plaintiff's son
        within six months,  the loss of $600,000 of Plaintiff's son's remaining $1,000,000, leading to a

balance of only $400,000 of Plaintiff's son's original $3,000,000 cash on hand.

516.    The fact is that both Plaintiff's son and Plaintiff are far too intelligent for the above financial losses to have occurred, and could only have occurred because Plaintiff's Privacy had been invaded upon, and because Defendants had violated every Constitutional and State Law in their perpetration of illegal activities against Plaintiff.

517.    All of the references herein to quotations made by Media personalities place all of the individuals referred to in the position of acting as co-conspirators; namely David Letterman, Craig Kilborne, Howard Stern, Charles Laquidara, and Mark Parento, among others.

518.    The quotations of statements made by the Defendants and other Media personalities demonstrate the Defendants' Invasion of Privacy of Plaintiff, the Defendants' Interference in all of Plaintiff's Activities and Life and Defendants' Defamation of Character of Plaintiff, among all other illegal activities referred to herein, during innumerable years, and ongoing to date.

519.    Numerous Threats had been made by Defendants against Plaintiff's Life and against Plaintiff's Financial Status.

520.    Several months later Plaintiff had been advised by an attorney that Charles Laquadeiras had "retired" after Stock Market Crash and after all Losses above to Plaintiff and Plaintiff's family and had been advised that he had moved to "Hawaii".

521.    The Plaintiff believes that Charles Laquidara may have been Fired in the Radio Station's attempt to remove themselves from blame.

522.    The Plaintiff had sent a telegram to Charles Laquidara while he had been employed at WBCN radio as a disc jockey during the 1987, in order to be asured that he would receive the Plaintiff's message to him.

523.    Plaintiff had advised Charles Laquidara to discontinue interferring in Plaintiff's life and Plaintiff had advised Charles Laquidara that if he failed to discontinue interferring in Plaintiff's life that Plaintiff intended to bring a lawsuit against him and against WBCN.

524.    Charles Laquedeiros responded to his receipt of the above telegram (1987) by making the statement on WBCN radio the the day after receipt of the telegram "Sue me? I'll sue you."

525.    Charles Laquidara responded to his receipt of the above telegram during 1987 by making the statement on WBCN radio "What about all of the other

(Radio) stations?"

526.    Charles Laquidara made thousands of statements on the air which pointed directly to the Plaintiff and which demonstrated that he had personal knowledge of all occurences in Plaintiff's life.

527.    Plaintiff had mailed a letter to David Letterman during February, 2003 in which Plaintiff requested that David Letterman discontinue all of his illegal activities and those illegal activities of members of his staff which were being perpetrated against Plaintiff, adding that Plaintiff would sue David Letterman and co-conspirators unless said illegal activies ceased.

528.    On February 10, 2003 Plaintiff had begun to prepare this lawsuit.

529.    On February 10, 2003 David Letterman had stated on the David Letterman Show "Our lawyers are tough lawyers, undeniably as a threat against Plaintiff to discontinue Plaintiff's attempted lawsuit.

530.    On February 10, 2003 David Letterman had stated during the David Letterman Show "You temperamental bitch."

531.    During 2003 David Letterman had stated "You don't know it, but you are on CNN."

532.    Defendants, Host of Late Night Television, Craig Kilborne, made Threats against Plaintiff's Life in Public during the year 2003, for making said threats in Televised Broadcasts on Channel 4 Television before hundreds of thousands of Witnesses and members of the viewing audience, the intention of said Host being to intimidate Plaintiff from filing this lawsuit against Defendants.

533.    Craig Kilborne stated on October 25, 2003 at about 1:00 a.m. and towards the beginning of the nightly program on television Channel 4 "...(we) will call Grandma on the telephone and ask her to meet us at the parking lot for a "Settlement. ..." "... Instead,..." (we)"... will bring a (lead) Pipe..."

534.    While Craig Kilborne stated the above, Craig Kilborne thrust his arms outward and about in slashing motions, such as if a person were attacking another person with a weapon in hand.

535.    After Craig Kilborne stated the above, Craig Kilborne stated further "I am in a really good mood."

536.    Any reasonable person would conclude that the above statements made by Craig Kilborne constitute a threat against the life of the Plaintiff.

537.    On May 9, 2003 Plaintiff had brought documentation to another attorney's office in Nashua, N.H. to request that he represent her. The attorney refused to represent Plaintiff in addition to all other attornies whom Plaintiff had sought out.

538.    On May 9, 2003 at 2:00 a.m. Craig Kilborne had stated "Get up off your Asses" during the Craig Kilborne late night show. Craig Kilborne added "She is going to sue us for Twenty Three Million ($23,000,000) Dollars."

539.    During January, 2003 Craig Kilborne stated on the Craig Kilborne late night show "She is going to Sue Us for Twenty-Three Million ($23,000,000 ) Dollars." Plaintiff had stated, in anger, and while Plaintiff had been alone in her Home that she would "...Sue them for Twenty-Three Million ($23,000,000) Dollars" a short time before Craig Kilborne made the above statement. Therefore, the above quote confirms Plaintiff's accusation against Defenda(s) that Plaintiff's home had been under surveilance, ongoing without Plaintiff's consent, and that the Defendants are and had involvement with Business Associates in a Consiracy to Invade the Privacy of Plaintiff.

