morning, immediately upon Plaintiff's return from a trip to New York City Fine
Arts Galleries during which trip Plaintiff had found her privacy to have been
Invaded upon in her Home and other very disturbing exhibits, including the Video
of the Freak, Painter.

721.    A Theft had occurred in Plaintiff's home of Plaintiff's photographs of
"Details" of sections of Plaintiff's Paintings which Plaintiff taken during Plaintiff's
process of Painting.

722.    Copies of Plaintiff's photographs of "Details" had been incorporated in the
Labels of Wine Bottles to be sold to the general public, said Wine Bottles having
been advertised on the David Letterman Show during 1999.

723.    Third Party Harassment of Plaintiff had led Plaintiff into Nervous
Breakdown during late 1987, said third parties having been influenced and
encouraged to perpetrate illegal actions against Plaintiff.

724.    Said Nervous Breakdown of Plaintiff during late 1987 had caused great
sufferring to Plaintiff: emotionally, physically, financially and had caused great
sufferring to Plaintiff's family members, said sufferring to Plaintiff and Plaintiff's
family members having been caused directly due to Defendants' perpetrating of
illegal activities against Plaintiff and Defendants' involvement with individuals who
perpetrated illegal activities against Plaintiff.

725.    All of the above having cost innumerable millions of dollars of Financial
Losses to Plaintiff and immeasurable amounts of Personal Losses to the Plaintiff
during each and every year during the past twenty to thirty years, the above
ongoing to this date.

726.    Due to the direct or indirect willful and malicious Involvement of Defendants
in a Conspiracy to Invade the Privacy of the Plaintiff, for Defendants Infringements
of Plaintiff's Constitutional Rights and for Defendants Harassment of the Plaintiff,
for Defendants' involvement with and encouragement of individuals who were guilty
of Breaking and Enterring into Plaintiff's Home, and of Theft of Contents from
Plaintiff's Home, which included, but were not limited to, all of Plaintiff's
Typewritten Instructions of methods of the Application of Acrylic Paint to a
Painting were Stolen from Plaintiff's Home during the years 1992, 1993, 1994, 1995,
1996, 1997, 1998 and 1999, among all other illegal activities described herein which
were perpetrated against the Plaintiff.

727.    For the fact that Plaintiff applied the date of 1992 above because 1992 was
the time Plaintiff first exhibited her Paintings which utilized the above referred to
Revolutionary approach.

728.    For the fact that between the years 1988 and 1992 Plaintiff had exhibited her

Dockets.Justia.com

Paintings in two important Exhibitions in the Boston Area. Plaintiff had invented an excellent approach to painting during the above period of time.

729.    For the fact that Plaintiff had spent some four (4) years, from 1988 to 1992, in researching, in perfecting and developing the above referred to Revolutionary method of applying paint in her method of paint application.

730.    For the fact that Plaintiff's above referred to method of paint application was financially very lucrative because:

      1.    Acrylic Paint dries within 30 minutes of applying acrylic paint to a painting.
      2.    For some forty or so years since the invention of Acrylic Paint as a Fine Arts
          Painting Material, this problem has plagued Painters.
      3.    Plaintiff painstakingly resolved the problem in order to be able to keep Acrylic
          Paint "wet" and pliable for Four Hours, the time required by Plaintiff to complete
          stage one of an entire Painting.
      4.    Had Plaintiff desired to do so, Plaintiff could have Published the above approach
          in Books, could have obtained all rights to any application of the above.
          could have obtained employment as a College Professor to teach the above
          Revolutionary approach in Art Schools, had Plaintiff so desired to do so
      5.    The reason Plaintiff had developed the above method was in order to create,
          exhibit, and to sell her own Paintings in Art Galleries

731.    Instead, due to the Defendants' willful and malicious direct or indirect Involvement in a Conspiracy to Invade the Privacy of the Plaintiff, Infringements of Plaintiff's Constitutional Rights, Harassment of the Plaintiff, Breaking and Enterring into Plaintiff's Home, Theft of Contents from Plaintiff's Home, Interference with Plaintiff's Right to Earn a Living, among all other illegal activities described herein which were perpetrated against the Plaintiff, all of the above referred to Options were no longer available to the Plaintiff.

732.    Instead of Plaintiff thereafter having been able and allowed to have sold her valuable Paintings in order to earn a good living from said sales, Individuals who had Stolen above Instructions to methods of Applying Acrylic Paint to Fine Arts Painting thereafter, in using Plaintiff's above referred to methods, were able to sell their Paintings in the amount of Twenty Thousand ($20,000) for each painting, to

have sold some twenty paintings in one exhibit, for a grand total of Four Hundred Thousand ($400,000) Dollars in PROFIT from one Exhibit alone, or per year, all due to the Theft of Contents from Plaintiff's Home.

733.    If one considers that Plaintiff could have held numerous Exhibits of Plaintiff's Paintings in numerous cities throughout the Country, one can easily see that the Profit amount easily become immeasurable.

734.    If the Court multiplies the above Loss to Plaintiff in the amount of Four Hundred Thousand ($400,000) Dollars times only one Exhibit per year for twenty years (20), due to the necessity of selecting a number of years during which Plaintiff should have been able to have realized a profit from her difficult Research, the Court will arrive at a Total Loss to the Plaintiff in the amount of Eight Million ($8,000,000) Dollars.

735.    Because Defendants were guilty of willful and malicious activities against Plaintiff, direct or indirect Involvement in a Conspiracy to Invade the Privacy of the Plaintiff, Infringements of Plaintiff's Constitutional Rights, Harassment of the Plaintiff, involvement with and encouragement of individuals who were guilty of Breaking and Entering into Plaintiff's Home, involvement with and encouragement of individuals who were guilty Theft of Contents from Plaintiff's Home, Defendants' Interference with Plaintiff's Right to Earn a Living,  among all other illegal activities described herein which were perpetrated against the Plaintiff, Plaintiff demands that the Court award Treble damages to Plaintiff, but in no event less than Double damages, for a Total Amount of damages due to the above of Twenty Four Million ($24,000,000) Dollars at Treble damages.

736.    Because Defendants had been guilty of all of the above illegal activities that had been perpetrated against Plaintiff, in addition to all other illegal activities described herein which were perpetrated against the Plaintiff,  and had, thereby, been guilty of destroying Plaintiff's professional Career as a Fine Arts Painter,  Plaintiff demands that this Court order Defendants named herein to pay Interest of 12%, compounded annually, to Plaintiff of the above referred to Twenty Four Million ($24,000,000) Dollars,  to arrive at an Interest Amount of Two Million Eight Hundred and Eighty Thousand ($2,880,000) Dollars in Interest Compounded Annually.

737.    If the Court will apply the Interest Amount of Two Million Eight Hundred and Eighty Thousand ($2,880,000) Dollars per YEAR in Interest to the Eight years during which Thefts were occurring in Plaintiff's Home, the Court will arrive at a Total Interest Amount of Twenty-Three Million and Forty Thousand ($23,040,000) Dollars which the Court should order Defendants named herein to pay to Plaintiff.

738.    If the above Amount of damages for Loss of Income to Plaintiff in the area of Fine Arts Painting  in the Total Amount of  Twenty Four Million ($24,000,000)

Dollars is added to the 12% Interest, Compounded Annually, Total Amount of Twenty-Three Million ($23,040,000) Dollars, a Total Amount of Forty-Seven Million and Forty Thousand ($47,040,000) Dollars which Plaintiff demands that Court order Defendants to pay to Plaintiff will be arrived at.

739.    Due to the Defendants' Invasion of Privacy of Plaintiff in Plaintiff's Home which had also been Plaintiff's Painting Studio, Plaintiff thereupon was unable to continue to Paint adequately and properly during eight years referred to above because Plaintiff required Privacy in order to paint Fine Arts Paintings and to be able to concentrate on said Painting process.

740.    Because of these requirements, and others, including Plaintiff having required no interruptions while Plaintiff had been Painting, Plaintiff could not work outside of her Home.

741.    A so-called "artist", using the name Vivian Fishbones, during the 1990's, copied Plaintiff's methods.

742.    The above can easily be proven because in an "artist's" exhibition in New York, numerous earlier works had been created in very inferior quality of paint application and, not until Plaintiff's instructions, written after Plaintiff had completed four years of research, had been Stolen from Plaintiff's Home, did above "artist" paint application become improved and give the same appearance as Plaintiff's work.

743.    The above referred to Painter had formerly been a bad painter.

744.    The Painter was able, thereupon, to sell paintings in New York for some Twenty Thousand ($20,000) Dollars each in one exhibition alone.

745.    The painter had applied DUCT TAPE to front of Canvas

746.    The paintings' "reference value " to Plaintiff in the similarity of the words "Duct" Tape to the word "Duck"caused the above paintings to have additional monetary value.

747.    The exhibition further insulted and humiliated the Plaintiff.

748.    The Painter claimed in the advertising brochure of the exhibition to have been a Boston Painter and claimed to have been born 1938  which is same age as Plaintiff.

749.    The above would not have occurred if the Defendants had not Invaded the Plaintiff's Privacy, had not been involved in a Conspiracy to Invade the Plaintiff's Privacy, had not Harassed the Plaintiff unmercifully for innumerable years and

made thousands upon thousands of references to Plaintiff and to Plaintiff's life on television.

750.   Defendants forced Plaintiff to be unable to create Paintings in her own Home which was the very reason Plaintiff decided to retire from earning a living with a job and living only on the Rental Income Plaintiff received.

751.   Defendants caused Plaintiff to be unable to further Exhibit and Sell her Paintings which Plaintiff had already created and had already Exhibited in two of the best Art Galleries in Boston, Massachusetts, and in which every Artist and Painter in Boston strove to Exhibit their work, which fact can only attest to Plaintiff's value as a Fine Arts Painter.