540.    Immediately before the above statement had been made by Craig Kilborne, Plaintiff had begun to type the herein referred to Lawsuit in which Plaintiff named David Letterman , Craig Kilborne and Channel Four Television as co-defendants. Plaintiff had typed the amount of request for damages in the amount of Twenty Three Million ($23,000,000) Dollars, the obvious source of Craig Kilborne's statement.

541.    On the very evening immediately after Plaintiff's February 10, 2003 preparation of the beginning of this herein referred to Lawsuit, and when Plaintiff named David Letterman as Defendant, and when Plaintiff inserted the request for "damages" amount of twenty-three million dollars, David Letterman stated during that evening's televised airing of his late night program "You temperamental Bitch."

542.    The above is simply a repetition of similar incidents which have been done against Plaintiff, in an obvious attempt to intimidate Plaintiff against filing this lawsuit.

543.    The Plaintiff had stated out loud in the "privacy" of Plaintiff's Home "I need help all right - from both the FBI and the CIA."

544.    Charles Laquidara had immediately threatened Plaintiff in stating "If you do, you will pay dearly" on December 18, 1998 at 5:00 p.m. on the WZLX radio program of which he was the disc jockey in obvious reference to the Plaintiff.

545.    Several months after April, 2000 Plaintiff had been advised by an attorney that Charles Laquadeiras had "retired" after Stock Market Crash and after all

Losses above to Plaintiff and Plaintiff's family and had been advised that he had moved to "Hawaii".

546.    Plaintiff believes that Charles Laquidara may have been Fired in the Radio Station's attempt to remove themselves from blame.

547.    The statements made by David Letterman on the David Letterman Show and Craig Kilborne on the Craig Kilborne Show, both late night talk show hosts, and both on CBS television, Channel 4 locally are of critical importance when considered in the light of the Studio Monitor incident involving Howard Sterns.

548.    During recent years and during every evening performance of the David Letterman Show, and immediately after the Opening, David Letterman would read "Ten Things you should Know...," beginning from Number 10 and reading them in reverse to the most important item, number 1 on the List. Invariable, these Statements were directed towards the Plaintiff's life, subtly camoflauged, and usually very insulting to Plaintiff. The above had been dispensed with during the past approximate year during which Plaintiff attempted, once again, to document a lawsuit against Defendants.

549.    The Plaintiff accessed a web site on the Internet of the "David Letterman Show" which contained one area which was entitled "Stupid Mamma" Jokes.

550.    During January, 2001 David Letterman stated "How would you like to spend the Weekend watching 'Ma'" which was said in sarcasm, Plaintiff hereby states that innumerable references had been made to Plaintiff in which Plaintiff had been referred to as "Ma," any reasonable person would conclude that David Letterman had admitted he had been "watching" Plaintiff.

551.    The above occurred a few months after Plaintiff typed "Lawsuit" in which Plaintiff had requested Court to order Judgement against Defendants in the amount of "...Twenty Three Million Dollars...".

552.    Undeniably, above Television Hosts are under the mistaken impression that their newly arrived at  responses of "Practical Joke" against a Private Individual (as opposed to being a Public Personality) can forgive damages caused to Plaintiff by Defendants due to Invasion of Plaintiff's Privacy, among numerous other damaging actions against to Plaintiff.

553.    During  2001, and repeatedly at various times, Charles Laquidara had also stated "It's a Practical Joke", "Can't you take a Joke?", and "It's a Joke."

554.    A Practical Joke has a market value of Five ($5) Dollars.

555.    Charles Laquidara had  stated  in obvious reference to the Plaintiff during

63

1999 on the <u>WZLX</u> radio program of which he was the disc jockey "<u>The most hated woman in Rock 'n Roll.</u>"

556.   Charles Laquidara had stated during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "No matter where you go, you will never have any Privacy. "

557.   Charles Laquidara had stated during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "If you go into any restaurant in Florida, and lean over the Flowers in the vase on the table, you will not have any Privacy."

558.   Charles Laquidara had stated during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey " It's Discrimination" repeatedly on the Radio.

559.   Charles Laquidara had stated during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "It's insidious."

560.   When Charles Laquidara had stated "You are going Down" during 1999 on the <u>WBCN</u> radio program of which he was the disc jockey, the above Statement was intended as a threat against Plaintiff.

561.   When Charles Laquidara had stated during 1999 and 2000 and 2001 on the <u>WZLX</u> radio program of which he was the disc jockey "It's Blackmail," the above Statement was intended as a threat against Plaintiff.

562.   When Charles Laquidara had stated "They are either going to Make You or Break You," during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey, the above Statement was intended as a threat against Plaintiff.

563.   Charles Laquidara had stated during 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "The first thing you need to do is to get rid of the Intruder."

564.   Plaintiff had contacted the F.B.I. and C.I.A. during 1999 to no avail, having been advised that resources are not available to such agencies to assist private citizens.

565.   In regard to the above, Charles Laquidara had stated "They have been trying for 20 years to get you and they finally did. And I am so glad." The statement clearly identifies Defendants intentions in regard to Invasion of Plaintiff's Privacy and all of the above references to Plaintiff that had been made in various segments of the Media.