752.   Because the Defendants had been guilty of Defamation of Plaintiff's Character, having done so during innumerable years, Plaintiff sufferred in the very substantial losses of a Fine Arts career as a recognized Painter.

753.   The Gallery Guide publication which mocked Plaintiff caused Plaintiff's career as a Fine Arts Painter to be destroyed, the intent of the published photograph having been to Defame Plaintiff's Character, cause Plaintiff to be viewed mockingly, viewed with Contempt and to be ridiculed.

754.   At that time of the above referred to Publication of Gallery Guide Plaintiff had been an accepted member of the artist community, having exhibitted Paintings in a Boston gallery and a Massachusetts museum.

755.   The above incident of the Gallery Guide publication severely damaged and destroyed Plaintiff's career as a Painter.

756.   Had the Defendants not been involved in a Conspiracy with other media personalities to cause Defamation of Character of Plaintiff, among all other illegal activities, the above referred to damaging incident in regard to the Gallery Guide magazine publication would never have occurred.

757.   Each and every Statement made by the Defendants and referred to in Count I of this Complaint caused Plaintiff Defamation of Character in the form of Libel and Slander damaged and destroyed Plaintiff's career as a Fine Arts Painter.

758.   Each and every Statement made by Third Parties and referred to in Count II of this Complaint caused Plaintiff Defamation of Character in the form of Libel and Slander, thereby destroying Plaintiff's career as a Fine Arts Painter.

759.   Had the Defendants not been involved in a Conspiracy with other media personalities to cause Defamation of Character of Plaintiff, among all other illegal activities, the Defamation of Character to Plaintiff by Third Parties would never

have occurred.

760.   The dollar losses suffered by Plaintiff to Plaintiff's career as a Fine Arts Painter, due only to the Statements made by Defendants in televised broadcasts, as referred to in Count I, as well as those referred to in other Counts herein, is immeasurable.

761.   The personal losses suffered by Plaintiff to Plaintiff's career as a Fine Arts Painter, due only to the Statements made by Defendants in televised broadcasts, as referred to in Count II, as well as those referred to in other Counts herein, is immeasurable.

762.   All illegal activities which had been perpetrated by Defendants which have been referred to herein, in addition to the Defamation of Character to Plaintiff, in both Libel and Slander which had been caused by the Defendants, have caused severe damage and destroyed Plaintiff's career as a Fine Arts Painter.

763.   Therefore, for the fact that, because Defendants had been guilty of all of Defamation of Character of Plaintiff, and had, thereby, been guilty of destroying Plaintiff's professional Career as a Fine Arts Painter, Plaintiff demands that this Court order Defendants named herein to pay to Plaintiff above Total Amount of Forty-Seven Million and Forty Thousand ($47,040,000) Dollars due to financial damages suffered by Plaintiff as referred to above as Loss of Income in the form loss of Plaintiff's Painting career.

764.   "Blue Man Group" was and continues to be heavily advertised in all newspapers and other media.  During the years 1999 through 2004 "Blue Man Group" had been heavily advertised on Television.  Cast members appear in Television Commercials.

765.   Obviously, such media coverage of a Stage Performance will lead to its great Success.

766.   Obviously, any and all Private and professional individuals known to the Plaintiff will have attended the above Production of "Blue Man Group," and would also have seen Plaintiff's photograph demonstrated upon the movie screen located on the stage of the performance, and, having seen Plaintiff's photograph demonstated on the "Blue Man Group" movie screen located on the stage of the performance would have caused:

   A.   Destruction of Plaintiff's professional reputation in any of her various pursuits, including but not limited to: Real Estate Development; Fine Arts Painting as a Career;

   B.   Destruction of Plaintiff's professional reputation and careers to the degree

that Plaintiff became unable to sell her premises in Newton, MA because no
potential Buyers would want to live in same property as Plaintiff, would have been
threatened and intimidated from doing so because of potential damage directly or
indirectly to their own professional lives due to the notoriety thereby created to
Plaintiff;

    C.    Destruction of Plaintiff's personal life to the degree that any personal friends
who would have seen "Blue Man Group" and would have recognised Plaintiff's
photograph on Stage would not wish to befriend the Plaintiff due to any personal
reasons said persons might have and due to intimidation and feeling threatened
from doing so because of the potential damage directly or indirectly to their own
professional lives due to the notoriety thereby created to Plaintiff;

767.    All of the above causing great Loss to Plaintiff of Friendship and Affection
and other personal losses, Loss of Professional status as a Fine Arts Painter, Loss of
Professional status as Manager of Commercial and Residential Real Estate, Loss of
potential jobs which Plaintiff might have wished to have pursued due to humiliation
of Plaintiff and due to notoriety to Plaintiff caused by the above production of
"Blue Man Group."

768.    Plaintiff had been Victimized by all Defendants named herein in the
Defendants' pursuit of wealth for themselves, regardless of any harm caused to
Plaintiff while Plaintiff had committed no Evil Deeds to have been treated as
described above.

769.    David Letterman had stated on one occasion "She lives like a hermit."

770.    Plaintiff further contends that Defendants named herein willfully and
maliciously set out to Defame Plaintiff simply because, in order for said production,
"Blue Man Group" to succeed, the performance "Blue Man Group" and other such
performances required a Victim in order to succeed.

771.    Because of Defendants Defamation of Plaintiff's Character, Plaintiff into a
nervous breakdown during 1987.

772.    Because of Defendants Defamation of Plaintiff's Character, heinously
insulting references have been made to Plaintiff which refer to Plaintiff as
"Puppet", "Monkey", and "Dog", as well as other such similar Insulting references.

773.    Defendants Defamation of Plaintiff's Character was responsible for Plaintiff
former tenants, who resided in an apartment in Plaintiff's home, having
undoubtedly giving Plaintiff LSD or similar halucinegenic substance without
Plaintiff knowledge, said halucinegenic substances having been hidden in a platter
of brownies which was given to Plaintiff by a female member of the tenancy for
Plaintiff's ingestion.

774.    The above tenants had obviously been either taking instruction from disc jockeys or television Personalities, or Defendants named herein, and had been promised Favors and / or Benefits from disc jockeys or television Personalities, and/or certainly had been influenced by disc jockeys or television Personalities into tenants performing above illegal activities against Plaintiff.

775.    For the fact that Plaintiff had been in perfect mental and physical health before above harassment and illegal activities had been perpetuated against Plaintiff.

776.    For the subsequent trauma that were caused to Plaintiff's three children upon learning of Plaintiff's ill mental health, Plaintiff's children, unaware of any halucinogenic drugs having been forced upon Plaintiff, forcibly had Plaintiff hospitalized, believing Plaintiff had become mentally ill.

777.    For the fact that one of the tenants had been a street musician and employed for a company which prepared movies subtitles at the beginning portion of Movies, second roommate had obtained a job as a disc jockey in New York City immediately upon becoming a tenant at Plaintiff's home, and the third tenant having been employed in an editorial company, all suspicious when considered in the light of Defendants' illegal activities against Plaintiff.

778.    Plaintiff had become ill immediately after Plaintiff having eaten the brownies, Plaintiff having immediately either sufferred a nervous breakdown or believing she had suffered a nervous breakdown.

779.    For the fact that the above tenants purposely and willfully made noises, such as drum playing at midnight, with the intention of purposefully causing the Plaintiff to not obtain needed sleep.

780.    Plaintiff discovered suspicious wires in tenant's apartment which led directly to Plaintiff's bedroom in Plaintiff's apartment, in addition to tape recording devices and tapes.

781.    All of the above were perpetrated against the Plaintiff with the utmost of evil intentions.

782.    Plaintiff had viewed a couple with who photographed Plaintiff with a movie camera during 1987 which caused Plaintiff to suffer distress.

783.    For all of the above occurring during 1987 during which time Plaintiff would have been well able to have sold Plaintiff property for a great financial profit;

784.    For the fact that Plaintiff, instead, sufferred great financial Losses because of

all of the interference in Plaintiff life from all of the above;

785.    For the fact that Plaintiff had been forced to live in near poverty for numerous subsequent years;

786.    For the fact that Plaintiff never turned the radio on during the following Seven entire years out of fear that Plaintiff might again be driven into a subsequent nervous breakdown;

787.    For the fact that, due to the above, Plaintiff lost the entertainment value of listening to any radio station during an entire seven years of her life, a priviledge which is provided to any United States Citizen;

788.    For the fact that a workman in Plaintiff's home had turned the radio on during 1994;

789.    For the fact that Charles Laquedeiras interviewed a laboratory technician who worked in same room as Plaintiff while she had been employed at Beth Israel Hospital, a most unusual circumstance in anyone's opinion;

790.    For the fact that, due to all of the above, Plaintiff has sufferred great psychological damage.

791.    For the fact that, upon learning of the surveilance by remarks I heard on the Radio, Plaintiff developed a terrible fear of driving on any places of height and Plaintiff became incapable of driving on any bridges.

792.    For the fact that this one factor alone has interferred with Plaintiff's ability to carry on Plaintiff financial work in a successful manner because Plaintiff's work has and would require Plaintiff to have been able to drive to numerous places, numerous routes, on highways, and certainly, across bridges;

793.    For the fact that Plaintiff believes that the above "Fear of Heights" to which Plaintiff has recently succumbed during the past 3 or so years is directly due to the above Surveilance;

794.    Therefore, for the fact that, because Defendants had been guilty of all of Defamation of Character of Plaintiff, and had, thereby, been guilty of destroying Plaintiff's professional Career as a Fine Arts Painter, Plaintiff demands that this Court order Defendants named herein to pay to Plaintiff above Total Amount of Forty-Seven Million and Forty Thousand ($47,040,000) Dollars due to financial damages sufferred by Plaintiff as referred to above as Loss of Income in the form loss of Plaintiff's Painting career.