566.   On December 2, 1998 on television Channel 4, while Plaintiff resided in Newton, Massachusetts, Craig Kilbourne had stated "Give it Away for Free".

567.    The Plaintiff had been typing the "Book" in Plaintiff son's room.

568.    The Plaintiff had presumed that Plaintiff could work in other rooms and areas of Plaintiff's home in order to interfere with the Invasion of Privacy which had been occurring in Plaintiff's home and Plaintiff's life.

569.    The Plaintiff thereupon discovered that Plaintiff could not avoid the Invasion of Plaintiff's Privacy by working in other rooms of Plaintiff's home.

570.    Defendants direct attacks against Plaintiff and for their involvement with other Media Personalities in the above referred conspiracy to vicimize Plaintiff which had caused and continues to cause immeasurable harm, suffering, and irreversible damage to Plaintiff.

571.    On July 17, 2002 a San Francisco based source of Talk Show Host's Television made the statement the "Golden Goose", a statement and description undoubtedly of Plaintiff.

572.    Any reasonable person can easily conclude that the above reference to "Golden Goose" was due to all other articles of Value, all business papers, all Profit and Loss Statements, all Plaintiff's typewritten Fine Arts notes that had been stolen from Plaintiff's home.

573.    During the year 2002, as Plaintiff watched CNN Television and Stock Market Analysts' program, the Panel Discussion Group's Leader stated "...IT'S THE FORMULA, STUPID ..."

574.    This statement, considered in conjunction with all of Plaintiff's quotations of Defendants named herein, among other Media Personalities, causes it to be obvious to the Court that the Defendants named herein are guilty of Invasion of Privacy of Plaintiff and thereby, also responsible for all Losses suffered by Plaintiff as a direct result of such damages caused to Plaintiff.

575.    Plaintiff hereby stipulates that if the Defendants, David Letterman, Craig Kilborne and Channel Four Television, had not Invaded Plaintiff's Privacy and had not committed all violations and illegal activities against Plaintiff as herein stated, and had not committed the breaches against Plaintiff during numerous years, other third parties who perpetrated attacks would never have done so.

576.    Although third parties perpetrated illegal activities against Plaintiff, said third parties had been influenced by Defendants' Invasion of Plaintiff's Privacy, Harassment of Plaintiff and all other Counts herein stated.

577.    Additionally, certain third parties who perpetrated illegal activities against

Plaintiff had also been in the employ of Defendants, either directly or indirectly, undeniably received benefits from Defendants to perpetrate such activities against Plaintiff in one form or another.

578.    All illegal activites which had been perpetrated against Plaintiff in one form or another were directly caused by the Defendants' Invasion of Plaintiff's Privacy, Harassment of Plaintiff, Interferring with Plaintiff's Quiet Enjoyment, Defamation of Character of Plaintiff, and all other Counts as herein stated.

579.    Plaintiff has spent numerous thousands of hours in Plaintiff's attempts to guard her Privacy, to safeguard her Home, and to safeguard her commercial premises in performing the following, all to no avail: to learn identity of persons who have broken into her Homes in both Massachusetts and New Hampshire, to protect her homes from Individuals' unlawfully enterring her homes, including having spent numerous hundreds of dollars at each home in the installation of "Burgular Proof Locks", including having attempted to have installed surveilance equipment to her home, nailing all windows shut in her Massachusetts residence when Plaintiff discovered that simply having Locks on all Windows had no effect in keeping Individuals from unlawfully enterring her home, in having purchased many combination Steel Floor Safes in which Plaintiff attempted to hide and to store Plaintiff's personal and business property, yet thereafter having found contents of various Safes had been Stolen.

580.    Plaintiff had tightly closed all Draperies in her home in Massachusetts, in the expectation that possibly a neighbor had been committing "Surveilance" of the interior of Plaintiff's home and private person from outside of Plaintiff's home, again to no avail.

581.    Plaintiff had on several occasions employed licensed Private Investigators to apply their equipment to searching for Surveilance Equipment in her home on several occasions and at costs of thousands of dollars to Plaintiff, to no avail, with the exception that said Detectives found that it appeared that signals were being transmitted to "Radio Stations".

582.    Plaintiff hereby states that Plaintiff has spent Thousands of Hours in Searching the Internet in her attempts to uncover the above referred to Victimization of Plaintiff and of some 30 years of Plaintiff's Life and has been unable to find said documentation on the Internet. Undoubtedly, this is due to Plaintiff's lack of Knowledge in this realm.

583.    Plaintiff hereby contends that it is not a requirement that any United States Citizen must be knowledgeable in Internet usage or in any other Media applications in order for Plaintiff or any other United States Citizen to not be Deprived of Plaintiff's "Unalienable Rights" as a United States Citizen.

584.    Defendants Interfered with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

585.    Defendants had involvement with Business Associates in a Conspiracy to Invade Plaintiff's Privacy, did so for numerous years, and continue to do so to date.

586.    Defendants interferred with Plaintiff's Constitutional Right of Plaintiff without ever obtaining any permission from Plaintiff to do so, either written or verbally to do so, for doing so during numerous years and for said illegal actions ongoing to date.

587.    The Defendants illegally have broken numerous Constitutional Laws when Defendants persecuted and victimized Plaintiff, the illegal activities having been perpetrated because Plaintiff was a single woman and lived alone, thereupon causing Plaintiff to be a readily available Victim.