795.    Plaintiff makes reference to and incorporates New Hampshire Laws

90

Annotated, Federal Laws, U.S. Constitution, as applicable.

## COUNT VII

## FAILURE TO DISCONTINUE ILLEGAL ACTIVITIES
## AFTER BEING NOTIFIED

796.   Plaintiff realleges paragraphs 1  through 795 above and incorporates them by reference as if stated herein.

797.   The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

798.   The Defendants illegally committed and were responsible for Surveilance perpetrated against Plaintiff in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said Surveilance of Plaintiff and all of Plaintiff's activities, having continued during innumerable years.

799.   The Defendants committed willful, malicious and deceptive illegal activities which interferred with the Plaintiff's Constitutional Rights of Life, Liberty and the Pursuit of Happiness, thereby denying Plaintiff her Unalienable Rights as a United States Citizen, and for said illegal actions continuing during numerous years and ongoing to date.

800.   The Defendants Interferred in Plaintiff's Constitutional Right to Privacy in that Defendants, directly or indirectly, invaded Plaintiff's Privacy, and were involved in a conspiracy to conduct Surveilance of Plaintiff and of Plaintiff's home, did so for numerous years, and continue to do so to date.

801.   The Defendants interfered with nearly every Constitutional Right of Plaintiff, said Interference ongoing to date.

802.   All herein described Losses of Plaintiff have been due to the willful, deceptive and malicious illegal activities which Defendants perpetrated against Plaintiff, including but not limited to,   Invasion the Privacy of the Plaintiff, Infringements of Plaintiff's Rights, Intentional Infliction of Emotional Harm  and Harassment of the Plaintiff, in addition to the Involvement of Defendants in a Conspiracty to Invade the Privacy of the Plaintiff,  among all other illegal activities described herein which were perpetrated against the Plaintiff.

803.   The Defendants' were directly and/or indirectly responsible for the Surveilance of the Plaintiff, Defendants' illegal activities having been committed against the Plaintiff, without her consent or permission, neither written, verbal nor implied consent or permission and, in fact, without Plaintiff's actual knowledge for

numerous years.

804.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

805.    The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

806.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

807.    Plaintiff's had written to Defendants and / or to Third Parties with whom Defendants had been involved on numerous occasions in which Plaintiff requested that either Defendants or Third Parties discontinue Invasion of Plaintiff's Privacy, Discontinue Interfering in Plaintiff's life and advising said parties that Plaintiff would otherwise bring suit against said individuals.

808.    Although Plaintiff had made numerous written and verbal requests of Defendants and/or Third Parties, all ignored Plaintiff's requests, and continued to conduct their illegal activities against Plaintiff.

809.    During the years from 1999 through 2004 Plaintiff had written several letters to the Defendants to discontinue interferring in Plaintiff's life and to discontinue Defendants Surveilance of Plaintiff or Invasion of Plaintiff's Privacy.

810.    The Defendants ignored Plaintiff's requests and continued their illegal activities against Plaintiff as herein described.

811.    Plaintiff had sent a telegram to Charles Laquidara while he had been employed at WBCN radio as a disc jockey during the 1987, in order to be asured that he would receive the Plaintiff's message to him.

812.    Plaintiff had advised Charles Laquidara to discontinue interferring in Plaintiff's life.

813.    Plaintiff had advised Charles Laquidara that if he failed to discontinue interferring in Plaintiff's life that Plaintiff intended to bring a lawsuit against him and against WBCN.

814.    Charles Laquidara refused to honor Plaintiff's request that he stop interferring in Plaintiff's life.

815.   Charles Laquidara responded to his receipt of the above telegram (1987) by making the statement on WBCN radio the the day after receipt of the telegram "Sue me? I'll sue you."

816.   Charles Laquidara responded to his receipt of the above telegram during 1987 by making the statement on WBCN radio "What about all of the other (Radio) stations?"

817.   Charles Laquidara made various statements on the air which pointed directly to the Plaintiff and which demonstrated that he had personal knowledge of all occurences in Plaintiff's life.

818.   For the refusal of Charles Laquidara to take Plaintiff request that he stop interfering in Plaintiff life which Plaintiff sent via Telegram, to be asured that he would receive said message, and in which Plaintiff threatened to sue him if he Failed to honor Plaintiff request.

819.   For the response of Charles Laquidara to the above telegram (1987) in which he stated the day after receipt of the telegram "Sue me? I'll sue you" and "What about all of the other (Radio) stations?"

820.   For the fact that all of the above references place all of the individuals referred to above in the position of acting as co-conspirators, namely David Letterman, Craig Kilborne, Howard Stern, Charles Laquedeiras, and Mark Parento, to name a few.

821.   During February, 2003 Plaintiff had mailed a letter to David Letterman to advise him to discontinue Invading Plaintiff's Privacy, Interferring in Plaintiff's life, in addition to all other illegal activities stated herein.

822.   On February 10, 2003 Plaintiff had begun to prepare this lawsuit.

823.   On February 10, 2003 David Letterman had stated on the David Letterman Show "Our lawyers are tough lawyers, undeniably as a threat against Plaintiff to discontinue Plaintiff's attempted lawsuit.

824.   On October 24, 2003 Plaintiff had again been typing and preparing the herein Summons and Complaint.

825.   For the fact that Craig Kilborne stated on October 24, 2003 at about 1:00 a.m. and towards the beginning of the nightly program on television Channel 4 "...(we) will call Grandma on the telephone and ask her to meet us at the parking lot for a "Settlement. ..."   "... Instead,..." (we)"... will bring a (lead) Pipe..."

826.    For the fact that while Craig Kilborne stated the above, Craig Kilborne thrust his arms outward and about in slashing motions, such as if a person were attacking another person with a weapon in hand.

827.    For the fact that after Craig Kilborne stated the above, Craig Kilborne stated further "I am in a really good mood."

828.    For the fact that any reasonable person would conclude that the above statements made by Craig Kilborne constitute a threat against the life of the Plaintiff.

829.    During the daytime of October 24, 2003, the same evening as Plaintiff had spent numerous hours in typing and in preparation of this Summons and Complaint against the Defendants with the obvious intention of Plaintiff completing and filing the herein referred to Lawsuit soon thereafter, Craig Kilborne made the above referred to threatening broadcasted statements about and to Plaintiff.

830.    Plaintiff purchased a Calendar during early May, 2002 that was an heinously insulting, degrading, unspeakably vulgar Calendar, and that referred to Plaintiff's life, and carried the title "ASS Good as it Gets."

831.    On May 9, 2002 Plaintiff had met with a Senior Partner in a large law firm in Nashua, New Hampshire in order to request that he represent Plaintiff in a case against herein named Defendants.

832.    On May 9, 2002 at 2:00 a.m., the same evening as Plaintiff had met with the attorney to represent Plaintiff, Craig Kilborne had made the televised statement "Get up off your asses", undeniably instructing Third Parties to cause more damage to Plaintiff or to remove Surveilance Equipment from Plaintiff's home.

833.    On October 24, 2003, the same evening as Plaintiff had spent numerous hours in typing and preparation of this Summons and Complaint, at 2:00 a.m. Craig Kilborne had made the televised statement "Get up off your asses. She is going to sue us for Twenty-Three Million ($23,000,000) Dollars."

834.    The above is simply a repetition of similar incidents which have been done against Plaintiff by various media personalities.

835.    During a recent past year, Plaintiff had telephoned Mark Parento, disc jockey at WBCN radio, while he was broadcasting a show, and requested that he and other media personalities discontinue their illegal activities which were being perpetrated against Plaintiff.

836.    Mark Parneto mocked Plaintiff on the air, certainly not taking Plaintiff's request seriously, certainly continuing to continue the illegal activities which were

being perpetrated against Plaintiff.

837.    During the approximate same time frame, Plaintiff had telephoned WBCN radio, requested that she be allowed to speak to the Station Manager, and spoke with a man who identified himself as the Station Manager.

838.    Again, Plaintiff requested of the Station Manager that WZLX radio discontinue perpetrating their illegal activities against Plaintiff.

839.    Again, the Station Manager responded with no change in the radio station's venue, and the radio station continued to perpetrate their illegal activities against Plaintiff.

840.    In early February, 2004 Plaintiff again attempted to prepare and to complete the Summons and Complaint of the herein referred to lawsuit.

841.    Once again, a member of the media had been fired from his television or radio position.

842.    During February, 2004 Plaintiff typed references to Howard Stern and the Monitor incident in which Plaintiff became aware that Plaintiff's Privacy had been being Invaded upon at the Howard Stern Show during approximately 1996.

843.    Immediately thereafter, on February 25, 2004 Howard Stern had become fired from his radio broadcasts on various radio stations for "Indencency," the radio stations or television station having been fined $750,000, according to news that had been reported.

844.    Plaintiff submits that Howard Stern had, instead, been fired because, in the privacy of Plaintiff's home, Plaintiff had typed Plaintiff's accusations of the Howard Stern Show having invaded the Plaintiff's Privacy.

845.    That is, while radio stations and television stations are well able to afford to pay fines which are levelled against them by the FCC, said radio stations and television stations are not well able to be found guilty of Criminal activity, are not well able to be found guilty of violating a private citizen's Constitutional Rights.

846.    The reason for the above is simply that perpetrators of such illegal activities would and could face imprisonment for their illegal activities.

847.    An additional reason for the above that the publicity would certainly destroy the credibility of any broadcasting radio or television station when the information is brought to the public's eye that said broadcasters would stoop so low as to perpetrate such illegal activities against a private citizen.