588.    Plaintiff hereby stipulates that no Private Citizen of the United States needs to live this way.

589.    The absolute and total futility and waste of one Human Life and the ensuing Horror to Plaintiff of being forced to live such a life has been due to the constant Invasion of Plaintiff's Privacy during innumerable years and ongoing to date by Defendants and Defendants Co-Conspirators.

590.    Plaintiff has had great difficulty in Plaintiff's attempts to prove the methods which Defendants have employed and have continued to employ in the Defendants Vicitimization of Plaintiff.

591.    Radio Stations, Television Stations, Media Personalities, Movie Personalities, and such are certainly persons of substantial means and certainly have access to equipment that is sufficiently sophisticated to be able to break into any private citizen's home and to be able to conduct surveilance upon any private citizen, should they desire to do so.

592.    Each and every Defendant herein named should immediately be placed in prison for their Involvement in the most unscrupulous, underhanded activities in which they have been involved, and ongoing for years, in their attacks upon a private citizen of the United States of America.

593.    No fine, no dollar penalty, no lawsuit is sufficient to penalize each and every Defendant herein named for their evil intentions and for their evil activities in regard to their attacks upon the Plaintiff.

594.    The herein Summons and Complaint demonstrates that no United States Citizen is safe from the potential attacks of the Media, whether that Citizen is the Plaintiff or whether that Citizen is any other person who resides in the United States of America.

595.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

68

## COUNT V

### ALIENATION OF AFFECTION
### & OTHER PERSONAL LOSSES

596.   Plaintiff realleges paragraphs 1   through        595 above and incorporates them by reference as if stated herein.

597.   The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

598.   The Defendants committed willful, malicious and deceptive illegal activities which interferred with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

599.   The Defendants Interferred in Plaintiff's Constitutional Right to Privacy in that Defendants, directly or indirectly, invaded Plaintiff's Privacy, and were involved in a conspiracy to conduct Surveillance of Plaintiff and of Plaintiff's home, did so for numerous years, and continue to do so to date.

600.   The Defendants interfered with nearly every Constitutional Right of Plaintiff, said Interference ongoing to date.

601.   Because Defendants' illegal activities which had been perpetrated against the Plaintiff caused Plaintiff to suffer enormous financial losses, Plaintiff's financial losses caused Plaintiff to further suffer Alienation of Affection of Plaintiff's Children.

602.   All herein described Losses of Plaintiff have been due to the willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to,   Invasion the Privacy of the Plaintiff, Infringements of Plaintiff's Rights, Intentional Infliction of Emotional Harm  and Harassment of the Plaintiff, in addition to the Involvement of Defendants in a Conspiracty to Invade the Privacy of the Plaintiff,  among all other illegal activities described herein which were perpetrated against the Plaintiff.

603.   The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, and led to great Financial Loss to the Plaintiff in the form of potential Income and Profits that Plaintiff could never thereafter earn.

604.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

605.    In addition, Defendants illegal activities against Plaintiff have cost immeasurable amounts of Personal Losses to the Plaintiff.

606.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

607.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

608.    The willful, malicious and deceptive illegal activities which Defendants perpetrated against Plaintiff caused great financial losses to Plaintiff's eldest son, for which Plaintiff son inadvertently blamed Plaintiff, causing Alienation of Affection of Plaintiff's son of Plaintiff.

609.    Plaintiff suffered additional personal losses because Plaintiff had been unable to entertain friends or family members  in Plaintiff home due to the constant and continuous Invasion of Plaintiff's privacy and Interference in Plaintiff's life by Defendants.

610.    Plaintiff had been unable and unwilling to become romantically involved with any member of the opposite sex during innumerable years because it would have been impossible for Plaintiff to develop a relationship with any such member of the opposite sex in Plaintiff Home because Plaintiff Privacy was constantly being invaded, ongoing to date.

611.    Plaintiff had been forced to live alone for some 30 years, due to the above referred to illegal surveillance of Plaintiff in her Home.

612.    Plaintiff had been forced to suffer needlessly due to the utter selfishness of individuals who continue to participate in such mindless surveillance of Plaintiff life, of Plaintiff Home, of Plaintiff in her car,  of every facet of Plaintiff life, and of every activity in which Plaintiff had become involved.

613.    Plaintiff is a Private individual,  is not a Public figure. therefore,  Plaintiff had been unable to protect herself against the above-referred to Surveilance of Plaintiff's Home and Plaintiff activities.

614.    Defendants perpetrated horendous illegal activities against Plaintiff during 1987, in addition to all other years, immediately upon Plaintiff's three children having moved out of Plaintiff's Home during June, 1987 in order to attend Colleges and Universities in other States, to have relocated hundreds to thousands of miles away from Plaintiff.

615.    Since Plaintiff lived alone after June, 1987, Plaintiff thereupon became an easy target for the willful, deceptive malicious illegal activities which had been perpetrated against Plaintiff, Defendants being directly responsible for and directly involved in the illegal activities against Plaintiff.

616.    Tenants of the Plaintiff who resided in 2nd Unit of Plaintiff's home from September to December, 1987 drove Plaintiff into Nervous Breakdown immediately upon residing in Plaintiff's home.