848.    That is, the use of obscenities or profanities during broadcasts is nothing compared with violations against the United States Constitution, particularly in the eyes of the government.

849.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

## COUNT VIII

## INTENTIONAL INFLICTION OF EMOTIONAL HARM

## CAUSING DAMAGE TO PLAINTIFF'S PSYCHOLOGICAL HEALTH

850.    Plaintiff realleges paragraphs 1 through 849 above and incorporates them by reference as if stated herein.

851.    The Defendants' Intentional Infliction of Emotional Harm to Plaintiff caused Plaintiff to suffer damages to Plaintiff's Psychological Health and Physical Health.

852.    Additionally, the Defendants' Intentional Infliction of Emotional Harm to Plaintiff caused Plaintiff to suffer damages in the form of Loss of Income of Plaintiff's Savings, Loss of Income of Plaintiff's Son's Savings, Loss of Income due to Plaintiff having been forced to sell a commercial property for less than the fair market value, and Loss of Income due to Plaintiff having been forced to declare Bankruptsy.

853.    The Defendants  Intentionally Inflicted Emotional Harm to Plaintiff because Defendants
have been involved in the Invasion of Plaintiff's Privacy, among all other illegal activities described herein, having caused serious psychological damage to Plaintiff and damage to Plaintiff's health.

854.    The Defendants set out willfully, maliciously, and purposefully with the intention of causing the Plaintiff to fall into the state of psychological Depression.

855.    Plaintiff has had numerous life threatening bouts with and hospitalizations for acute Pancreatis which is a stress related illness.

856.    Plaintiff had been hospitalized for serious heart attack symptoms during approximately 1999, due undeniably to the stress of Invasion of Plaintiff's Privacy by the Defendants.

857.    Plaintiff had been seen at the Emergency Room of a local hospital because Plaintiff sufferred severe chest pains  on numerous occasions, and during numerous years, due undeniably to the stress caused by Defendants' Interference in Plaintiff's life and Invasion of Plaintiff's Privacy.

858.    Plaintiff had been treated in the Emergency Room of a local hospital for symtom of Stroke, due undeniably to the stress caused by Defendants Interference in Plaintiff's life, ongoing for innumerable years and ongoing to date.

859.    Plaintiff had lost some function to Plaintiff's left leg as a result of the above

during 1987 attacks upon Plaintiff by Defendants.

860.    So severely detrimental has the Defendants' Invasion of Plaintiff's Privacy been to Plaintiff's Health that Plaintiff has  suffered severe dizziness every day during the past five years, from 1999 through 2004.

861.    Dizzyness is a symptom and warning sign of onset of Stroke and / or Heart Attack.

862.    So severe have the dizzy symptoms been that Plaintiff on numerous occasions nearly fell down the flight of stairs in Plaintiff's home and frequently losing Plaintiff's balance while in a standing position.

863.    So severely detrimental has the Defendants' Invasion of Plaintiff's Privacy been to Plaintiff's Health that Plaintiff has  Plaintiff has sufferred loss of function to Plaintiff's left leg during 2003 and 2004, far worse than that sufferred during 1987, causing Plaintiff's left leg to collapse at the knee frequently, thereby causing Plaintiff to nearly fall down.

864.    The Defendants recklessly Intentionally Inflicted Emotional Harm against Plaintiff because Defendants were responsible for Invasion of Privacy and Surveilance of Plaintiff having been perpetrated against Plaintiff in Plaintiff's home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments to which Plaintiff had visited, said illegal activities having continued during innumerable years, and ongoing to date.

865.    Because the Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff and to Plaintiff's Family Members, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff, Plaintiff sufferred greatly in the form of Psychological Damage to Plaintiff and damage to Plaintiff's Health.

866.    The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and all of Plaintiff's activities, said illegal activities having continued during innumerable years.

867.    The Defendants' illegal activities and actions were committed against the Plaintiff during numerous years without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years.

868.    All herein activities of Defendants against Plaintiff or in regard to Plaintiff were illegal because Plaintiff is and was a private Individual and not a Public figure.

869.   Third Party Harassment of Plaintiff led Plaintiff into Nervous Breakdown during late 1987, said Third Parties having been either Influenced by Defendants into doing so, having been in the employ of Defendants, or having received Benefits from the Defendants, directly or indirectly, for doing so.

870.   Because of the Defendants' illegal activities against Plaintiff, Plaintiff had been forced to sell Plaintiff's Massachusetts home during 1999 at substantial loss, because the property has doubled in value since 1999 to date.

871.   Plaintiff had sold the Massachusetts home in the amount of Six Hundred and Thirty Thousand ($630,000) Dollars in 1999.

872.   The current value of the former Massachusetts home of Plaintiff is approximately One Million and Two Hundred Thousand ($1,200,000) Dollars.

873.   Due to the fact that Plaintiff had been forced to sell Plaintiff's former Massachusetts home because Plaintiff could not tolerate the Defendants' and Defendants' co-conspirators' Invasion of Plaintiff's Privacy, Plaintiff had thereby suffered a financial loss in the amount of Five Hundred and Seventy Thousand ($570,000) Dollars to date.

874.   Therefore, Defendants are liable to Plaintiff for Plaintiff's losses in regard to Plaintiff's being forced to sell Plaintiff's home in the amount of Five Hundred and Seventy Thousand ($570,000) Dollars to date.

875.   The Defendants' Intentional Infliction of Emotional Harm to Plaintiff caused Plaintiff to suffer damages in the form of loss of Plaintiff's substantial Savings, Plaintiff having been forced to sell Plaintiff's commercial property in Middleborough, Massachusetts for some $200,000 less than fair market value, and caused Plaintiff to be forced to declare Bankruptsy which thereupon cost Plaintiff great further financial losses.

876.   Because Plaintiff had been forced to declare Bankruptsy, although Plaintiff had equity in Plaintiff's commercial premises in the approximate amount of One Million ($1,000,000) Dollars, Plaintiff was in danger of losing 100% of Plaintiff's equity to foreclosure by order of the Bankruptsy Court.

877.   If Defendants had not been guilty of Infliction of Emotional Harm against Plaintiff, and had not interferred in Plaintiff's life, had not caused Defamation of Character of Plaintiff, other illegal activities would not have been perpetrated against Plaintiff by individuals who had either been influenced by the Defendants or had been involved in a Conspiracy with the Defendants.

878.   If Defendants had not been guilty of the above, Plaintiff and Plaintiff's family

members would not have suffered the very substantial financial losses as described herein.

879.   The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

880.   Upon Plaintiff having learned of the Monitor incident in regard to Howard Stern, that Plaintiff's Privacy had been being Invaded and that all Plaintiff's activities in her home and all factors of Plaintiff's Life had been under Surveillance, that knowledge was extremely damaging to Plaintiff emotionally and psychologically, Plaintiff, thereafter, unable to concentrate on Plaintiff's work and management of Plaintiff's real estate ventures sufficiently, and was extremely damaging to Plaintiff's Health, Plaintiff, thereafter, suffering severe chest pains on numerous occasions among other health related symptoms.

881.   Unable to live in Plaintiff's home of some 35 years due to the Invasion of Plaintiff's Privacy, Plaintiff had been forced to sell Plaintiff's home and to move to New Hampshire, at great loss of income to Plaintiff, since the property had doubled in value within a few years time, and to have cost Plaintiff loss of Plaintiff's personal relationships, including Plaintiff's mother who resided within one mile of Plaintiff's home.

882.   Defendants perpetrated horendous illegal activities against Plaintiff during 1987, in addition to all other years,  immediately upon Plaintiff's three children had moved out of Plaintiff's Home during June, 1987 in order to have relocated hundreds to thousands of miles away from Plaintiff.

883.   Since Plaintiff  lived alone after June, 1987,  Plaintiff thereupon became an easy target for the willful, deceptive malicious illegal activities which had been perpetrated against Plaintiff,  Defendants being directly responsible for and directly involved in the illegal activities against Plaintiff.

884.   Because Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff and to Plaintiff's Family Members, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff, Plaintiff suffered enormous damage to Plaintiff's Health.

885.   Upon Plaintiff having learned of the Monitor incident in regard to Howard Stern, that Plaintiff's Privacy had been being Invaded, that Plaintiff's home was under Surveilance,  that all Plaintiff's activities in her home and all factors of Plaintiff's Life had been under Surveilance,  that knowledge was extremely damaging to Plaintiff emotionally and psychologically, Plaintiff, thereafter, unable

to concentrate on Plaintiff's work and management of Plaintiff's real estate ventures sufficiently, and was extremely damaging to Plaintiff's Health, Plaintiff, thereafter, sufferring severe chest pains on numerous occasions among other health related symptoms.

886.    Unable to live in Plaintiff's home of some 35 years due to the Invasion of Plaintiff's Privacy, Plaintiff had been forced to sell Plaintiff's home and to move to New Hampshire, at great loss of income to Plaintiff, since the property had doubled in value within a few years time, and to have cost Plaintiff loss of Plaintiff's personal relationships, including Plaintiff's mother who resided within one mile of Plaintiff's home.

887.    Because Defendants recklessly and negligently committed illegal activities against Plaintiff, including publishing defamatory false accusations about the Plaintiff on television with the intention of Defendants having been to cause Plaintiff to suffer great financial and emotional loss, to humiliate Plaintiff, to riducule Plaintiff, and to cause Plaintiff loss of credibility in the eyes of Plaintiff's peers, to cause Defamation of Character of Plaintiff, Plaintiff sufferred greatly in damage to Plaintiff's Health.

888.    Plaintiff, shocked, became 100% aware for the first time that Plaintiff had been under Surveilance by several Media Personalities and that the Surveilance had been ongoing for innumerable years, Plaintiff, thereafter, became unable to feel secure in her own home in which she had resided during some 35 years, in regard to Invasion of Plaintiff's Privacy, in addition to repetitious burgularies in Plaintiff's home.