617.    Plaintiff had been in perfect mental and physical health before above harassment and illegal activities had been perpetuated against Plaintiff by Tenants of Plaintiff 2 Unit home.

618.    Tenants of the Plaintiff drove Plaintiff into Nervous Breakdown by deceptively providing Plaintiff halucinogenic drugs, hidden within a tray of brownies laced with halocinogenic drugs, without Plaintiff's knowledge, Tenants having given a tray of brownies to Plaintiff as a gift which Plaintiff ate, and for harassing Plaintiff during 4 months time, including causing Plaintiff to not sleep for several nights time in a row.

619.    Plaintiff became immediately mentally ill after having eaten the tray of brownies, began to halucinate and began to have suicidal tendancies, the above continuing for months of time.

620.    Numerous other incidents had also been perpetrated against Plaintiff by Defendants during early and late 1987 which were the direct result of the illegal activities of the Defendants, said illegal activities having been responsible for driving the previously healthy Plaintiff into a Nervous Breakdown, in addition to the illegal activities of the Tenants.

621.    Upon Plaintiff realizing the source of Plaintiff's halucinations, thereafter lived in fear of the Tenants because they were occupants of Plaintiff's home.

622.    All of the above referred to Tenants had occupations in the Media in the film industry, music industry and publishing industry.

623.    All of the above referred to Tenants had been influenced by the Defendants and had been in the employ of the Defendants either directly or indirectly in order to receive financial benefits from the Defendants.

624.    Plaintiff's children, unaware of any halucinogenic drugs having been forced upon Plaintiff, forcibly had Plaintiff hospitalized, believing Plaintiff had become mentally ill.

625.    Subsequently, Plaintiff's three children sufferred trauma in believing that Plaintiff had become mentally ill.

626.    The Defendants caused Plaintiff to lose One Hundred and Seventy-Five Thousand ($175,000) Dollars of her entire Savings of Two Hundred Thousand ($200,000) Dollars on April 9, 2000, leaving Plaintiff nearly penniless thereafter, with the exception of the remaining some Twenty-Five Thousand ($25,000) Dollars in Savings.

627.    The Defendants caused the Plaintiff again to lose approximately Sixty-Five Thousand ($65,000) Dollars in the Stock Market during the Fall of 2000, the Sixty-Five Thousand ($65,000) Dollars having been obtained by Plaintiff when Plaintiff refinanced Plaintiff's New Hampshire property in August, 2000.

628.    For the Plaintiff, thereafter, being left entirely penniless after the above referred to  Loss, the entire proceeds remaining from some One Million ($1,000,000) Dollars or more in previous Equity in Plaintiff's Real Estate holdings to the year 1999.

629.    Plaintiff's above referred to Savings of Two Hundred Thousand ($200,000) Dollars  represented part of Plaintiff's Equity which proceeds received when Plaintiff sold Plaintiff's home in Massachusetts, said property to have accummulated equity during Plaintiff's thirty-five years of ownership and improvements.

630.    For causing Plaintiff, thereupon, due to the above financial losses to Plaintiff, to be unable to improve and repair her two commercial properties, thereby causing Plaintiff to become unable to lease or to sell either of said premises in order to produce an income to Plaintiff.

631.    The willful, deceptive and malicious illegal activies which  Defendants which had been perpetrated against Plaintiff caused Plaintiff to be forced to declare Bankruptsy during June, 2001.

632.    The above cash losses to Plaintiff interferred with Plaintiff's need and attempts to rehabilitate Plaintiff's two commercial properties, leading to great further financial losses to Plaintiff and losses of years' time in performing any rehabilitation to either property.

633.    For the fact the above forced Plaintiff to sell one commercial property in Middleborough, Massachusetts for approximately $200,000 less than it's market

value would have been if Plaintiff had been financially able to expend some $20,000 to $40,000 in rehabilitation that was severely required.

634.    The above Financial Losses forced Plaintiff to be unable to obtain adequate funding to perform rehabilitation to Plaintiff's commercial property in New Hampshire, and finally Plaintiff being forced to obtain said funding at prohibitive interest costs of 27% Interest and other excessively expensive penalties and refinance costs.

635.    Plaintiff was thereafter forced to request funding from her son's income in order to sustain Plaintiff's life and to sustain Plaintiff's carrying costs and expenses of her two commercial real estate holdings.

636.    The above Financial Losses of Plaintiff caused great stress and grief to Plaintiff's son.

637.    The above Financial Losses suffered by Plaintiff severely interferred with Plaintiff's son's ability to earn an income.

638.    For the fact that all the following Financial Losses suffered by Plaintiff's Son were due to all of the Defendants' willful, deceptive and malicious illegal activities which had been perpetrated against Plaintiff as described above.

639.    The Defendants caused the Plaintiff's son to lose approximately Two Million ($2,000,000) Dollars in the Stock Market on approximately April 8, 2000 of his entire holdings of approximately Three Million ($3,000,000) Dollars which he held in the Stock Market, which he had accummulated during an approximately ten year period of time as a practicing medical physician, having invested all of his available cash from his income into the Stock Market.