889.    Because the  Defendants recklessly, negligently, willfully, maliciously and deceptively made Statements on television during the David Letterman Show and during the Craig Kilborne Show which referred to the Plaintiff or to incidents of Plaintiff's life, or became involved in a Conspiracy to Invade Privacy of Plaintiff, among any and all other illegal activities perpetrated against Plaintiff, Plaintiff sufferred greatly in damage to Plaintiff's Health.

890.    Because the intention of Defendants in their perpetrating illegal activities against Plaintiff as described herein had been to cause Plaintiff to suffer great financial and emotional loss, to humiliate Plaintiff, to riducule Plaintiff, and to cause Plaintiff loss of credibility in the eyes of Plaintiff's peers, the Plaintiff suffered greatly in damage to Plaintiff's Physical Health and Psychological Health.

891.    The Defendants' illegal activities were committed against the Plaintiff without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years, were ongoing during numerous years, and continue to date.

892.    Plaintiff had advised Defendants on numerous occasions, by several methods, including having made written requests, that Defendants discontinue perpetrating said illegal activities and involvement in said illegal activities against Plaintiff, all to no avail.

893.    The Defendants caused immeasurable Damage to the Plaintiff Health because Defendants illegally committed and were directly and indirectly responsible for Invasion of Plaintiff's Privacy

894.    New tenants of the Plaintiff who resided in 2nd Unit of Plaintiff's home from September, 1987 to December, 1987 drove Plaintiff into Nervous Breakdown immediately upon residing in Plaintiff's home.

895.    Tenants of the Plaintiff drove Plaintiff into Nervous Breakdown by deceptively providing Plaintiff halucinogenic drugs, hidden within a tray of brownies laced with halocinogenic drugs, without Plaintiff's knowledge, Tenants having given a tray of brownies to Plaintiff as a gift which Plaintiff ate, and for harassing Plaintiff during 4 months time, including causing Plaintiff to not sleep for numerous nights and during several nights time in a row.

896.    Plaintiff became immediately mentally ill after having eaten the tray of brownies, began to halucinate and began to have suicidal tendancies, the above continuing for months of time, said illegal activities of the tenants having been responsible for driving the previously healthy Plaintiff into a Nervous Breakdown.

897.    As Plaintiff would walk from one room of her seven room first floor unit to another room, the 2nd floor tenants would follow Plaintiff from room to room, dragging what sounded like heavy media equipment from room to room.

898.    Upon Plaintiff realizing the source of Plaintiff's halucinations, thereafter lived in fear of the Tenants because they were occupants of Plaintiff's home.

899.    All of the above referred to Tenants had occupations in the Media in the film industry, music industry and publishing industry.

900.    There is no doubt that the Tenants had been influenced by, paid by, or received financial benefits from media personalities to perpretrate such illegal activities against Plaintiff, particulary since Plaintiff and tenants certainly were not involved in any Landlady-Tenant dispute.

901.    Immediately upon moving into Plaintiff's home, one previously unemployed tenant received a job in New York City to become a disc jockey for a radio station.

902.    The Defendants were responsible for the above because of their involvement in a Conspiracy to commit illegal activities against Plaintiff.

903.    Plaintiff's children, unaware of any halucinogenic drugs having been forced upon Plaintiff, forcibly had Plaintiff hospitalized, believing Plaintiff had become mentally ill.

904.    Subsequently, Plaintiff's three children sufferred trauma in believing that Plaintiff had become mentally ill.

905.    Defendants illegal activities against Plaintiff caused Plaintiff to lose One Hundred and Seventy-Five Thousand ($175,000) Dollars of her entire Saving from some thirty-five years of accumulated Equity of Two Hundred Thousand ($200,000) Dollars, leaving Plaintiff nearly penniless thereafter.

906.    Defendants were again responsible for causing Plaintiff to lose an additional Sixty-Five Thousand ($65,000) Dollars within some six months, which amount represented Plaintiff's entire Saving which Plaintiff obtained through refinancing her property, leaving Plaintiff nearly penniless thereafter.

907.    Plaintiff, thereupon, due to the above financial losses to Plaintiff, had been unable to improve and repair her two commercial properties, thereby causing Plaintiff to become unable to lease or to sell either of said premises in order to produce an income to Plaintiff.

908.    Thereupon, Plaintiff had been forced to declare Bankruptsy.

909.    Defendants illegal activities against Plaintiff caused Plaintiff's son to lose approximately Two Million ($2,000,000) Dollars in the Stock Market on approximately April 14, 2000 of his entire holdings of approximately Three Million ($3,000,000) Dollars, accummulated during some 10 years of difficult and intense labor.

910.    Defendants illegal activities against Plaintiff caused Plaintiff's son to lose approximately Six Hundred Thousand ($600,000) Dollars of his remaining One Million ($1,000,000) Dollars within 6 months.

911.    All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

912.    Therefore, Plaintiff demands that the Court order Defendants to pay Plaintiff damages in the amount of Three Million Six Hundred and Ten Thousand ($3,610,000) Dollars because Defendants had been guilty of causing Plaintiff to

suffer the above amount in financial damages due to Defendants Infliction of Emotional Harm to Plaintiff and to Plaintiff's Family Members.

913.    Because Defendants actions had been willful, malicious, and deceptive, Plaintiff hereby demands the Court to order Defendants to pay Plaintiff treble damages, but in no event less than double damages, for a total amount of damages of Ten Million Eight Hundred and Thirty Thousand ($10,830,000) Dollars in damages due to Defendants Infliction of Emotional Harm to Plaintiff and Plaintiff's Family Members, plus Interest, compounded annually, plus reasonable attorney fees plus court costs.

914.    Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

## COUNT IX

## HARASSMENT OF PLAINTIFF

915.    Plaintiff realleges paragraphs 1  through        914 above and incorporates
them by reference as if stated herein.

916.    Defendants unmercifully Harassed Plaintiff during innumerable years, and
had involvement  with individuals and/or business associates who harassed and
attacked Plaintiff  in one realm or another.

917.    The Defendants, and particularly David Letterman, made thousands upon
thousands of Statements during the David Letterman Show  on television which
made references to the Plaintiff indirectly and under camoflauge,  using the word
"she", and using the words "Ten Things" each evening in making reference to
Plaintiff's activities and/or daily activities on television before hundreds of
thousands or millions of viewers of the audience.

918.    The Defendants' illegal activities and actions were committed against the
Plaintiff, namely direct or indirect responsibility for the Surveilance of the Plaintiff
without her consent or permission, either Written, Verbal or implied consent or
permission.

919.    The Defendants reckless, negligent, malicious activities in regard to all illegal
activities referred to herein have cost innumerable millions of dollars of Financial
Losses to Plaintiff, all of the above having cost immeasurable amounts of Personal
Losses to the Plaintiff, said illegal activities having occurred during each and every
year during the past twenty to thirty years, the above ongoing to this date.

920.    Additionally, the Defendants have been involved in a Conspiracy with
business associates and/or other Media personalities who made reference on either
the Radio or Television of such personal matters as the City or Town in which
Plaintiff resided, to Plaintiff's automobile License Plate,  and to magazine articles,
particularly to Art Forum Magazine, November, 1987 issue, in which above referred
"doctored" photographs of Plaintiff appeared, the express intention of said
associates to have been to identify Plaintiff to the listening public and to cause
Defamation of Character of Plaintiff.

921.    If Defendants had not been guilty of Infliction of Emotional Harm against
Plaintiff, and had not interferred in Plaintiff's life, had not caused Defamation of
Character of Plaintiff, other illegal activities would not have been perpetrated
against Plaintiff by individuals who had either been influenced by the Defendants or
had been involved in a Conspiracy with the Defendants.

922.    If Defendants had not been guilty of the above, Plaintiff and Plaintiff's family

members would not have sufferred the very substantial financial losses as described herein.

923.    The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

924.    The Defendants' Intentional Infliction of Emotional Harm to Plaintiff caused Plaintiff to suffer damages in the form of loss of Plaintiff's substantial Savings, Plaintiff having been forced to sell Plaintiff's commercial property in Middleborough, Massachusetts for some $200,000 less than fair market value, and caused Plaintiff to be forced to declare Bankruptsy which thereupon cost Plaintiff great further financial losses.

925.    Because Plaintiff had been forced to declare Bankruptsy, although Plaintiff had equity in Plaintiff's commercial premises in the approximate amount of One Million ($1,000,000) Dollars, Plaintiff was in danger of losing 100% of Plaintiff's equity to foreclosure by order of the Bankruptsy Court.

926.    Therefore, due to Defendants illegal activities perpetrated repeatedly against Plaintiff, due to the damage to Plaintiff that ensued, Plaintiff had been forced to sell the above referred to commercial premises for a least $200,000 less than it's fair market value, and probably greatly more than for $200,000 less than it's fair market value.

927.    Defendants illegal activities against Plaintiff caused Plaintiff to lose One Hundred and Seventy-Five Thousand ($175,000) Dollars of her entire Saving from some thirty-five years of accumulated Equity of Two Hundred Thousand ($200,000) Dollars, leaving Plaintiff nearly penniless thereafter.

928.    Defendants were again responsible for causing Plaintiff to lose an additional Sixty-Five Thousand ($65,000) Dollars within some six months, which amount represented Plaintiff's entire Saving which Plaintiff obtained through refinancing her property, leaving Plaintiff nearly penniless thereafter.

929.    Plaintiff, thereupon, due to the above financial losses to Plaintiff, had been unable to improve and repair her two commercial properties, thereby causing Plaintiff to become unable to lease or to sell either of said premises in order to produce an income to Plaintiff.