640.    For the subsequent damage due to Defendants' interference in Plaintiff's Life caused damage to Plaintiff's Son's health in the form of grief suffered by Plaintiff's Son thereafter and continuing to this date,  due to the Plaintiff's Son's Loss of approximately   Two Million ($2,000,000) Dollars in the Stock Market  of his entire Stock Market portfolio of approximately Three Million ($3,000,000) Dollars on approximately April 8, 2000, and subsequently losing an additional Four Hundred Thousand ($400,000) Dollars of his remaining One Million ($1,000,000) Dollars in the fall of the year 2000.

641.    Plaintiff's Son's entire previous holdings of Three Million ($3,000,000) Dollars which he had owned in Stock refelected his entire Savings and  Retirement Fund.

642.    The above Financial Losses sufferred by Plaintiff severely interferred with Plaintiff's son's ability to earn an income.

643.   Plaintiff's son sufferred Alienation of Affection towards Plaintiff, inadvertently blaming Plaintiff for son's financial losses.

644.   For the fact that Charles Laquidara had stated on the radio during 1998 "They have been trying to get you for 20 years and finally did, and I am so glad the did".

645.   The above quotation of the statement made by Charles Laquidara demonstates the fact that the Defendants were directly responsible and liable for any and all Financial Losses sufferred by Plaintiff, by Plaintiff's Family Members, and Plaintiff's subsequent Heirs.

646.   Defendants were responsible for all Financial losses sufferred by the Plaintiff in the field of Real Estate Investments and in regard to Plaintiff's attempts to purchase valuable Commercial Real Estate for far below Market Value, causing damage to the Plaintiff in the form of Plaintiff's loss of potential Income in regard to Plaintiff's plan to convert said Premises from Warehouse buildings to Storage Facilities and to rental premises.

647.   The Financial losses to Plaintiff's direct Heirs and their subsequent Heirs would be counted in the Billions of Dollars of Financial losses.

648.   Plaintiff spent the major portion of some three years time and innumerable thousands of hours during which time Plaintiff researched all available Commercial Real Estate listed "For Sale" in Massachusetts and, subsequently, in New Hampshire, which were warehouses of 20,000 square feet and larger, that is, as large as 200,000 square feet.

649.   Plaintiff's children had been aware of Plaintiff's financial plans in the realm of investing in Commercial real estate and of Plaintiff's intended NET annual income to have been thereby earned by Plaintiff.

650.   Plaintiff accuses Defendants of being directly and indirectly responsible for Plaintiff's Loss of NET Annual Income potential in the amount of Nine Hundred Thousand ($900,000) Dollars per year during a period of Fourteen years (14 years), for a Total Loss of NET Income to Plaintiff in the amount of Twelve Million Six Hundred Thousand ($12,600,000) Dollars for the years 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998 and 1999 alone.

651.   Plaintiff accuses Defendants of being directly and indirectly responsible for Plaintiff's Loss of NET Annual Income potential in the amount of Nine Hundred Thousand ($900,000) Dollars per year during the past four years, for a Total Loss of NET Income to Plaintiff in the amount of Three Million Six Hundred Thousand ($3,600,000) Dollars for Plaintiff's Loss of NET Annual Income during the years

2000, 2001, 2002, and 2003, plus losses in the amount of Nine Hundred Thousand ($900,000) Dollars per year for the year 2004 and until such time as Judgement is ordered to the Plaintiff from the Defendants.

652.    Undeniably, the Defendants' illegal activities which had been perpetrated against Plaintiff caused Plaintiff to not be able to realize the above.

653.    Undeniably, Defendants' illegal activities led directly to Alienation of Affection of Plaintiff's children towards Plaintiff.

654.    Plaintiff demands that the Court order Defendants to pay to Plaintiff the Total Amount of Five Million ($5,000,000) Dollars because of Plaintiff's immeasurable Personal Losses which Plaintiff had been forced to suffer during innumerable years, all said Personal Losses, including Alienation of Children's Affection towards Plaintiff, caused directly because of Defendants illegal activities which Defendants perpetrated against Plaintiff.

655.    All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

656.    Therefore, Plaintiff demands that the Court order Defendants to pay Plaintiff damages in the amount of Twelve Million Two Hundred and Ten Thousand ($12,210,000) Dollars because Defendants had been guilty of causing Plaintiff to suffer the above amount in financial losses, said losses having led to Plaintiff's sufferring Allienation of Affection of Plaintiff's children to Plaintiff and due to Plaintiff and Plaintiff's family members losses due to Defendants illegal activities as described herein.

657.    Because Defendants actions had been willful, malicious, and deceptive, Plaintiff hereby demands the Court to order Defendants to pay Plaintiff treble damages, but in no event less than double damages, for a total amount of damages of Thirty-Six Million Six Hundred and Thirty Thousand ($36,630,000) Dollars in damages because Defendants' illegal actions caused Plaintiff and Plaintiff's family members to suffer enormous financial losses and because Plaintiff has suffer Alienation of Affection of Plaintiff's Family members to Plaintiff, said sufferring having been caused by illegal activities of Defendants, plus Interest, compounded annually, plus reasonable attorney fees plus court costs.