930.    Thereupon, Plaintiff had been forced to declare Bankruptsy.

931.    Defendants illegal activities against Plaintiff caused Plaintiff's son to lose approximately Two Million ($2,000,000) Dollars in the Stock Market on

approximately April 14, 2000 of his entire holdings of approximately Three Million ($3,000,000) Dollars, accummulated during some 10 years of difficult and intense labor.

932.    Defendants illegal activities against Plaintiff caused Plaintiff's son to lose approximately Six Hundred Thousand ($600,000) Dollars of his remaining One Million ($1,000,000) Dollars within 6 months.

933.    All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

934.    If Defendants had not become involved in the above referred to Conspiracy to perpetrate illegal activities against Plaintiff, none of the following harassing and illegal activities would have been committed against Plaintiff.

935.    Doctored photographs included affixing photographs of Plaintiff's face taken without Plaintiff's permission or knowledge to bodies of other women's bodies, one event in which Plaintiff's photograph had been affixed to that of a nude woman's body, another event in which photographs of Plaintiff's face had been affixed to that of a woman garmented in a gown, said photograph displayed within an article of an exhibition in utmost derogatory manner, all said photographs intended to cause Defamation of Character to the Plaintiff, all said photographs intended to cause Libel and Slander to the Plaintiff, and all said photographs intended to damage Plaintiff's professional and personal Reputation.

936.    Defendants had involvement with individuals and/or business associates in a Conspiracy, said individuals having attacked Plaintiff by causing damages to various premises owned by Plaintiff, including but not limited to having set fire to Plaintiff's home when Plaintiff was away on vacation, damage to any commercial premises owned by Plaintiff, and setting fire to a commercial property which Plaintiff had been negotiating to purchase in recent years.

937.    Defendants had involvement with individuals and/or business associates in a Conspiracy, said individuals having attacked Plaintiff by causing damage to Plaintiff's automobile, particularly to the brakes of Plaintiff's automobile and to PLaintiff's automobile tires, causing very dangerous driving conditions for Plaintiff, several occasions during which Plaintiff was nearly involved in very severe automobile accidents on highways as a result of said tampering.

938.    The following is a list of illegal, damaging, harassing activities which have been perpetrated against Plaintiff, the list including but not limited to such

damaging activities, and ongoing to date:

939.    Plaintiff had found the words "Helter Skelter" written as grafitti on the walls of the cellar of the commercial property which Plaintiff had owned in Boston during approximately 1986 to 1987, soon before Plaintiff had been pushed into a Nervous Breakdown.

940.    Hundreds of incidents of Theft to Plaintiff's home  include but are not limited to Theft of Plaintiff's Clothing, Shoes, Boots, Food, Blank Checks from Checking Accounts, Personal Business Records, Income Tax Returns, Plaintiff's Medical Records, one Fine Arts Painting of 6 ft size that had been exhibitted and soon thereafter missing from Plaintiff's home, Plaintiff's painting instructions and notes, photographs of Plaintiff's "Details" from Plaintiff's paintings, plus innumerable documents which Plaintiff had attempted to hide in floor safes, to no avail.

941.    Although Plaintiff had installed burgular alarms to Plaintiff's home, the above continued to occur during numerous years.

942.    A Massachusetts tenant / neighbor of Plaintiff harassed Plaintiff by covering neighbor's front lawn with items that referred to media involvement in Plaintiff's life, the items having mocked the Plaintiff, having caused Defamation of Character of Plaintiff and having cast dispersions on the Plaintiff during 1999.

943.    Plaintiff had paid $20,000 Down Payment to a real estate broker for the potential purchase of a commercial property shortly before tenant/neighbor harassed Plaintiff, requiring written notice of cancellation of Purchase and Sales agreement in timely manner to receive refund of down payment.

944.    Due to the interference and harassment of tenant / neighbor, who had been influenced by media interference in Plaintiff's life, Plaintiff lost the $20,000 down payment.

945.    During approximately 1998 an article appeared in Art Forum magazine which described the contents of a conceptual art exhibit in New York.

946.    Within the article, and as part of the exhibit, were the words "Who killed this woman while 10 men stood around and did nothing?"  Additional words were "An artist is supposed to care about people."

947.    A photograph of a drummer was displayed in the article or exhibit; Plaintiff recognized the drummer in the photograph.

948.    While Plaintiff read the Art Forum article, also having the radio turned on at the same time,  Mark Parento, disc jockey of WBCN radio stated "She just saw it."

949.    Tenant in N.H. harassed Plaintiff during two years of tenancy, and continued to do so after vacating premises in mailing innumerable harassing letters to Plaintiff, in damaging premises, in written requests to local officials not grant Plaintiff's applications,  in posting notes and signs throughout the premises that were insulting and derogatory to Plaintiff during numerous months of tenancy, and in admitting in writing upon vacating premises that said tenant had done so due to media involvement in Plaintiff's life.

950.    Most of harassing letters which above-referred to tenant had written to Plaintiff had been stolen from Plaintiff's home soon after Plaintiff's purchase of the premises.

951.    Plaintiff had been performing repairs to Plaintiff's Boston commercial property on the fateful day when the seven astronauts had been killed when their spacecraft had exploded.

952.    Charles Laquidara attacked Plaintiff on WBCN radio because Plaintiff had been working at the time in repairing the interior of windows to the property.

953.    Plaintiff had visited Plaintiff's family member in New Hampshire during one Easter Sunday to have discovered a man running through the woods directly behind Plaintiff's family member's home, Plaintiff having accidentally seen him from a kitchen window during 1999.

954.    Plaintiff had attempted to hide computer discs of Plaintiff's "Book" and other material at Family Member's home, to have found all said material had been stolen from Family Member's home during 1999.

955.    Plaintiff had attempted to hide other computer discs and the important contents of a Housing Court lawsuit at Plaintiff's mother's home to have found all said computer discs and legal documents had been stolen from Plaintiff's mother's home during 1995.

956.    At "First Night", New Years Eve display of Ice Sculptures in Boston, Massachusetts Plaintiff had discovered that on numerous occasions said Ice Sculptures referred to Plaintiff's life, were defamatory towards Plaintiff, and were of a derogatory nature towards Plaintiff.

957.    On one such event a main figure represented Charles Laquidara who appeared to be directing other individuals within the display, pointing his fingers in a scolding manner.  Additional figures were a castle, a man and woman, a gnome, and a fish or mermaid.

958.    Several fires and other vandalism had occurred to various premises in which

Plaintiff had been involved, all of which Plaintiff considers to have been set by indivuals who had been scheming against Plaintiff.

959.    A fire had been set to Plaintiff's Massachusetts home while Plaintiff had been away on vacation, a fire had been set to the Middleborough, Massachusetts property immediately after Plaintiff had purchased the property, and a fire had been set to a Milford, Massachusetts property while Plaintiff had the property under agreement to purchase.

960.    Plaintiff's property in New Hampshire had been attacked in such ways as to have caused four floods in less than four years to have occurred to the premises.

961.    Some $200,000 worth of contents had been stolen from Plaintiff's Middleborough restaurant during 2000, Plaintiff not knowing if tenant had done so or if said had been done by individuals who had been influenced by media personalities into doing so.

962.    Numerous antiques had been stolen from Plaintiff's New Hampshire home; Plaintiff had purchased the antiques with the intention of opening an Antique shop in New Hampshire.

963.    The entire front porch had been destroyed of Plaintiff's Boston commercial property the night before Plaintiff had been waiting for a Building Inspector to arrive to view the premises.

964.    The pump which serviced  the water supply well at Plaintiff's N.H. property had been destroyed during 2002.

965.    Plaintiff had seen two men leave Plaintiff's home during 2002 while Plaintiff had been working in an attached office and while Plaintiff's car was in a repair shop, giving the impression that Plaintiff was not at home.

966.    Upon returning to Plaintiff's home, Plaintiff discovered a flood in the basement and that Plaintiff's furnace had been damaged so severely that the furnace had to be replaced.

967.    Upon returning home from Plaintiff's Family Member's home during a holiday, Plaintiff discovered two men driving away from Plaintiff's rental apartment during 2000.

968.    Repetitions of the above witnessing of men leaving Plaintiff's premises had occurred on several occasions.

969.    Plaintiff had caught a woman hiding in the hallway of Plaintiff's Massachusetts home while Plaintiff had been conducting an Open House during

1999; the woman laughed when Plaintiff saw her in the hallway.

970.    Plaintiff had caught a woman walking suspiciously out of Plaintiff's driveway, which led to Plaintiff's cellar, during 1999, said woman attempting to hide her face from Plaintiff. Plaintiff had just returned home from an errand when the above had occurred.

971.    Plaintiff had caught a woman walking towards Plaintiff's car suspiciously, obviously believing Plaintiff had already parked Plaintiff's car at a mall in Watertown, Massachusetts during the 1990's; the woman immediately turning and attempting to walk away upon seeing Plaintiff had seen the woman.

972.    After Plaintiff returned to Plaintiff's parked car after shopping, Plaintiff found suspicious looking objects on the floor of Plaintiff's car, objects which the Plaintiff had not put there, and which resembled plastic toys that made noises; thereupon, Plaintiff's car radio and speakers were filled with static.

973.    Plaintiff had been followed into a local restaurant in New Hampshire by about 10 teenagers on one Sunday morning, watching and staring at Plaintiff the entire time while Plaintiff attempted to breakfast there and attempted to work out financial plans in the restaurant.

974.    Numerous such incidents as the above had repeatedly occurred.

975.    Plaintiff had visited New York during the 1990's at which time, when Plaintiff visited one Gallery in SoHo, Plaintiff found an exhibition being displayed which were words stencilled upon white canvases. Plaintiff recognized Plaintiff's social security number, Plaintiff's telephone number, Plaintiff's home address, and other identifying information relative to Plaintiff's life.