658.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

## COUNT VI

### DEFAMATION OF CHARACTER
### in the form of
### LIBEL AND SLANDER

659.   Plaintiff realleges paragraphs  1  through  658  above and incorporates them by reference as if stated herein.

660.   Defendants are and have been guilty of Defamation of Character of Plaintiff in the form of Libel and Slander when Defendants recklessly, willfully, maliciously, deceptively and negligently made slanderous and libelous defamatory statements about the Plaintiff during televised broadcasts, in addition to all other illegal activities referred to herein

661.   The intention of Defendants had been malicious in Defendants' perpetrating illegal activities against Plaintiff as described herein, the purpose having been to cause Plaintiff to suffer great financial and emotional loss, to humiliate Plaintiff, to riducule Plaintiff, and to cause Plaintiff loss of credibility in the eyes of Plaintiff's peers.

662.   The Defendants have unmercifully caused Defamation of Character of Plaintiff during innumerable years in the form of thousands upon thousands of Statements made by the Defendants, namely David Letterman and Craig Kilborne, which referred to the Plaintiff, and referred to herein in Count I,  under camoflauge, using the word "she", and in making reference to Plaintiff's activities and/or daily activities and made reference to such personal matters as the City or Town in which Plaintiff resided, to Plaintiff's automobile license plate for the purpose of identifying Plaintiff, doing so on television before hundreds of thousands of audience members.

663.   The purpose of the Defendants' Defamation of Plaintiff has been to humiliate, riducule, cast dispersions upon Plaintiff, cause Plaintiff to be viewed with Contempt and Hatred, and to destroy Plaintiff's reputation in the eyes of Plaintiff's peers and business associates.

664.   The Defendants have unmercifully caused Defamation of Character of Plaintiff during innumerable years in the form of thousands upon thousands of Statements made by business associates and / or other Media personalities, referred to in Count II,  with whom Defendants had been involved in a Conspiracy to Invade Plaintiff's Privacy and to cause Defamation of Character of Plaintiff, the purpose having been to humiliate, riducule, cast dispersions upon Plaintiff and to destroy Plaintiff's reputation in the eyes of Plaintiff's peers and business associates.

665.   The Defendants and their business associates with whom the Defendants had been involved in a Conspiracy to cause Defamation of Character of Plaintiff and to

Invade Plaintiff's Privacy, said Statements referred to in Count II, made reference on either the Radio or Television of such personal matters as the City and /or Town in which  Plaintiff resided, to Plaintiff's automobile License Plate, to Art Forum Magazine, November, 1987 issue, in which above referred "doctored" photographs of Plaintiff appeared  for the express purpose of further identifying Plaintiff to the viewing and/or daily listening audience.

666.    Defenants caused Defamation of Plaintiff's character because Defendants were responsible for the publication of  photographs of Plaintiff illegally having been taken without Plaintiff's consent, photographs of Plaintiff illegally having been taken in her home via Invasion of Plaintiff's Privacy, photographs of Plaintiff's face illegally having been affixed to a falsified and doctored photographs of a nude woman's body, photographs of Plaintiff's face illegally having been affixed to falsified and doctored photographs of a woman's garmented body.

667.    If the Defendants had not been guilty of Defamation of Character of Plaintiff, had not been involved in a Conspiracy to Defame Plaintiff's Character and to Invade Plaintiff's Privacy, the publishing of the above referred to photographs and articles would not have occurred.

668.    The intention of publishing of the above referred to photographs had been to cause Defamation of Character to the Plaintiff with the intention of damaging Plaintiff's professional career, professional reputation and personal reputation.

669.    Because said photographs  had been published in Art Forum magazine (1987) and the Gallery Guide (1999), Defendants are and were guilty of Libel.

670.    Because said photographs had been published in Art Forum magazine (1987) and the Gallery Guide (1999) Defendants are and were guilty of Slander because the purpose of said photographs had been to slander Plaintiff's reputation.

671.    Severe psychological damage had been done to Plaintiff because Defendants were directly or indirectly responsible for the above referred to Art Forum magazine publication having been repeatedly referred to on the air with the express intention of causing Defamation of Character to Plaintiff and of identifying Plaintiff.

672.    Severe damage had been caused to Plaintiff because Plaintiff thereupon sufferred a nervous breakdown for which Plaintiff required hospitalization during 1987.

673.    Severe damage had been caused to Plaintiff because, after having recovered from nervous breakdown, because for seven years Plaintiff had not listenend to any radio stations due to fear of a repetition of the damage again being caused to Plaintiff in the form of another nervous breakdown, thereby Plaintiff having lost the entertainment value to which every United States Citizen is entitled.

674.    In regard to the Gallery Guide publication, at that time Plaintiff had been an accepted member of the artist community, having exhibitted Paintings in a Boston gallery and a Massachusetts museum.

675.    The above incident of the Gallery Guide publication severely damaged and destroyed Plaintiff's career as a Painter.

676.    Had the Defendants not been involved in a Conspiracy with other media personalities to cause Defamation of Character of Plaintiff, among all other illegal activities, the above referred to damaging incident in regard to the Gallery Guide magazine publication would never have occurred.

677.    The dollar loss to Plaintiff in regard only to the above two incidents is immeasurable.

678.    The personal loss to Plaintiff in regard only to the above two incidents is immeasurable.

679.    The dollar losses sufferred by Plaintiff due to Defendants' Defamation of Plaintiff's Charater in regard to the Statements made by Defendants in televised broadcasts, as referred to in Count I, as well as those referred to in Count II and other Counts herein, is absolutely immeasurable.