976.    Plaintiff became enraged upon seeing the exhibition, requested that the Director immediately meet with Plaintiff, showed the director Plaintiff's driver's license, social security number and address, and demanded that the director remove each and every item from the gallery walls that referred to the Plaintiff; the Director removed about 2/3 of all items displayed, undeniably returning same as soon as Plaintiff left the gallery.

977.    Charles Laquidara had made reference to Plaintiff's license plate, RAG 999, RAG being Plaintiff's initials, on WBCN or WZLX radio during the 1990's, identifying Plaintiff to hundreds of thousands of listeners; Plaintiff had been forced to change Plaintiff's license plate number soon thereafter.

978.    Plaintiff had found a photograph of Plaintiff's face displayed in the Boston Globe on one occasion which had been substituted with a photograph from a local art exhibition. Infuriated, Plaintiff telephoned the director of the exhibition. Upon

visiting the exhibition, Plaintiff could see that the photograph in the same exhibit was not that of the Plaintiff, either the Plaintiff's photograph having been removed from the exhibit or the Plaintiff's photograph having been falsely affixed to the imagery in the Boston Globe newspaper.

979.   During the 1990's Plaintiff had requested at MCA that Plaintiff be allowed to view Plaintiff's records at the college, being suspicious about activities there.

980.   Upon viewing Plaintiff's college records, Plaintiff discovered that false report cards had been inserted into Plaintiff's college records, that courses which Plaintiff had never taken had been substituted for classes that Plaintiff had taken, that classes that Plaintiff had received "A" grades in had been substituted with "D" grades, undeniably done with the intention of causing Defamation of Plaintiff's Character and to present Plaintiff in a derogatory light.

981.   Plaintiff's intentions to attend Plaintiff's 25 year anniversary of Plaintiff's graduation from MCA had been interferred with, members of the staff having provided falsified reasons for said interference.

982.   Undeniably, the real reason was that Plaintiff would see exhibitions or demonstrations, either of Plaintiff's own work, thefts of Plaintiff's work, or exhibitions that were derogatory to Plaintiff.

983.   Plaintiff received harassing telephone calls every morning during 2000 while Plaintiff had been trying to trade in the Stock Market, eventually said harassing telephone calls having led Plaintiff to lose some $175,000 in the Stock Market.

984.   Plaintiff had purchased and installed Floor Safes to Plaintiff's home in which Plaintiff attempted to store valuable papers, to no avail, numerous important papers thereupon having been stolen from the floor safes.

985.   On the very evening immediately after Plaintiff's February 10, 2003 preparation of the beginning of this herein referred to Lawsuit, and when Plaintiff named David Letterman as Defendant, and when Plaintiff inserted the request for "damages" amount of twenty-three million dollars, David Letterman stated during that evening's televised airing of his late night program "You temperamental Bitch."

986.   Finally, on or about the Summer of the year 2002, several of the above named Defendants made the following descriptive remark in the media:
       David Letterman had stated "It's a Practical Joke" during the David Letterman Show.
       Craig Kilborne had stated "It's a Practical Joke" during the Craig Kilborne Show.

113

987.    The above occurred soon after Plaintiff typed "Lawsuit" in which Plaintiff had requested Court to order Judgement against Defendants in the amount of "...Twenty Three Million Dollars...".

988.    A Practical Joke has a market value of Five ($5) Dollars.

989.    During January, 2002 Craig Kilborne stated on the Craig Kilborne late night show  "She is going to Sue Us for Twenty-Three Million ($23,000,000 ) Dollars." Plaintiff had stated, in anger, and while  Plaintiff had been alone in her Home that she would "...Sue them for Twenty-Three Million ($23,000,000) Dollars" a short time before Craig Kilborne made the above statement.  Therefore, the above quote confirms Plaintiff's accusation against Defenda(s) that Plaintiff's home had been under surveilance, ongoing without Plaintiff's consent, and that the Defendants are and had involvement with Business Associates in a Consiracy to Invade the Privacy of Plaintiff.

990.    A few days before, on Thursday or Friday before the holiday weekend, Plaintiff searched the Internet for  information about the a heinously insulting Calendar and for information about the company that created and distributed the Calendar, named "Surrounded by Asses" and "Ass Good Ass it Gets," after the movie "As Good as it Gets." Photographs appeared in the Calendar of a home which looked identical to that owned by the Plaintiff, among numerous other similarities, too many to be coincidental.  Plaintiff wrote to the company that "...I will sue ..."

991.    Is Plaintiff and the Court to believe that Craig Kilborne, Television Talk Show Host, is actually involved with the production of this amateurish, heinously insulting, degrading, unspeakably vulgar Calendar?

992.    During January, 2001, David Letterman had stated during the David Letterman Show  "How would you like to spend the Weekend watching 'Ma.'" Therefore, if this remark is taken into consideration with all the other activities described herein that have been perpetuated against Plaintiff, the conclusion that Defendants are and were "watching" Plaintiff in her home, that is, having had Plaintiff under Surveilance in her home, is easily arrived at.

993.    On January 2, 2003  the David Letterman Show re-ran an earlier showing that was aired during Thanksgiving week of the year 2002.  Remarks about "eating turkey" also had been made.  Plaintiff had been away during Thanksgiving week with family members and had not viewed any television.  Early in the program David Letterman  stated "lunatic, idiot, imbecile", totally irrelevant to other remarks having been made and undoubtedly directed against Plaintiff.

994.    During the first week of December, 2002 and upon Plaintiff's return to New Hampshire after Thanksgiving week, Craig Kilborne made the Statement

"<u>Handsome Rules</u>" on his late night television program. He looked directly at the camera and said nothing else before or after the remark. This statement ties Craig Kilborne in with the Advertising Agency of Handsome Brothers, Inc., of Massachusetts.

995.    During approximately 1998 or 1999, Plaintiff had been watching the "Howard Stern Show" on Late Night Television at about midnight. Vulgar or not, Plaintiff happened to have passed gas while watching Television. Howard Stern immediately and suddenly changed expression, and appearing very surprised, looked at his female co-host and stated "Did you just pass GAS?" Obviously, the reason for his astonishment was that he thought the sound came from his co-host. Howard Stern's co-host stated "No. I do not do such uncouth things." Howard Stern then immediately looked in a different direction from where his co-host had been sitting, looked directly at a Television Monitor which was, I believe, towards his left side and towards the front of the stage, so he could be able to see the screen, and stated "<u>IT MUST BE THE MONITOR. IS THE MONITOR TURNED ON?</u>"

996.    Plaintiff, shocked, became 100% aware for the first time that she was being Spied upon.

997.    All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

998.    Therefore, Plaintiff demands that the Court order Defendants to pay Plaintiff damages in the amount of Three Million Six Hundred and Ten Thousand ($3,610,000) Dollars because Defendants had been guilty of causing Plaintiff to suffer the above amount in financial damages due to Defendants' Harassment of Plaintiff and to Plaintiff's Family Members.

999.    Because Defendants actions had been willful, malicious, and deceptive, Plaintiff hereby demands the Court to order Defendants to pay Plaintiff treble damages, but in no event less than double damages, for a total amount of damages of Ten Million Eight Hundred and Thirty Thousand ($10,830,000) Dollars in damages due to Defendants' Harassment of Plaintiff and Plaintiff's Family Members, plus Interest, compounded annually, plus reasonable attorney fees plus court costs.

1000.   Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

## COUNT X

### INTERFERENCE OF QUIET ENJOYMENT

**1001.  Plaintiff realleges paragraphs    1  through 1000 above and incorporates them by reference as if stated herein.**

**1002.  Defendants were guilty of Interference of Quiet Enjoyment of Plaintiff  when Defendants recklessly and negligently committed illegal activities against Plaintiff, including publishing defamatory false accusations about the Plaintiff on television with the intention of Defendants having been to cause Plaintiff to suffer great financial and emotional loss, to humiliate Plaintiff, to riducule Plaintiff, and to cause Plaintiff loss of credibility in the eyes of Plaintiff's peers.**

**1003.  Defendants were guilty of Interference of Quiet Enjoyment of Plaintiff when Defendants recklessly, negligently, willfully, maliciously and deceptively made Statements on television during the David Letterman Show and during the Craig Kilborne Show which referred to the Plaintiff or to incidents of Plaintiff's life, or became involved in a Conspiracy to Invade Privacy of Plaintiff, among any and all other illegal activities perpetrated against Plaintiff.**

**1004.  The intention of Defendants in their perpetrating illegal activities against Plaintiff as described herein had been to cause Plaintiff to suffer great financial and emotional loss, to humiliate Plaintiff, to riducule Plaintiff, and to cause Plaintiff loss of credibility in the eyes of Plaintiff's peers.**

**1005.  The Defendants caused immeasurable Damage to the Plaintiff and to Plaintiff's life because Defendants illegally committed and were directly and indirectly responsible for Invasion of Plaintiff's Privacy and of Surveilance of Plaintiff and of all of Plaintiff's activities in Plaintiff's Home, car, home office and Painting Studio in Plaintiff's home, in addition to all environments  which Plaintiff had visited.**

**1006.  The Defendants' illegal activities were committed against the Plaintiff without Plaintiff's consent or permission, neither written, verbal nor implied consent or permission, and, in fact, without Plaintiff's actual knowledge for numerous years, were ongoing during numerous years, and continue to date.**

**1007.  Plaintiff had advised Defendants on numerous occasions, by several methods, including having made written requests, that Defendants discontinue perpetrating said illegal activities and involvement in said illegal activities against Plaintiff, all to no avail.**

**1008.  All herein activities of Defendants against Plaintiff or in regard to Plaintiff**

were illegal because Plaintiff is and was a private Individual and not a Public figure.