680.    The personal losses sufferred by Plaintiff due to Defendants' Defamation of Plaintiff's Charater in regard to the Statements made by Defendants in televised broadcasts, as referred to in Count I, as well as those referred to in Count II and other Counts herein, is absolutely immeasurable.

681.    The dollar loss and personal losses to Plaintiff in regard to Defendants' Invasion of Privacy and Conspiracy to Invade Plaintiff's Privacy is absolutely immeasurable and a violation of the Plaintiff's Rights provided for in the U.S. Constitution.

682.    Each and every quotation made by the Defendants in Count I of this Complaint caused Plaintiff Defamation of Character in the form of Libel and Slander because the intention had been malicious, to ridicule Plaintiff, to humiliate Plaintiff, and to cause financial losses and damages to Plaintiff.

683.    Each and every quotation made by Third Parties in Count II of this Complaint caused Plaintiff Defamation of Character in the form of Libel and Slander because the intention had been malicious, to ridicule Plaintiff, to humiliate Plaintiff, and to cause financial losses and damages to Plaintiff.

684.    All illegal activities which had been perpetrated by Defendants and which

have been referred to herein have caused severe Defamation of Character to Plaintiff, in both Libel and Slander.

685.    The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

686.    The Defendants illegally committed and were responsible for Surveilance perpetrated against Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance of Plaintiff and all of Plaintiff's activities, having continued during innumerable years.

687.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

688.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and has been a private Individual and not a Public figure.

689.    The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

690.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

700.    The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly or indirectly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years, ongoing to date.

701.    The Defendants illegally committed and were responsible for Surveilance perpetrated against Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance of Plaintiff and all of Plaintiff's activities, having continued during innumerable years, ongoing to date.

702.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

703.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

704.    The purpose and intention of Defendants' Invasion of Plaintiff's Privacy and Involvement with Conspirators in the Invasion of Plaintiff's Privacy had been to cause Defamation of Character to Plaintiff, to cause Plaintiff to be viewed with Contempts, Hatred, Ridicule, to cause Libel and Slander to Plaintiff.

705.    The further intention of Defendants' Invasion of Plaintiff's Privacy and Involvemnt with Conspirators in the Invasion of Plaintiff's Privacy had been for the Theft of Plaintiff's Intellectual Property, as referred to in Count III and Count XI.

706.    The result of Defendants above Defamation of Character of Plaintiff is that Plaintiff's career as a Fine Arts Painter has been destroyed, thereby costing Plaintiff immeasurable losses financially and personally.

707.    The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

708.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

709.    The Defendants had involvement with individuals and/or business associates who attacked Plaintiff in said associates perpetrating Theft to Plaintiff's home of Plaintiff's Instructions in regard to revolutionary Fine Arts' application of paint to canvas which represented four (4) years of Plaintiff's research.

710.    David Letterman had stated during the recent past few years "The Kids are allright" during a televised broadcase of the "David Letterman Show," demonstrating his encouragement of illegal actions of said individuals against Plaintiff.

711.    David Letterman had stated during the recent past few years "The Kids are allright," during a televised broadcast of the "David Letterman Show" demonstrating his involvement in a Conspiracy to commit illegal actions against Plaintiff, causing Plaintiff great financial and personal Losses.

712.    Charles Laquidara had stated in obvious reference to the Plaintiff during 1994 throughout 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "I will Fire YOU if you wreck "her" painting materials", demonstrating his involvement in a Conspiracy to commit illegal actions against Plaintiff, causing Plaintiff great financial and personal Losses.

713.    Charles Laquidara had also made statements which referred to "Interns" of the radio station."

714.    When Charles Laquidara had stated during 1994 throughout 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "I will Fire you if you wreck "her" painting materials", Plaintiff found that turpentine had been added to Plaintiff's quarts of water based Acrylic paints and which Plaintiff had prepared in advance to be utilized during Plaintiff's painting process and to Plaintiff's large supply of about 20 Fine Arts Paint Brushes.

715.    When Charles Laquidara had stated during 1994 throughout 1999 on the <u>WZLX</u> radio program of which he was the disc jockey "I will Fire you if you wreck "her" painting materials", the implication was that "every other illegal activity is allowed" by Charles Laquidara and by the radio station at which he had then been employed.

716.    For the fact that no one would destroy any Painter's Painting Materials and Paint Brushes which were required for Plaintiff to continue to Paint, unless those persons, or individual(s) whom those persons represented, had something to gain in so doing.

717.    The only possible reason why any individual(s) would perform such an illegal activity would have been that said individual(s) wished to produce Plaintiff's Painting Ideas and Approaches to Painting themselves or for the benefit of an Individual (s) whom they represented in one capacity or another instead of the Plaintiff so doing.

718.    The above statement had been made by Charles Laquidara on Monday morning, immediately upon Plaintiff's return from a trip to New York City Fine Arts Galleries during which trip Plaintiff had found her privacy to have been Invaded upon in her Home and other very disturbing exhibits, including the Video of the Freak, Painter.

719.    Charles Laquidara had stated in obvious reference to the Plaintiff during 1998-1999 on the <u>WBCN</u> radio program of which he was the disc jockey "They've been trying to get her for Twenty years and I'm glad they finally did."

720.    The above statement had been made by Charles Laquidara on Monday