1009.   The Defendants illegal activities which the Defendants perpetrated against Plaintiff have cost innumeralbe millions of dollars of Financial Losses to Plaintiff, to Plaintiff's Family Members and to Plaintiff's Heirs, in addition to the Defendants having cost immeasurable amounts of Personal Losses to the Plaintiff.

1010.   If Defendants had not been guilty of Infliction of Emotional Harm against Plaintiff, and had not interferred in Plaintiff's life, had not caused Defamation of Character of Plaintiff, other illegal activities would not have been perpetrated against Plaintiff by individuals who had either been influenced by the Defendants or had been involved in a Conspiracy with the Defendants.

1011.   If Defendants had not been guilty of the above, Plaintiff and Plaintiff's family members would not have sufferred the very substantial financial losses as described herein.

1012.   The Defendants' illegal activities which they perpetrated against Plaintiff were particularly costly to Plaintiff in terms of Financial Losses to Plaintiff, and to Plaintiff's Family Members, during the years 1998, 1999, 2000, 2001, 2002, 2003 and 2004, and ongoing to this date.

1013.   The Defendants' Interference of Quiet Enjoyment of Plaintiff caused Plaintiff to suffer damages in the form of loss of Plaintiff's substantial Savings, Plaintiff having been forced to sell Plaintiff's commercial property in Middleborough, Massachusetts for some $200,000 less than fair market value, and caused Plaintiff to be forced to declare Bankruptsy which thereupon cost Plaintiff great further financial losses.

1014.   Because Plaintiff had been forced to declare Bankruptsy, although Plaintiff had equity in Plaintiff's commercial premises in the approximate amount of One Million ($1,000,000) Dollars, Plaintiff was in danger of losing 100% of Plaintiff's equity to foreclosure by order of the Bankruptsy Court.

1015.   Therefore, due to Defendants illegal activities perpetrated repeatedly against Plaintiff, due to the damage to Plaintiff that ensued, Plaintiff had been forced to sell the above referred to commercial premises for a least $200,000 less than it's fair market value, and probably greatly more than for $200,000 less than it's fair market value.

1016.   Defendants illegal activities against Plaintiff caused Plaintiff to lose One Hundred and Seventy-Five Thousand ($175,000) Dollars of her entire Saving from some thirty-five years of accumulated Equity of Two Hundred Thousand ($200,000) Dollars, leaving Plaintiff nearly penniless thereafter.

1017.  Defendants were again responsible for causing Plaintiff to lose an additional Sixty-Five Thousand ($65,000) Dollars within some six months, which amount represented Plaintiff's entire Saving which Plaintiff obtained through refinancing her property, leaving Plaintiff nearly penniless thereafter.

1018.  Plaintiff, thereupon, due to the above financial losses to Plaintiff, had been unable to improve and repair her two commercial properties, thereby causing Plaintiff to become unable to lease or to sell either of said premises in order to produce an income to Plaintiff.

1019.  Thereupon, Plaintiff had been forced to declare Bankruptsy.

1020.  Defendants illegal activities against Plaintiff caused Plaintiff's son to lose approximately Two Million ($2,000,000) Dollars in the Stock Market on approximately April 14, 2000 of his entire holdings of approximately Three Million ($3,000,000) Dollars, accummulated during some 10 years of difficult and intense labor.

1021.  Defendants illegal activities  against Plaintiff caused  Plaintiff's son to lose approximately Six Hundred Thousand ($600,000) Dollars of his remaining One Million ($1,000,000) Dollars within 6 months.

1022.  All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

1023.  All herein referred to Damages to Plaintiff and to Plaintiff's family members have been due to the Defendants being directly responsible for Invasion of Privacy of Plaintiff, for Harassment of Plaintiff in her home and commercial property, and for Defendants Involvement with Business Associates who committed Invasion of Privacy to Plaintiff's home and committed Harrassment of Plaintiff in her home and commercial property, among all other illegal activities perpetrated against Plaintiff.

1024.  Therefore, Plaintiff demands that the Court order Defendants to pay Plaintiff damages in the amount of Three Million Six Hundred and Ten Thousand ($3,610,000) Dollars because Defendants had been guilty of causing Plaintiff to suffer the above amount in financial damages due to Defendants' Interfernece of Quiet Enjoyment of  Plaintiff and to Plaintiff's Family Members.

1025.  Because Defendants actions had been willful, malicious, and deceptive, Plaintiff hereby demands the Court to order Defendants to pay Plaintiff treble damages, but in no event less than double damages, for a total amount of damages

of Ten Million Eight Hundred and Thirty Thousand ($10,830,000) Dollars in damages due to Defendants Interference of Quiet Enjoyment of Plaintiff and Plaintiff's Family Members, plus Interest, compounded annually, plus reasonable attorney fees plus court costs.

1026.  Plaintiff makes reference to and incorporates New Hampshire Laws Annotated, Federal Laws, U.S. Constitution, as applicable.

119

## COUNT XI

### INTELLECTUAL THEFT OF PLAINTIFF'S BOOK
#### caused by
### CONSPIRACY TO INVADE PRIVACY

**1027.  Plaintiff realleges paragraphs  1  through 1,026  above and incorporates them by reference as if stated herein.**

**1028.   Due to the direct or indirect willful and malicious Involvement of Defendants in a Conspiracy to Invade the Privacy of the Plaintiff, for Defendants' Infringements of Plaintiff's Constitutional Rights, for Defendants Harassment of the Plaintiff, Defendants' involvement with individuals who had been guilty of Breaking and Enterring into Plaintiff's Home, for Defendants' involvement with individuals who had been guilty of Theft of Contents from Plaintiff's Home, for Defendants' employment of  individuals who had been guilty of all other illegal activities described herein which were perpetrated against the Plaintiff, during the years of 1992, 1993, 1994, 1995, 1996, 1997, 1998 and 1999.**

**1029.   Plaintiff had also attempted to and been involved in writing a Book in which Plaintiff described  Defendants' illegal activities in regard to Defendants' Involvement in a Conspiracy to Invade the Privacy of the Plaintiff,  Infringements of Plaintiff's Constitutional Rights and Harassment of the Plaintiff.**

**1030.   For the fact that, immediately upon Plaintiff's typing of one Computer Disc of the above, said Computer Disc would thereupon be Stolen from Plaintiff's Home, regardless of Plaintiff's innumerable attempts to hide said Computer Disks in Plaintiff's home.**

**1031.   Because the Defendants had been guilty of Defamation of Plaintiff's Character, having done so during innumerable years, and because of the very substantial losses which Plaintiff had suffered as a Fine Arts Painter, Plaintiff had great difficulty emotionally and psychologically in attempting to complete the writing the herein referred to Book.**

**1032.   Because Defendants had been guilty, directly or indirectly, of Theft of numerous versions of Plaintiff's "Book," Plaintiff had great difficulty emotionally and psychologically in attempting to complete the writing the herein referred to Book**

**1033.   The dollar losses suffered by Plaintiff to Plaintiff's career as a writer, due only to the Statements made by Defendants in televised broadcasts, as referred to in Count I, as well as those referred to in other Counts herein,  is immeasurable.**

**1034.   The personal losses suffered by  Plaintiff to Plaintiff's career as a Writer,**

due only to the Statements made by Third Parties in televised broadcasts, as referred to in Count II, as well as those referred to in other Counts herein, is immeasurable.

1035. The above would not have occurred if the Defendants had not Invaded the Plaintiff's Privacy, had not been involved in a Conspiracy to Invade the Plaintiff's Privacy, had not Harassed the Plaintiff unmercifully for innumerable years and made thousands upon thousands of references to Plaintiff and to Plaintiff's life on television.

1036. Defendants caused Plaintiff to be unable to write Plaintiff's "Book" in her own Home, due to Invasion of Privacy, as well as all other illegal activities described herein in Complaint.

1037. Defendants caused Plaintiff to be unable to write Plaintiff's "Book", due to Defamation of Character caused by Defendants, as well as all other illegal activities described herein in Complaint.

1038. All illegal activities which had been perpetrated by Defendants which have been referred to herein, in addition to the Defamation of Character to Plaintiff, in both Libel and Slander which had been caused by the Defendants, have caused severe damage and destroyed Plaintiff's career as a Writer.

1039. Plaintiff herein stipulates that the NET proceeds which Plaintiff would have earned from the Sale of said Book would have arrived to a Total Amount of about Two Million ($2,000,000) Dollars, undeniably the Book would have become a Best Seller and in a short period of time due to the nature of the subject matter.

1040. Plaintiff therefore demands that this Court order Defendants to pay Plaintiff damages in the amount of Two Million ($2,000,000) Dollars due to repeticious activities of Defendants' of Theft of "Book" Computer Disks from Plaintiff's Home.

1041. Because Defendants were guilty of willful and malicious activities against Plaintiff, direct or indirect Involvement in a Conspiracy to Invade the Privacy of the Plaintiff, Infringements of Plaintiff's Constitutional Rights, Harassment of the Plaintiff, Breaking and Enterring into Plaintiff's Home, Theft of Contents from Plaintiff's Home, Interference with Plaintiff's Right to Earn a Living, among all other illegal activities described herein which were perpetrated against the Plaintiff, Plaintiff demands that the Court award Treble damages to Plaintiff, for a Total Amount of damages due to the above of Six Million ($6,000,000) Dollars.

1042. Because Defendants were guilty of willful and malicious activities against Plaintiff, direct or indirect Involvement in a Conspiracy to Invade the Privacy of the Plaintiff, Infringements of Plaintiff's Constitutional Rights, Harassment of the Plaintiff, Breaking and Enterring into Plaintiff's Home, Theft of Contents from